UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., individually and on behalf of the Armenian Genocide Museum and Memorial, Inc., | Civil File No. 07-1746 (RWR) |
| Plaintiff, | |
| v. | **PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION** |
| Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian and the Armenian Assembly of America, Inc., | <u>**ORAL ARGUMENT REQUESTED**</u> |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 65 and United States District Court for the District of Columbia Local Rule 65.1, The Cafesjian Family Foundation, Inc. ("CFF") moves this Court for a preliminary injunction enjoining Armenian Genocide Museum & Memorial, Inc. ("AGM&M") from (1) excluding CFF from AGM&M governance and (2) further planning and developing the museum and memorial without consultation with or input from CFF. The grounds for this motion are that actions taken by AGM&M without regard to CFF's status in the organization and in contravention of the charter documents and contractual obligations are ultra vires as well as relative applicable law.

As detailed in plaintiff's Memorandum of Points and Authorities in Support of its Application for Preliminary Injunction, the balance of equities favors injunctive relief because plaintiff will likely succeed on the merits and will suffer irreparable harm in the absence of an injunction. In addition, both the balance of harms and the public interest favor enjoining ultra vires corporate action. Unless this application for a preliminary injunction is granted, CFF will suffer immediate and irreparable harm.

Plaintiff requests oral argument.  The Court has scheduled an initial scheduling conference for December 19, 2007 at 10:30 a.m.  In the interest of efficiency and convenience to the Court, plaintiff requests that the Court schedule oral argument on the same day or on December 20.  As required by Local Rule 65.1, the reasons for expedition of this matter are detailed in the memorandum of law filed in support of this application.

Dated: November 27, 2007

**BRIGGS AND MORGAN, P.A.**


By:  s/ Molly M. Borg
      Timothy R. Thornton
      Molly M. Borg
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400
*Admitted Pro Hac Vice*
**AND**

**HOGAN AND HARTSON LLP**


By:    s/ Peter C. Lallas
        Ty Cobb (D.C. Bar No. 270736)
        Peter C. Lallas (D.C. Bar No.495944)
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

**ATTORNEYS FOR DEFENDANT THE CAFESJIAN FAMILY FOUNDATION**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

The Cafesjian Family Foundation, Inc.,
individually and on behalf of the Armenian
Genocide Museum and Memorial, Inc.,

        Plaintiff,

      v.

Armenian Genocide Museum and Memorial,
Inc., Hirair Hovnanian, Anoush Mathevosian,
Van Krikorian and the Armenian Assembly of
America, Inc.,

        Defendants.

Civil File No. 07-1746 (RWR)

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR
PRELIMINARY INJUNCTION**

---

## INTRODUCTION

Over the last decade, the parties had aspired to construct a fitting museum and memorial to honor the struggle of the Armenian people and the tragedy of the Armenian Genocide. The project reflected the collective dreams of Anoush Mathevosian and Gerard Cafesjian. Cafesjian, through his nonprofit corporation, the Cafesjian Family Foundation ("CFF") and Mathevosian collaborated with the Armenian Assembly of America, Inc. ("Assembly"), the Armenian National Institute ("ANI") and other supporters to promote the undertaking. An independent entity – the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") – was ultimately created to raise funds and develop the venture.

The parties envisioned that the AGM&M would become a focal point for advocating the universal affirmation of the Armenian Genocide as well as an Armenian gathering place in the heart of this nation's capital. Everyone agreed, no second rate undertaking could fulfill that purpose or do justice to the cause. The edifice was intended to make the visiting and viewing public unmistakably aware of the Armenian people and the atrocities committed against them.

Committed to this important cause, CFF pledged and donated in excess of $17.5 million in money and real estate – by far the largest contribution.  CFF's generous support is conditioned on the Assembly and AGM&M's assent to and compliance with various contractual obligations – including specifically CFF's participation in all material decisions regarding museum and memorial development.   In recognition of this entitlement, CFF is empowered to appoint representatives to the AGM&M Board of Trustees – the body charged with corporate oversight.

Beginning in May 2007, defendants – the non-Cafesjian AGM&M trustees – deliberately excluded CFF from all project decisions.  In the absence of proper corporate authority and in disregard of overarching contractual and fiduciary duties, defendants embarked on a stratagem that contravenes AGM&M's stated purpose as well as its founding aspirations – especially those of Cafesjian and CFF.

Rather than pursuing a development with a commanding presence – occupying five parcels of property and encompassing over 100,000 square feet of space – some AGM&M trustees have initiated a course of action that would result in a mediocre gallery that would be substantially unalterable and exhibit space deficient.  Since the dwarfed development would be limited to a single plot, AGM&M apparently intends to sell the four adjacent properties, even though these properties were donated by Cafesjian to house the superior museum and memorial. The unjustified banishment of CFF from AGM&M governance and the paltry development plan cannot be countenanced.

Unless this Court intervenes to maintain the status quo, CFF – and most notably AGM&M – will suffer immediate and irreparable harm.  Without an injunction, AGM&M will continue to exclude CFF from museum and memorial planning and development, will construct a museum that flouts AGM&M's founding mission as well as donor intent and will sell real estate

that was acquired exclusively for museum and memorial purposes. This Court should enjoin AGM&M from further action without CFF involvement and maintain the status quo pending resolution of the merits of this action.

## BACKGROUND

A.    **The Parties**

CFF brings this action individually, in its capacity as an initial donor with trustee appointment power, to enjoin the unauthorized action of a rump group and derivatively on behalf of AGM&M to hold that group to the terms of AGM&M's charter documents and enabling agreement. At the center of this dispute is a contractual relationship between CFF and the Assembly and the significant charitable donations made by CFF to provide a place for AGM&M to be built.

AGM&M is a D.C. nonprofit corporation that was created for a singular purpose – namely to "own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide" and "to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide." (Verified Compl. ¶ 29.) AGM&M was incorporated in October 2003 and is governed by a board of trustees. (*Id.* ¶ 10.) AGM&M trustees are appointed by supporters of the project who contribute $5 million or more. (*Id.* ¶ 12; *id.* Exs. B, C.) The board currently comprises six votes. (*Id.* ¶ 12.)

CFF is a non-profit corporation dedicated to charitable, religious, scientific and educational purposes; Cafesjian is the president and a director. (Waters Aff. ¶¶ 3, 5.) CFF is particularly committed to promoting the Armenian community and Armenian causes. (*Id.* ¶ 3) CFF has made substantial contributions of money and services to the Assembly and AGM&M. To date, CFF has provided in excess of $17 million in cash and pledges and has funded over $14.5 million (plus an additional $500,000 interest free loan) for the benefit of AGM&M.

(Verified Compl. ¶ 13.)  In recognition of this unparalleled support, CFF is entitled to appoint AGM&M trustees and controls three of the six votes.  (*Id.* ¶13; *id.* Exs. A – C.)  From October 2003 until 2006, Cafesjian was AGM&M chairman and president.  (Waters Aff. ¶¶ 27-28.)  From 2003 until May 2, 2007, Cafesjian was the CFF-designated trustee.  (*Id.*)

The Assembly is a non-profit advocacy organization that solicits charitable contributions from around the country and drums up support among national, state and local governments, organizations, and constituents.  The Assembly controls one AGM&M trustee vote.  (Verified Compl. ¶ 16.)  Defendant Van Krikorian is legal counsel to the Assembly, an Assembly Life Trustee and the currently designated Assembly AGM&M trustee.  (*Id.*)

Defendant Hirair Hovnanian is the chairman of the Assembly board and an Assembly Life Trustee.  By virtue of his commitments – a $5 million pledge for the benefit of AGM&M (yet to be fully funded) – Hovnanian controls one AGM&M trustee vote.  (*Id.* ¶ 14.)

Defendant Anoush Mathevosian is an unaffiliated patron who helped conceive AGM&M and whose contribution facilitated the acquisition of the initial project site.  In honor of her founding role, Mathevosian is vested with one trustee vote.  (*Id.* ¶ 15.)

B.    **The AGM&M Dream**

The impetus for the AGM&M was a consolidation of Cafesjian's vision for a commanding commemoration of the Armenian Genocide and desire to establish a gathering place for the Armenian community, Mathevosian's yearning to create a genocide museum, and the Assembly's support for the universal affirmation of the Armenian Genocide.  (Waters Aff. Ex. 1.)

About ten years ago, the Assembly – through Hovnanian – began soliciting Cafesjian's support for an Armenian-American landmark.  (*Id.* ¶ 7.)  Aware of Cafesjian's significant wealth, philanthropic reputation and personal interest in the cause – his grandparents perished in the

genocide – the Assembly targeted Cafesjian to underwrite project initiation. (*Id.*) Together, CFF, Mathevosian and the Assembly wanted to engender a historical and culturally significant public institution. (*Id.* ¶ 8.) The obvious first step was the acquisition of land.

The project slowly gained momentum. In January 2000, Assembly representatives located a potential site: the former National Bank of Washington, located at 14th and G Street in Washington D.C. (*Id.* ¶ 10.) The building's size and price tag were significant. Mathevosian pledged $3,500,000, and CFF matched that contribution and loaned an additional $500,000 interest free to enable the Assembly to buy the property. (*Id.* ¶ 11.) In fact, CFF originally advanced the entire $7,500,000 purchase price to be paid back $3,500,000 when Mathevosian funded her pledge. (*Id.*)

CFF Vice President John Waters spearheaded the deal by conducting due diligence and negotiating the purchase agreement. (*Id.* ¶ 10.) Time was of the essence – another party had already submitted a substantial bid. (*Id.*) In a matter of days, Waters successfully completed the requisite research and thorough inspections that ordinarily would have consumed months. The bank building site was secured due to Waters' efforts and Cafesjian's money.[1]

As the land was being assembled, the Assembly formed the AGM&M Planning Committee – a group mustered by the Assembly and staffed with Assembly, ANI, and major donor representatives. (*Id.* ¶ 13.) The committee was charged with preparing a development

---

[1] After the closing and anticipating that the project would exceed the bank building's boundaries, Cafesjian endeavored to secure additional real estate. From March 2000 through October 2000, Cafesjian, through his TomKat Limited Partnership, purchased and contracted to purchase three adjacent properties: 1338 G Street; 1342 G Street and 1340 G Street. (*Id.* ¶ 14.) The fourth plot, located at 1334-36 G Street, was secured in September 2003. (*Id.*)

Initially, Cafesjian contemplated developing an art museum on these properties in conjunction with the museum and memorial. As time progressed and expert advice confirmed that the bank building would be insufficient to house the museum and memorial, Cafesjian willingly made this real estate available so that AGM&M's founding vision could be realized. (*Id.*)

plan and a fundraising campaign. (*Id.*) The committee met numerous times throughout 2000, but accomplished almost nothing. (*Id.*)

In early 2001, Ross Vartian, the Assembly's executive director, became the project director. (*Id.* ¶ 16.) Vartian worked closely with Waters and Edele Hovnanian (Hovnanian's daughter) to prepare a timeline, draft budget and list of potential consultants. (*Id.*) These materials were to be considered at the Assembly's March 2001 annual meeting. During the fifteen-minute presentation – the wholly insufficient time that was allotted for this important subject – the report was unilaterally rejected by Hirair Hovnanian. (*Id.* ¶ 17.)

In April 2001, the committee decided to commission a master plan and feasibility study. (*Id.* ¶ 18.) By then, it was clear that additional property would be needed to bring to fruition a museum and memorial with stature befitting of the cause. Two different teams – each consisting of real estate project management, architectural, and museum content experts – submitted bids. (*Id.*) Inexplicably, the Assembly declined to act on the committee's recommendation. (*Id.*) In the wake of Assembly dithering, the project languished.

Recognizing the Assembly's unwillingness or inability to give the project the attention it deserved, in early 2002, CFF, Mathevosian and the Assembly determined that the museum and memorial would stand the best chance of success under the auspices of a stand-alone nonprofit corporation. Although not a novel proposition – the idea had been repeatedly explored – everyone finally agreed that a separate entity, with an independent board, new donors and broader community involvement would enhance development prospects. (*Id.* ¶ 19.)

Among other things, the project scope and budget had outgrown the Assembly's means. The museum project only had $200,000 in the bank with no fundraising or development plan in sight. (*Id.* ¶ 20.) The need for such strategies was compelling because the experts had

unanimously advised that the bank building's National Historic Register designation limited structure use and modification. (*Id.*) As a result, the alterations required to afford appropriate exhibition space would be prohibited within the bank footprint. (*Id.*) More land was needed; changes had to be made.

In July 2002, while the new entity was under consideration, the Assembly hired Concord Partners, a Washington-based project-management firm, to oversee project management and development, including the selection of an architect and museum designer. (*Id.* ¶ 21.) In October 2002, ANI executive director Rouben Adalian and Gallagher and Associates, a museum design firm, met with the experts to discuss museum and memorial mission, content and potential exhibits. (*Id.* ¶ 22.)

In November 2002, Concord Partners distributed an initial design brief and request for qualification to over 60 national and international architectural firms. (*Id.*) From these professionals, finalists would be selected to participate in a design competition. (*Id.*) Concord Partners received approximately 30 responses, but without direction from the Assembly, no action was taken. (*Id.*)

In February 2003, at the annual meetings of both ANI and the Assembly, a report regarding museum and memorial planning was slated for consideration. (*Id.* ¶ 23.) Again, Hovnanian spurned the presentation without discussion. (*Id.*) Once again, no action was taken.

Fortunately, nine months later, the Assembly finally surrendered control over museum and memorial development to a newly created and independent entity. (*See* Verified Compl. Exs. A-B.)

## C. **The AGM&M, Inc. is born**

In October 2003, the AGM&M came into being. (*Id.*) To make the incorporating intent possible – the creation of a significant structure with a commanding presence sited on

appropriate real estate – Cafesjian pledged the four adjacent properties that had been acquired (through TomKat) for the exclusive benefit of the "Armenian Genocide Museum and Memorial." (*Id.* Ex. C.)  This commitment was reflected in a conditional grant of $12.85 million.  (*Id.*)  At the same time, Hovnanian pledged $5 million.  (*Id.*)

For its part, the Assembly promised to transfer all of the assets and outstanding pledges that had been made previously for the benefit of the undertaking.  Brothers Sarkis and Nishan Kechejian were in for $1 million, James Keshishian and Edgar Hagopian contributed valuable Armenian carpets, and other donors came up with over $200,000.  (Waters Aff. ¶ 24.)  In total, AGM&M was launched with $27.5 million in assets, funded grants and pledges.  (*Id.*)

The founding intent clearly and undisputedly envisioned a development that would utilize the bank building and the four of the adjacent properties, which had been donated by CFF.  In fact, AGM&M's October 31, 2003 Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code states that all of the land – five parcels total – would be used "to house the museum and memorial."  (Borg. Aff. Ex. 10 at Statement in Support of Application for Exempt Status at 1-3.)

The transfer of assets from the Assembly to AGM&M provided the resources that enabled the AGM&M to take title to the land "that will eventually be the site of the museum [and memorial] in Washington D.C."  (*Id.* at 3.)  (See Verified Compl. Ex. C.)  Founding intent was clear:  the parties wanted to make a significant statement dedicated to the Armenian people and the memory of their suffering.  To accomplish that goal, the bank plus the four adjacent lots would be needed.

1.  <u>The Contracts</u>

To document the various AGM&M-related commitments, on November 1, 2003, the Assembly on the one hand and Cafesjian and CFF on the other executed the Grant Agreement.

(Verified Compl. Ex. C.)  The Grant Agreement reaffirmed the terms and conditions of the initial 2000 grant and added a new conditional pledge in excess of $12.85 million for the benefit of the newly formed AGM&M.  (*Id.*)  The Assembly agreed that the funds from the new pledge would be used to facilitate the transfer of the four adjacent properties from TomKat to AGM&M.  (*Id.*)  This real estate would never be conveyed to the Assembly; rather CFF's contributions would allow the Assembly to acquire the property on behalf of AGM&M.  (*Id.*)

That acquired land could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of the Armenian Genocide Museum & Memorial, Inc. (the "Plans")."  (*Id.* § 3.1.)  If the project was not completed prior to December 31, 2010 pursuant to trustee-approved plans or if the property was not developed in substantial compliance with such plans, then at the donors' "sole discretion," either the funds or the real estate would revert to CFF and Cafesjian.  (*Id.* § 3.1(B).)

The Grant Agreement imposed specific obligations requiring the Assembly to:

> (A)    make available in the Grant Property space acceptable to [CFF] for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,0000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by [CFF];

> (B)    cooperate with the design firms, artists and others selected by [CFF] to design and ensure the successful completion of the Memorial;

> (C)    permit [CFF] to participate in all material decisions regarding the Memorial;

> (D)    operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by [CFF] in writing;

> (E)    be solely responsible for the costs of maintaining the Memorial; and

> (F)    name the Memorial the "Gerard L. Cafesjian Memorial" or
> another name approved by [CFF] in writing.

(*Id.* § 3.2.)

In the event the Assembly "fails to use the Grants solely for the purposes set out in [the

Grant] Agreement or if the Assembly fails to satisfy any of the conditions of [the Grant]

Agreement, [CFF and Cafesjian are] released from any remaining obligation under this

Agreement to provide funds or property to the Assembly." (*Id.* § 3.9(A).)  "If the Assembly uses

any portion of the Grants either for a purpose other than those set out in [the Grant] Agreement .

. . the Assembly shall repay the portion of the Grants so spent to [CFF and Cafesjian], plus

interest." (*Id.* § 3.9(B).)   Further CFF and Cafesjian retained all other legal and equitable

remedies. (*Id.* § 3.9(C).)

CFF's extraordinary donations were made for the benefit of the museum and memorial

because the parties had finally agreed that a separate entity would take over the project and

because the parties realized that a proper monument would require more square footage and

more flexibility than the bank building could afford.  The Grant Agreement called for Cafesjian,

CFF and the Assembly to incorporate this independent entity.  (*Id.* §§ 5.1-5.2.)

After inking the Grant Agreement, the Assembly executed a contract with the newly

formed AGM&M.  Pursuant to that agreement the Assembly covenanted to transfer "all of its

right, title, and interest in and to all cash, pledges, real property, tangible property, intangible

property, and other assets" that had been contributed to or held by the Assembly for the

development, renovation and construction of the museum and memorial.  (*Id.* § 5.3.)

The Assembly and AGM&M alone entered into the Transfer Agreement.  "In order to

complete the building of the Armenian Genocide Museum and Memorial," the Assembly

undertook to "transfer all of its real property, pledges, cash, and other assets acquired for the

purpose of building the AGM&M to AGM&M, Inc." (Verified Compl. Ex. E at 1.) AGM&M in turn agreed to honor the Assembly's Grant Agreement obligations. (*Id.* §§ 1.2, 1.3.) Notably, unlike the Grant Agreement, the Transfer Agreement obligated the Assembly and AGM&M to arbitrate disputes pertaining to the transfer of assets. (*Id.* § 5.3.) Importantly, nothing in the Transfer Agreement purports to diminish the legal and equitable remedies that CFF and Cafesjian expressly retained pursuant to § 3.9 of the Grant Agreement.

  2. <u>AGM&M Governance</u>

  AGM&M is a creature of its articles of incorporation and subject to its by-laws. The trustees adopted the governing by-laws on October 30, 2003. (Verified Compl. Ex. B.) AGM&M has no members, but the trustees constitute the board of directors for District of Columbia Nonprofit Corporation Act purposes. (*Id.* § 2.2; *id.* Ex. A at Art. V.) The initial trustees – who collectively exercised six votes – were Cafesjian, Hovnanian, Mathevosian and on behalf of the Assembly, Robert A. Kaloosdian.[2] (*Id.* Ex. A at Art. IX.) "The term of office of an initial Trustee shall be perpetual." (*Id.* Ex. B § 2.4.)

---

[2] Because Cafesjian had almost single-handedly funded AGM&M, CFF was allocated three trustee votes. Hovnanian, who made a pledge of $5 million – but as of September 2006, had only funded $1.5 million – was afforded one trustee vote. Anoush Mathevosian, who contributed the founding $3.5 million, was granted one vote. (*See* Verified Compl. Exs. A-B.) Although the Assembly had contributed nothing and accomplished less during the previous three years, Hovnanian and the Assembly refused to create AGM&M unless the Assembly was conceded one vote. (Waters Aff. ¶ 25.)

Arguments about CFF improperly holding three votes are disingenuous. The by-laws provide that trustee votes, with the exception of Mathevosian and the Assembly, are awarded based on each $5 million contribution for the benefit of AGM&M. (Verified Compl. Ex. B. §§ 2.4, 2.5.) The parties understood that a pledge was equated with a contribution. CFF has indisputably contributed cash and pledges in excess of $17.85 million. In comparison, while pledging $5 million, Hovnanian's funded contributions as of September 2006 amount to less than $2 million. No one, however, challenges his entitlement to cast one vote. And, until the current dispute, CFF's control over three votes has never been questioned.

Action of the AGM&M board "shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  (*Id.* Ex. B § 2.7.)  A quorum is convened when at least one-half of the aggregate eligible votes are present at a validly called board meeting.  (*Id.* § 2.6.)  Trustee meetings must be properly noticed.  (*Id.* § 2.14.)

The by-laws provide for resignation and removal of trustees:

> Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal.  Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.
>
> * * *
>
> Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote . . . <u>Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee.</u>  The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, <u>shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason</u>.

(*Id.* § 2.17 (emphasis added).)  Thus removal of a specific trustee does not extinguish the donor's franchise.  As the major AGM&M contributor, CFF indisputably retains the right to participate in and designate trustees to vote on all board decisions.

### D.    AGM&M Progress Continues to Meet Resistance

Following AGM&M's incorporation, all concerned hoped that the project would finally get off the ground.  Cafesjian for one accepted his obligation to further AGM&M's corporate

purpose of bringing the museum and memorial into reality.[3]   At a June 2004 board meeting, Cafesjian proposed that an architect be selected.  (Waters Aff. ¶ 32.)  Cafesjian suggested two options:  (1) reinitiate the architectural design competition that had been squelched in 2001; or (2) select a single architect to develop the design.  (*Id.*)  Hovnanian and Assembly trustee, Robert Kaloosdian, stymied that proposal.  (*Id.*)  Without an 80% affirmative vote, no action could be taken.  Consistently, neither Hovnanian nor Kaloosdian offered any alternatives for moving forward.

Cafesjian nevertheless persevered – after all AGM&M existed to construct the museum and memorial, and trustees were obligated to fulfill that purpose.  Greater traction would be needed to overcome the obstacles created by Hovnanian and the Assembly, so Cafesjian personally commissioned the services of a passionate young architect, Edgar Papazian.  (*Id.* ¶ 33.)  Since all major expenditures required board approval, CFF paid Papazian.  (*Id.*)  Cafesjian intended to present Papazian's concepts to the board in hopes of sparking progress.

Cafesjian's magnanimous efforts backfired.   At a February 2005 trustee meeting, Papazian, at Cafesjian's request, proposed a design.  (*Id.* Ex. 34.)  Hovnanian erupted in a fit of anger.  (*Id.*)  CFF's generosity – commissioning a design without burdening AGM&M – went for naught.  Instead, Hovnanian and the Assembly ridiculed Papazian and disavowed everything. (*Id.*)

It soon became obvious that Hovnanian and the Assembly would block any Cafesjian proposal.  Hovnanian apparently could not stand the prospect of Cafesjian receiving credit for

---

[3]    As AGM&M had no employees, Cafesjian generously provided CFF personnel to conduct AGM&M's day-to-day affairs.  (Waters Aff. ¶ 30.)  From 2003 until September 2006, all AGM&M management and administration functions were conducted from CFF's offices in Minneapolis.  (*Id.* ¶¶ 30-31.)  None of the trustees objected to CFF's generosity or its staff's execution of AGM&M's business.  (*Id.* ¶ 31.)

making AGM&M a success. Not to be dissuaded and consistent with the obligations of a trustee, Cafesjian proposed that an outside consultant be retained to prepare a preliminary development plan. (*Id.* ¶ 35.) The trustees – including incredibly Hovnanian and his Assembly minion – finally agreed to something.

The consultant reviewed AGM&M corporate documents, sought expert input, explored community interest and involvement and produced a preliminary plan, which was presented to the board in late August 2005. (*Id.*) The proposal embodied the broad, bold and expansive vision that AGM&M was founded to bring into being, as was called for by the corporate documents. The project budget was estimated at $150 million. (*Id.*)

Even though the board seemed to endorse the recommendations, the struggle continued. Cafesjian believed that the community would rally behind this important endeavor, but Hovnanian and the Assembly were pessimistic. Again nothing was decided – and without a plan, fundraising would get nowhere. (*Id.* ¶ 36.) Without resources, design and development plans were impossible. The project remained at an impasse.

Undaunted, Cafesjian tried one more time. In April 2006, he proposed that Papazian be retained as design architect. (*Id.* ¶ 37.) Cafesjian also advocated the formation of advisory and honorary boards in order to expand community involvement and to spur fundraising. Cafesjian – subject to board approval – solicited potential participants who supported the proposal. (*Id.*) Not about to let anyone steal the spotlight in the community, Hovnanian and his pawn, the Assembly trustee, nixed this idea. Neither suggested any options, and no decisions were made. (*Id.*)

The board waned into a hopeless malaise: the Hovnanian-controlled trustees consistently rejected anything put forth by Cafesjian. If he said it, they were against it. Yet Cafesjian was the only one urging any progress.

In May 2006, Cafesjian offered to withdraw in hopes of breaking the deadlock. (*Id.* ¶ 38.) The offer went unanswered. (*Id.*) In the meantime, AGM&M ran out of money – CFF had continually stepped up to meet AGM&M's current obligations while the other trustees did nothing except thumb their noses. (*Id.*) In September 2006, Cafesjian resigned as AGM&M chairman and president. (*Id.* ¶ 39; *id.* Ex. 2.) By stepping aside Cafesjian hoped that the project could be freed of petty jealousies and finally succeed. Unfortunately, Cafesjian's gesture did not produce the desired effect.

### E. CFF is ostracized

On August 31, 2007, AGM&M announced that Phase I contracts for the project had been awarded to two design firms and that the development would only occupy the bank site. (Verified Compl. ¶ 19.) More recently, a design plan was unveiled, and goals for a newly named "Armenian Genocide Museum of America" were announced. (Borg Aff. Exs. 11-12; Waters Aff. Exs. 7-8.)

These decisions were purportedly made at or following a May 7, 2007 AGM&M board meeting. (Verified Compl. ¶ 27.) Waters, the newly elected CFF designated trustee,[4] Hovnanian, Mathevosian and the Assembly's new designee, Van Krikorian, convened the May 7 meeting. (*Id.* ¶¶ 21-21.) Waters attended the meeting by telephone. (Waters Aff. ¶ 41.) From the outset, Krikorian, a lawyer, relentlessly grilled Waters about a litigation between the

---

[4]     On May 2, 2007, Cafesjian stepped down as the CFF representative to the AGM&M board, and CFF appointed Waters as the new elected trustee. Ross Vartian was designated CFF's successor trustee. (Waters Aff. ¶ 40; *id.* Ex. 3.)

Cafesjian interests and the Assembly – a lawsuit that was unrelated to the noticed agenda. (Verified Compl. ¶ 23.)  Waters, without counsel present, declined to be cross-examined.  (*Id.*) In response to that silence, Krikorian charged Waters with a conflict of interest and demanded that the CFF interests be excluded from further participation "in discussions on proposals on how to develop the museum." (*Id.* ¶ 24; Waters Aff. Ex. 4 at 12.)

Krikorian's obviously pre-plotted motion to blackball CFF was eagerly seconded by Hovnanian. (Waters Aff. Ex. 4 at 12.) Mathevosian did <u>not</u> vote. (*Id.*) Although Waters, as the CFF-designee, cast three votes in opposition to the motion, Krikorian decreed that Waters had no say.[5] (*Id.*) Waters objected to the exclusion and requested an adjournment. (*Id.*) In the face of Krikorian and Hovnanian's unilateral refusal to allow the meeting to proceed in CFF's presence, Waters excused himself under protest. (Verified Compl. ¶ 24.)

Apparently, the meeting continued after Waters was ejected. (*Id.* ¶ 27.) Without proper authority, the board purportedly delegated all AGM&M development authority to a planning and building committee that had just been contrived.[6] (*Id.*) This committee has since purported to initiate a bank-site-only museum-only development. (Borg Aff. Exs. 11-12; Waters Aff. Exs. 7-8.) The newly unveiled plans make no mention of the four adjacent properties or the memorial.

---

[5]     Assuming Waters was not empowered to vote on Krikorian's expulsion motion, the record shows that only 2 of the remaining 3 trustees voted in favor of expelling CFF. (Waters Aff. Ex. 4 at 12.) Thus Krikorian's motion to exclude CFF only drew a 67% support – not an 80% vote of the quorum required by the by-laws.

[6]     CFF has requested a full transcript of the May 7, 2007 meeting. (Waters Aff. Ex. 5.) Despite repeated demands, AGM&M has only produced a transcript of that portion of the meeting, during which Waters was present. (*Id.* Ex. 4.) Hence, the rest of the board's so-called actions were rendered in secret after the representative of the AGM&M's major donor had been banished. The Hovnanian puppets' refusal to produce a record of their actions to the AGM&M's biggest supporter speaks – indeed screams – volumes about their skullduggery. What do they have to hide? Clandestine proceedings of charitable organizations rarely pass fiduciary muster.

(*See id.*)  AGM&M apparently intends to sell the non-bank properties and "downsize" the whole project "to just be the old National Bank Building."  (Borg Aff. Ex. 9.)

On October 31, 2007, AGM&M – without the knowledge of or approval by the CFF trustee – announced the retention of an architect and the museum planner for Phase Two work. (Waters Aff. Ex. 7.)  At the Assembly's November 3 annual gala, Edele Hovnanian, on behalf of the Assembly – not AGM&M – trumpeted that the Assembly would be developing a museum and revealed preliminary plans for the re-christened "Armenian Genocide Museum of America," confirming that some sort of dwarfed development was taking shape on the bank parcel.  (Borg Aff. Exs. 11-12.)

The Cafesjian interests have not been included in any decisions pertaining to the now apparently memorial-less museum since the unauthorized ouster of Waters from the May 7, 2007 meeting.  (Waters Aff. ¶ 48.)  If further board meetings have been conducted, neither CFF nor Waters have been informed.  (*Id.*)  Alternatively, all board authority has been usurped by a renegade planning committee that appears to be answerable to no one.  To protect AGM&M's purpose and the right to participate in AGM&M decision-making, CFF filed this action in September 2007.[7]

## ARGUMENT

## I.    STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenish*, 451 U.S. 390,

---

[7]    There are three other potentially related lawsuits pending in this district and the District of Minnesota:  (1) *Cafesjian v. The Armenian Assembly of America, Inc.*, 07-2079 (D. Minn) is an action against the Assembly for breach of the Grant Agreement; (2) *AGM&M v. Cafesjian Family Foundation, Inc.*, 07-1259 (D.D.C.) is a quiet title action by the AGM&M against CFF; and (3) *Waters v. AGM&M*, 07-4212 (D. Minn.) is an action to enjoin arbitration.  All of this litigation is ongoing.

395 (1981).  "To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

"A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.*  "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Preliminary injunctions are available to maintain the status quo pending resolution of the merits.  *See*, *e.g.*, *Omar v. Harvey*, 416 F. Supp. 2d 19, 22 (D.D.C. 2006).  If the case raises questions "going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for more deliberative investigation . . . courts should eschew an exaggeratedly refined analysis of the merits at an early stage of the litigation." *Id.* (internal quotations omitted); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977). "This is particularly true when the moving party seeks to maintain the status quo pending a final determination of the merits." *Omar*, 416 F. Supp. 2d at 22.  Maintaining the status quo is called for when "[t]here is substantial equity, and need for judicial protection, whether or not [the] movant has shown a mathematical probability of success." *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844.

## II.     THE BALANCE OF EQUITIES SUPPORTS INJUNCTIVE RELIEF

### A.     Likelihood of Success on the Merits

A non-majority of the trustees have highjacked AGM&M development without regard to corporate authority or governance procedures.  It bears repeating that AGM&M exists for a singular purpose:  the creation of a museum _and_ memorial to honor the Armenian people and to remember the slaughter of so many at the hands of the Turks.  Despite CFF's dedication to and support of the project probably two, but no more than three, trustees have unilaterally and unlawfully excluded the CFF-designated trustee from board participation.  AGM&M decisions made without regard to the CFF trustee's three votes contravene the by-laws, rendering such actions null and void.

"A corporation acts 'ultra vires,' or beyond its power, when it acts in an area outside the scope of the power allowed by its charter or statute." _Wolgin v. Simon_, 722 F.2d 389, 393 (8th Cir. 1983); _see also_ D.C. Code § 29-301.06 (a director may seek to enjoin the corporation from taking actions that are beyond corporate power or capacity).  "Generally, meetings of a corporation or association should be conducted in compliance with the constitution and bylaws.  Only votes taken in compliance with these rules can effect binding actions." _Nat'l Dev. Co. v. Trusteeship of Woodland Lakes_, 643 F. Supp. 561, 563 (E.D. Mo. 1986).

The _Higginsville Memorial Post 6270 v. Benton_ court set aside the ultra vires action of a not-for-profit corporation.  108 S.W.2d 28 (Mo. Ct. App. 2003).  The Bentons and the VFW post entered into a sale of real estate contract that allowed the post to repurchase the property at a later date. _Id._ at 31.  The Bentons refused to honor the repurchase attempt because the option had not been exercised in accordance with the post's internal procedures and by-laws. _Id._

Specifically, the VFW failed to obtain the by-law-required two-thirds approval. _Id._ at 33-34.  As a result, the attempt to exercise the repurchase option was ineffective; accordingly the

post's actions were ultra vires. *Id.*; *see also Lake Arrowhead Property Owners Assoc. v. Bagwell*, 100 S.W.2d 840 (Mo. Ct. App. 2003) (setting aside amendments to property association's restrictive covenants for lack of requisite quorum); *Melissa Industrial Develop. Corp. v. N. Collin Water Supply Corp.*, 316 F. Supp. 2d 421 (E.D. Tex. 2004) (preliminary injunction issued because nonprofit water corporation failed to comply with by-laws).

*Owen v. Board of Directors of Washington City Orphan Asylum* shows the way for this Court. 888 A.2d 255 (D.C. 2005). The *Owen* board of directors sued the corporation's board of trustees charging that the trustees had breached fiduciary duties, acted arbitrarily and capriciously, diverted and converted corporate assets and acted ultra vires. *Id.* The orphan asylum, originally founded by Dolly Madison, was later incorporated by a 1828 Act of Congress that created a dual-board governance structure. *Id.* at 258-59. Pursuant to the charter documents, the directors managed the internal affairs of the corporation and the trustees managed the corporate property and endowments. *Id.* at 259.

From 1828 until 2000, the two boards cooperated to further the institution's charitable endeavors. *Id.* Things changed, however, in 2000 when the trustees purported to repeal the charter documents and enact new by-laws that disenfranchised the directors. *Id.*

The directors disputed their ouster and filed suit. *Id.* The directors, who had standing by virtue of directorship status and because of their specific charter document responsibilities, prevailed. *Id.* at 257, 260. The trial court, relying on the governing documents, vindicated the directors and enjoined "the Trustees from: (1) exercising unilateral authority; (2) withholding funds from [the corporation's] charitable operations; (3) diverting [corporate] funds to other charities without the Director's concurrence; and (4) acting on behalf of the organization without the concurrence of the Board." *Id.* at 261.

The appellate court affirmed, concluding that the trustees lacked the plenary authority they sought to exercise – the charter documents and legislative intent contemplated a dual-governing board. *Id.* at 261-67. The elimination of the directors' role was therefore ultra vires. *Id.* at 267.

Like in *Higginsville* and *Owen*, AGM&M's charter documents mandate the protocol for exercising corporate authority. AGM&M's by-laws require that corporate actions be approved by an 80% vote of a proper trustee quorum. (Verified Compl. Ex. B § 2.6.) If all six votes are present, proposed actions must garner five votes. If only three votes are present, then a board decision requires the affirmative support of all three votes.

Removal of a trustee requires "the unanimous affirmative vote" of the quorum. (*Id.* § 2.17.) Such removal, however, does not vitiate the donor's franchise. Upon removal of the trustee, the donor or the appointed successor becomes the designated trustee. (*Id.*) Thus even if the board disqualifies a particular trustee, the donor's rights to appoint a successor and continue to participate in corporate affairs are not extinguished. (*See id.*)

The May 7, 2007 meeting had been properly noticed and convened. There was no mention in the meeting notices, however, that any trustee would be challenged. (Verified Compl. Ex. D.) Accordingly, the CFF delegation attended unprepared for a conflict of interest debate and unrepresented by counsel. All six trustee votes were present. Troublingly, under the circumstances one trustee was a lawyer; another was accompanied by her lawyer.

When Waters declined to be interrogated without advice of counsel about legal proceedings that were unrelated to the noticed agenda, two votes unilaterally decreed that CFF should be precluded from participating and improperly expelled Waters from the meeting. This

ostracism failed to comply with AGM&M's by-laws: only two of the six trustee votes – and two of the three non-CFF trustee votes – approved. (Waters Aff. Ex. 4 at 12.)

If that were not enough, the exclusion could not constitute a proper removal; only two of the three non-CFF Trustees voted – removal requires unanimous approval of the quorum. (Verified Compl. Ex. B § 2.17.) Thus the purported ejection of CFF interests contravened AGM&M's by-laws and was therefore ineffective. *See, e.g., Higginsville Mem. Post*, 108 S.W.2d at 33; *Owen*, 888 A.2d at 257.

But for the purported ouster of Waters, CFF controlled votes could have and would have participated in the remainder of the May 7 meeting. (Waters Aff. ¶ 43.) If the CFF-designee had been present, the quorum would have been six votes. A meeting so constituted would have required the affirmative vote of five trustees.

Without CFF's votes, the remaining trustees failed to muster the requisite 80% affirmative vote; accordingly any AGM&M action – including the purported creation of and delegation to a museum planning and development committee – is invalid. Because the actions purported to have been taken at the May 7 board meeting failed to comply with the by-laws, all decisions are ultra vires.[8] *See* D.C. Code § 29-301.06; *Higginsville Mem. Post*, 108 S.W.2d at 33.

The barring of CFF from AGM&M development and the delegation of project authority to some made-up committee are particularly egregious. AGM&M was created for the exclusive

---

[8]    Even assuming that the non-CFF trustees properly removed Waters, such removal could not vitiate CFF's trustee voting rights. The by-laws do not equate removal of a trustee with revocation of the donor's franchise. (Verified Compl. Ex. B. § 2.17.) Regardless of Waters' trustee qualifications, CFF nevertheless retained all rights – including the right to vote on AGM&M actions – at the May 7, 2007 meeting. Neither the by-laws nor the District of Columbia Nonprofit Corporation Act authorize the other trustees to ordain unilaterally that a conflict of interest precludes some CFF designated trustee from having a voice in all board decisions.

purpose of funding and constructing a museum and memorial. Cafesjian, through CFF, is by far and away the cause's largest supporter. In return for his generosity, Cafesjian was given a say in what AGM&M would be.

The by-laws and the agreements that empower AGM&M to realize its reason for being all require that development plans be approved by the board of trustees – not some committee concocted to deny CFF any input. Further, the by-laws require an 80% super-majority for board action. That governance provision was a major inducement for CFF's contribution. (Waters Aff. ¶ 29.)

Despite this corporate protocol, a minority of the trustees have commandeered AGM&M's purpose and control to suit their own purposes. Apparently the project is no longer in the hands of the board of trustees, and the wishes of the major donor are no longer considered. This strategem constitutes an absolute contravention of AGM&M's governance procedures and CFF's donor intent. The committee delegation repudiates the consideration upon which CFF's contribution was based. Such an usurpation cannot be tolerated.

Accordingly, plaintiff has demonstrated a likelihood of success on the merits of the claim that the exclusion of CFF from corporate governance was ultra vires and that the AGM&M's subsequent abrogation of authority in favor of a museum planning and development committee – in the absence of CFF – must be set aside. This factor decisively comes down in favor of injunctive relief.

### B.  Irreparable Injury

"All that is required to justify the restraining order is that the case on its face seems sufficiently meritorious to warrant the court in preserving the status quo until the controversy can be disposed of on the merits." *Phillips v. Sager*, 276 F. 625, 627 (D.C. Cir. 1921). Deprivation of a real property interest constitutes irreparable harm. *See Carpenter Tech. Corp. v. City of*

*Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999); *see also Miller v. District of Columbia*, No. 06-1935, 2006 WL 3361504, \*3 (D.D.C. Nov. 20, 2006) ("real estate constitutes a unique interest").

The *Phillips* parties were real estate partners.   276 F. at 626.   As a condition to partnership dissolution, plaintiff agreed to purchase defendant's one-half interest in a parcel for $12,500, represented in notes secured by deed of trust against the property.  *Id.*   At the time of the partnership dissolution, plaintiff believed the entity's assets to be in excess of $250,000.   In fact, however, the partnership had less than $5,000 in assets with debts abound.  *Id.*

Plaintiff sued for an accounting and sought to enjoin the sale of the property pursuant to the deed of trust pending resolution on the merits.   The court concluded:

> The property here sought to be sold by defendant was part of the partnership property and directly involved in the contract of dissolution, and, we think, in the light of the record, should be held in status quo to await the determination of this suit.   Little or no injury can flow from such a course, while great injury can result from the failure of the court to interpose a restraining hand . . . [E]quity and justice require the intervention of the court to prevent the sale or disposition of the property in question pending the result of the action for a partnership accounting.

*Id.*; *see also Young Men's Christian Assoc. v. Convington*, 484 A.2d 589, 593 (D.C. 1984) (charitable trust that allowed building to deteriorate in contravention of trust mandate constituted imminent danger of irreparable harm; "[i]f building were to deteriorate beyond economic repair" remedy of restoration of property as required by trust could not be achieved); *Tioronda LLC v. New York*, 386 F. Supp. 2d 342, 350 (S.D.N.Y. 2005) (potential "permanent damage to rare and horticulturally significant trees" that were identified on national register of historic places constituted irreparable harm); *People ex rel. Stony Island Church of Christ v. Mannings*, 509 N.E.2d 572, 575 (Ill. Ct. App. 1987) (enjoining former church officers from seizing control of religious and business affairs without proper authority; irreparable harm threatened if "property .

. . may be destroyed or if the plaintiff seeks only to maintain the status quo until the ultimate issue is decided").

Like in *Phillips*, CFF – and most importantly AGM&M – would suffer immediate and irreparable injury if the current course of conduct is not restrained. As a trustee, CFF is charged with assuming that AGM&M's actions conform to its corporate and charitable purpose, by-laws and contractual commitments. The continued and wrongful exclusion of CFF from museum planning irreparably interferes with CFF's rights to participate in AGM&M governance, prevents CFF from ensuring that museum and memorial development complies with institutional and donor intent and threatens the validity of all AGM&M corporate actions. (*See* Waters Aff. ¶¶ 49-50.)

When the organization was conceived and CFF was induced to contribute millions, two things were clearly understood. One, the project would make a grand architectural statement about the Armenian experience, and two CFF would help determine the comprehensive plan to effect that mission. Both of those purposes are now being flouted.

AGM&M was created to further educational purposes by owning, operating and maintaining a permanent Armenian museum and memorial. The corporation was funded with contributions earmarked for this purpose: CFF's pledges and contributions were to be used only for the AGM&M, "subject to plans for the [Armenian Genocide Museum & Memorial] approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc." (Verified Compl. Ex. C § 3.1.) The bank building and the four adjacent properties acquired with CFF's donations are restrictive grants: the properties must be "*developed*" for museum and memorial purposes. (*Id.*) And that development must be pursuant to plans approved by the AGM&M board, not some Hovnanian-manipulated committee.

AGM&M's current museum plan – as purportedly approved by the mysterious committee – has ignored AGM&M's originating purpose and has disregarded CFF's participation rights. AGM&M has made substantial and irreparable efforts to discard its incorporating vision for the "Armenian Genocide Museum and Memorial," which would occupy the property assembled by CFF. (See Borg. Aff. Ex. 10 (announcing intention that museum and memorial would encompass all five parcels of property donated for the benefit of AGM&M).)

Instead, AGM&M – through the rogue efforts of some of its trustees – is planning to open a re-branded "Armenian Genocide Museum of America" in the bank building alone. (Waters Aff. Ex. 8; Borg Aff. Exs. 11-12.) Continued development of the project without CFF input is imminent: Phase I and Phase II projects have been awarded to design and architecture firms and development plans have been presented to the public. (Waters Aff. Exs. 7-8; Borg Aff. Exs. 11-12.) AGM&M intends to sell the adjacent lots – even though these properties either must be used for development of the museum and memorial or returned to the donor. (*See* Borg Aff. Ex. 10.) If allowed to go forward, the announced inferior development plan would prevent the founding purpose from ever being realized: once construction on a bank-site-only project begins, the grander originally envisioned undertaking can never be achieved.

Neither CFF nor AGM&M can be compensated for the impending irreparable harm in the absence of an injunction. CFF will continue to be excluded from corporate governance and from project plan approval – both of which rights are expressly granted by the by-laws. Besides that the Hovnanian controlled trustees' continued exclusion of CFF tortiously interferes with CFF's Grant Agreement rights. CFF is entitled to participate actively in museum and memorial development and retains significant rights regarding the contributions that have been made. Legal remedies cannot undo this deprivation.

Until the Court resolves the merits of this dispute, AGM&M must be stopped from ploughing forward with a development that does not comport with founding intent, that lacks board approval and from which CFF has been denied input. Any development of the bank building – a National Historic Register landmark – or alienation of the remaining properties cannot be undone. *See Young Men's Christian Assoc.*, 484 A.2d at 593 (allowing the building to deteriorate pending decision on the merits would result in imminent harm).

At base this lawsuit challenges the authority of a minority of trustees to secretly develop a museum that contravenes the corporate mission as well as donor intent and rights – equitable intervention is the only way to maintain the status quo and to restrain ultra vires decision-making. Importantly, the fundamental issue – the development of real property – perforce implicates the threat of irreparable harm. Like in *Phillips*, this Court should prevent further museum development or property disposition pending resolution on the merits. Failure to do so would condone the infliction of irreparable harm. *Phillips*, 276 F. at 626 (prohibiting disposition of partnership assets pending partnership accounting).

C.    **Balance of Harms**

Defendants would not be harmed by injunctive relief. The AGM&M project has been stalled due to Hovnanian mulishness for over ten years. For all that time, defendants did nothing to move the project forward and instead frustrated progress at every turn. There is no urgency to proceed with a half-baked and unapproved plan. A judicially imposed delay would only ensure that the Armenian-American community receives the opportunity to support a museum and memorial that their dignity and struggle to overcome warrants.

On the other hand, CFF – and ultimately AGM&M – would suffer irreparably if an injunction does not issue. Although the development of the museum and memorial would be temporarily suspended pending the resolution of this lawsuit, AGM&M – and the Armenian

people – will ultimately benefit because putting things on hold would allow AGM&M development to be the product of properly exercised corporate authority.

In fact both sides would be served by an injunction pending resolution of plaintiff's claims:  the questions of board governance, corporate purpose, and AGM&M's future will be conclusively answered.  If the Hovnanian cabal pushes forward while those issues are in doubt, those trustees would be personally accountable when plaintiff ultimately prevails.  *See* D.C. Code § 29-301.113(b)(5); *id.* § 29-301.100; *see also Owen*, 888 A.2d at 269, n. 16 (concluding that trustees were not entitled to immunity under D.C. Code §29-301.113(b)(5) when actions conflict with corporate charter).  Without an injunction CFF will continue to be denied the right to participate in AGM&M's affairs, and AGM&M would be further victimized by ultra vires machinations.

It is difficult to understand how letting a charitable organization's biggest contributor, who specifically bargained for input into the institutions' singular mission, participate in irrevocable decisions could harm the organization.  Ensuring that the museum and memorial is developed as intended and as required by the enabling agreement furthers the interests of all parties – which clearly outweighs any harm that could result from a minor delay.  CFF is indisputably committed to the building of a memorial and museum to honor the memory of all Armenians; CFF simply insists that the project proceed as required by the contracts and governing documents.  This factor weighs in favor of an injunction.

**D.    Public Interest**

The public interest would be undeniably served by injunctive relief.  AGM&M was created to establish a cultural center for Armenian-Americans in the heart of this nation's capital. Development of a genocide museum and memorial is undoubtedly of substantial cultural significance.  Requiring a nonprofit corporation to abide by its legal and contractual obligations

– including corporate by-laws, articles of incorporation, and donor requirements – furthers the public interest.

Denying the injunction "would be like rewarding [AGM&M] for failure to follow its own bylaws" resulting in a disservice to the public interest. *Melissa Industrial Develop. Corp.*, 316 F. Supp. 2d at 432. The public interest cries out for holding the organization to its charter documents and the trustees to their fiduciary obligations. *See Young Men's Christian Assoc.*, 484 A.2d at 593-94.

## CONCLUSION

The unauthorized and improper exclusion of CFF from AGM&M decision-making bastardizes any corporate decision. Further abrogation of board prerogative in favor of some unauthorized committee in order to promote a development plan that contravenes corporate procedures and donor intent sullies AGM&M's raison d'être. Continued excommunication of CFF from AGM&M proceedings will cause CFF and AGM&M substantial and irreparable harm. Without an injunction, AGM&M will continue down an ultra vires path, developing an inferior museum that contravenes donor intent and AGM&M by-laws.

This threat is immediate: all AGM&M design plans and representations exclude the four adjacent properties and confirm that the museum will be limited to the bank building. As an AGM&M donor of over $17 million, CFF must be permitted to exercise its three votes so as to require AGM&M to conduct its affairs in accordance with its charitable purpose, governing documents, and contractual obligations. AGM&M must be enjoined from further board or development activity without CFF participation.

Dated: November 27, 2007

**BRIGGS AND MORGAN, P.A.**

By:   s/ Molly M. Borg
    Timothy R. Thornton
    Molly M. Borg
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400
*Admitted Pro Hac Vice*
**AND**

**HOGAN AND HARTSON LLP**

By:    s/ Peter C. Lallas
    Ty Cobb (D.C. Bar No. 270736)
    Peter C. Lallas (D.C. Bar No.495944)
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

**ATTORNEYS FOR DEFENDANT THE
CAFESJIAN FAMILY FOUNDATION**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

The Cafesjian Family Foundation, Inc.,
individually and on behalf of the Armenian
Genocide Museum and Memorial, Inc.,

        Plaintiff,

v.

Armenian Genocide Museum and Memorial,
Inc., Hirair Hovnanian, Anoush Mathevosian,
Van Krikorian and the Armenian Assembly of
America, Inc.,

        Defendants.

Civil File No. 07-1746 (RWR)

**AFFIDAVIT OF JOHN J. WATERS JR. IN
SUPPORT OF PLAINTIFF'S
APPLICATION FOR PRELIMINARY
INJUNCTION**

---

STATE OF MINNESOTA      )
                                   ) ss.
COUNTY OF HENNEPIN      )

I, John J. Waters, Jr. under oath attest as follows:

1.      I am Secretary and Treasurer of the Cafesjian Family Foundation ("CFF").  I am also a Director and a Vice President of CFF.  I have personal knowledge of the facts set forth in this affidavit.

2.      My principal duties include the supervision of the daily activities, personnel, programs and investments of CFF.  I work closely with Gerard Cafesjian and have personal knowledge of his relationship with the Armenian community.

3.      CFF is a non-profit corporation that engages in, assists with, and contributes to charitable, religious, scientific and educational activities and projects.  CFF is particularly dedicated to supporting the Armenian community.

4.      CFF has been a significant supporter of money and services to the Armenian Assembly of America, Inc. ("Assembly") and the Armenian Genocide Museum & Memorial, Inc. ("AGM&M").  To date, CFF is the largest financial contributor for AGM&M's benefit.

5.      Cafesjian is President and director of CFF.  He is a former resident of Minnesota. Prior to his retirement, Mr. Cafesjian worked for West Publishing Company.

6.      Cafesjian has a strong Armenian heritage.  His grandparents perished at the hands of the Turks in the Armenian Genocide.  Cafesjian is personally committed to the universal affirmation of the Armenian Genocide.

7.      The Assembly, Cafesjian and CFF have worked closely to further this Armenian cause.  In 1998, Assembly Trustees Hirair Hovnanian and Robert Kaloosdian traveled from Washington D.C. to Minnesota to meet with Cafesjian.  The parties discussed their organizations and their visions for a museum and memorial dedicated to the Armenian Genocide.  Aware of Cafesjian's significant wealth, philanthropic attitude and his personal interest in obtaining recognition of the Armenian Genocide, the Assembly sought Cafesjian's financial support for the project.

8.      Beginning in 1998, the Assembly, Anoush Mathevosian, CFF and Cafesjian explored developing an Armenian museum and memorial.  They worked together to assess potential locations, financing, and other details.

9.      Cafesjian has been a steady supporter of the Assembly.  In 1999, he made significant financial contributions to the Assembly to cover the cost of full page ads in the Washington Post and the Washington Times.  In March 1999, Cafesjian and CFF pledged $1

million to the Assembly in support of a $15 million endowment campaign. The pledge was funded with three equal installments in 1999, 2000 and 2001.

10.     In January 2000, the Assembly identified a potential site for the museum and memorial. The site was the former National Bank of Washington. Another party had already bid on the property. I traveled immediately from Minnesota to Washington to evaluate the plot. CFF ultimately provided the leadership and development team to secure the property. In a matter of days, we were able to complete all necessary due diligence and submit a competing bid for purchase of the property.

11.     The price of the property was $7,250,000. Mathevosian and CFF each contributed $3,500,000 to acquire the property. CFF also loaned an additional $500,000, interest free, to enable the Assembly to buy the property. In fact, CFF advanced the entire purchase price up front and was reimbursed $3,500,000 when Mathevosian funded her contribution.

12.     CFF's contribution was memorialized in a Grant Agreement between the Assembly and CFF. Attached as **Exhibit 1** is a photocopy of the Grant Agreement dated February 16, 2000.

13.     After the bank building was acquired, the Assembly formed the AGM&M Planning Committee which took on responsibility for the Project. The committee included major donors as well as representatives of the Assembly and Armenian National Institute ("ANI"). CFF, through Cafesjian, was a member of the AGM&M Planning Committee. The committee was organized to prepare a development and fundraising plan. Although the committee met frequently during 2000, very little was accomplished.

14.    After the sale of the bank building closed, Cafesjian and CFF made plans to secure additional real estate near the bank building. Originally, Mr. Cafesjian hoped to build a museum of art. However, as the museum and memorial project progressed, it became apparent that the bank building alone would not be big enough to house the significant project. From March 2000 to October 2000, Cafesjian, through the TomKat Limited Partnership, purchased and contracted to purchase three properties adjacent to the bank building: 1338 G Street, 1342 G Street, and 1340 G Street. 1334-36 G Street was secured in September 2003.

15.    TomKat Limited Partnership ("TomKat") is a South Dakota limited partnership that holds Cafesjian family assets. TomKat, Inc. is the sole general partner of TomKat. I am the sole officer and director of TomKat, Inc. TomKat and TomKat, Inc. perform substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, MN 55402.

16.    Ross Vartian was appointed director of the museum and memorial project in 2001. I worked closely with Vartian and Edele Hovnanian to prepare a timeline, draft budget and list of consultants, to be presented at the Assembly's 2001 annual meeting. These efforts were intended to get the project off the ground and moving forward.

17.    At the annual meeting, we were allotted only fifteen minutes to present the proposed plan and budget for the significant museum and memorial project. Right before the presentation, Edele's father, Hirair Hovnanian, became angry at the proposed budget and demanded an explanation. The meeting was immediately adjourned without further discussion.

18.    About a month later, the committee decided to commission a master plan and feasibility study. Everyone involved in the project planning – including the Assembly and Hovnanian – knew that the bank building alone was insufficient for the significant project. Two different teams – each including a real estate management firm, an architectural firm, and a

museum content design firm – bid on the proposal.  Despite this opportunity, the Assembly failed to act on the committee's recommendation.

19.    In January 2002, Cafesjian invited Assembly leadership to meet with him to discuss the stalemate of the project.  Cafesjian again requested that consideration be given to delegating the development of the museum and memorial project from the Assembly to a new, separate entity.  This idea had been proposed and considered on previous occasions.  Finally, the Assembly representatives – Hovnanian and Carolyn Mugar – agreed that the project needed an independent entity in order to move forward.

20.    By this point, the project scope and budget had outgrown the Assembly's means.  Advice solicited from experts confirmed that the bank building alone was inadequate to house the significant museum and memorial.   The bank building's National Historic Register designation limited how the structure could be used and modified.  Moreover, experts confirmed that more space was needed for proper exhibition space and museum programs.

21.    In July 2002, the Assembly finally agreed to hire a firm to oversee project management and development.  Concord Partners, a Washington based project management firm, agreed to assist in both the selection of an architect and a museum design firm.

22.    In October 2002, ANI executive director Rouben Adalian and the museum design firm of Gallagher and Associates met with experts to discuss the mission, content, and potential exhibits of the museum and memorial.  In November 2002, Concord Partners distributed a request for qualification to over 60 international architectural firms.  The intended plan was that one or more of these professionals would be selected to participate in the design competition.  Concord Partners received approximately 30 responses but without direction from the Assembly, no action was taken.

23.    In February 2003, a planning report for the museum and memorial project was scheduled for presentation at the AGM&M and ANI annual meetings.  Mr. Adalian was to present the report prepared by Gallagher and Associates.  Like the previous year, Hovnanian interrupted the presentation.  Hovnanian prevented any further discussions and adjourned the meeting.  No decisions were made.

24.    In October 2003, negotiations regarding the formation of a new entity were finally complete.  AGM&M was incorporated on October 29, 2003.  The project was launched with over $27.5 million in assets, funded grants and pledges.  These assets, funded grants and pledges included a $1 million pledge by Brothers Sarkis and Nishan Kechejian, antique carpets contributed by James Keshishian and Edgar Hagopian, and other monetary contributions totaling $200,000.

25.    AGM&M is governed by the Board of Trustees, who serve as AGM&M's directors.  AGM&M's by-laws provide that trustee votes, with the exception of Mathevosian and the Assembly, are awarded based on each $5 million contribution for the benefit of AGM&M.  Mathevosian was allocated one trustee vote in recognition of her significant and founding contribution.  Hovnanian and the Assembly refused to agree to incorporate the AGM&M unless the Assembly was allocated one trustee vote – even though the Assembly had contributed nothing and had failed to make significant progress with project development for three years.

26.    Hovnanian was awarded one trustee vote based on his $5 million contribution.  As of September 2006, Hovnanian had funded $1.5 million of his contribution.  CFF was allocated three trustee votes based on its $17.85 contribution.  To date, CFF has funded over $14.5 million of its contribution.  The remainder of CFF's contribution will be realized per the Grant Agreement dated November 1, 2003.

27.    Cafesjian served as the initial CFF-designated trustee from October 2003 until May 2, 2007.

28.    Following AGM&M's incorporation, Cafesjian was appointed Chairman and President of AGM&M and I was appointed Secretary and Treasurer of AGM&M.  Both of us resigned these positions in the fall of 2006.

29.    CFF had agreed to contribute funds and property because the parties understood that the museum and memorial project would make a grand and commanding statement about the Armenian experience in the heart of this nation's capitol.  The parties also understood that CFF would retain significant reversionary rights with respect to the donations and that museum and memorial decisions could not be made without input from CFF.

30.    AGM&M has no employees.   After AGM&M was incorporated, Cafesjian directed CFF staff to provide administrative and organizational support to AGM&M.  CFF staff provided these services at no cost to AGM&M.  From October 2003 through September 2006, the day to day activities of AGM&M were directed or completed from CFF's business office located at 15 South Fifth Street, Suite 900, Minneapolis, MN 55402.  During this time, I performed AGM&M management and administrative duties from CFF's Minneapolis office.

31.    For example, AGM&M mail, bills and other correspondence were forwarded to CFF's Minneapolis office for processing and payment.  The accounting and business needs of AGM&M were completed in Minnesota at CFF's direction, including accounts payable, tax and financial preparation, and banking.  Bank statements, insurance documents and accounts payable were sent to AGM&M's Minneapolis office and processed in Minnesota.  AGM&M's corporate records were maintained and stored in Minnesota from November 2003 until September 2006.

None of the other AGM&M trustees objected to CFF's generosity in performing these functions or CFF's conduct of AGM&M's management and administration.

32.     In June 2004 at the AGM&M board of trustees meeting, Cafesjian proposed that the board either recommence the architectural design competition that was initially suggested in 2001 or select a single architect to develop the design plan.  Hovnanian and the Assembly trustee, Robert Kaloosdian, rejected this proposal and provided no alternative solutions.

33.     Cafesjian was committed to his AGM&M trustee duties but cognizant that no AGM&M action could be taken absent a proper vote of the board of trustees.  Cafesjian, through CFF, personally commissioned the services of a young architect, Edgar Papazian, to design the project.  Cafesjian intended to present Papazian's designs to the board of trustees.  No AGM&M funds were used to pay Papazian; CFF paid Papazian for his work.

34.     In February 2005, Papazian, at Cafesjian's request, presented the proposed design to the AGM&M board of trustees.  Hovnanian ridiculed the design and together with Kaloosdian they rejected the design and proposed no alternatives.

35.     Cafesjian recognized that Hovnanian and Kaloosdian would reject any design that the CFF interests proposed.  I suggested that the board of trustees hire an outside consultant to prepare a preliminary plan for AGM&M development.  The board of trustees agreed and over the next four months reviewed AGM&M corporate documents, sought expert input, explored community interest and prepared a preliminary plan.  The estimated project budget was $150 million.

36.    The board of trustees endorsed the consultant's findings but were deadlocked on how to proceed.  Without a plan, fundraising could not move forward and the realization of the project could not be achieved.

37.    In April 2006, Cafesjian again presented a proposed plan to move the project forward.  Cafesjian recommended that Papazian be designated the project design architect and that an advisory board and honorary board be created to expand community involvement and to spark fundraising.  Cafesjian had even contacted potential participants for the community and honorary boards.  However, both Hovnanian and Kaloosdian rejected the plan.

38.    Based on Hovnanian and Kaloosdian's continued rejection of any CFF proposal, Cafesjian believed that the board of trustees was deadlocked.  In May 2006, Cafesjian offered to withdraw from AGM&M; he received no response.  By this time, the AGM&M accounts were empty because no fundraising could be conducted without any development plan.  CFF stepped up and advanced additional funds to keep AGM&M solvent.  None of the other trustees offered any financial support to AGM&M.

39.    In September 2006, Cafesjian resigned as AGM&M president and chairman.  He hoped that his absence would allow the project to proceed.  Attached as **Exhibit 2** is a photocopy of Cafesjian's resignation letter dated September 13, 2006.

40.    In May 2007, I was appointed as the CFF-elected trustee and Ross Vartian was appointed as CFF-successor trustee.  Attached as **Exhibit 3** is a photocopy of the letter from Cafesjian to the AGM&M board of trustees dated May 2, 2007.

41.    On May 7, 2007, I attended the AGM&M board of trustees meeting.  I participated by telephone.  Attached as **Exhibit 4** is a photocopy of a portion of the transcript of

the May 7, 2007 meeting that was provided to me by Van Krikorian, the current Assembly-designated AGM&M trustee.  CFF has requested the remaining portion of the transcript from the AGM&M board of trustees but has not received a full transcript.

42.    During the May 7, 2007 meeting, Krikorian and Hovnanian accused the CFF interests of having a conflict of interest.  I declined to answer any questions related to this purported conflict of interest without the presence of counsel and attempted to confine the meeting to the noticed agenda.

43.    Krikorian and Hovnanian refused to allow the meeting to proceed in my presence, voted to exclude the CFF interests from participation, and demanded that I leave the board of trustees meeting.  As a result of this unilateral exclusion and Hovnanian and Krikorian's refusal to allow the board of trustee's meeting to proceed, I understood that I had no other option but to leave the meeting under protest.  But for this exclusion, I would have participated in the remainder of the May 7, 2007 meeting.

44.    Attached as **Exhibit 5** is a photocopy of a letter dated May 17, 2007 from CFF to the AGM&M board of trustees.

45.    Attached as **Exhibit 6** is a photocopy of the press release issued by AGM&M on August 31, 2007.

46.    Attached as **Exhibit 7** is a photocopy of the press release issued by AGM&M on October 31, 2007.

47.    Attached as **Exhibit 8** is a photocopy of the press release issued by AGM&M on November 21, 2007.

48.     CFF has not participated in any AGM&M activity since the May 7, 2007 meeting. CFF has not been informed of any further AGM&M board of trustee meetings since the May 7, 2007 meeting.

49.     Based on recent developments, issued press releases, and representations made by AGM&M trustees and agents, CFF believes that AGM&M intends to build the museum on the site of the bank building alone and sell the remaining four properties.  CFF believes that the development of the bank building property and sale of the adjacent four properties are imminent.

50.     CFF will suffer immediate and irreparable harm if an injunction does not prohibit the AGM&M from continued exclusion of the CFF-designated trustee from AGM&M governance and participation in the development of the museum and memorial project.

This concludes my affidavit.

<u>s/ John J. Waters, Jr.</u>
John J. Waters, Jr.

Subscribed and sworn to me
this 27th day of November, 2007

<u>s/ Donald Anthony Kovachvich</u>
Notary Public
My Commission Expires: January 31, 2010

# THE CAFESJIAN FAMILY FOUNDATION

4001 Tamiami Trail North, Suite 425
Naples, Florida 34103

**JOHN J. WATERS, Jr.**
*Secretary/Treasurer*

February 16, 2000

Mr. Hirair Hovnanian
Armenian Assembly of America, Inc.
122 C. Street NW, Suite 300
Washington, D.C. 20001

Re:   Grant Agreement

Dear Hirair:

Congratulations to the Armenian Assembly of America, Inc. ("Assembly") on concluding the negotiations for the purchase of the National Bank of Washington building ("Property"). The Cafesjian Family Foundation, Inc., ("Foundation") believes that this signature building, located at the heart of our Nation's capital, represents a unique opportunity to consolidate the Foundation's vision for a memorial commemorating the Armenian Genocide, Anoush Mathevosian's vision for an Armenian Genocide museum and the resources of the Assembly and its affiliate, the Armenian National Institute, Inc., ("ANI"), in one central location which will serve as a national center for the Armenian American community. For convenience and clarity, this letter will refer to the entire process of acquiring the Property, renovating and developing the Property to accommodate the uses described below, and establishing a contribution and endowment program to fund such activities and the ongoing operation of the Property as the "Project". This letter will confirm our agreement regarding the nature of the financial support the Foundation will provide to the Assembly in connection with the Project.

1.   Grant.

   (a)   The Foundation will make a grant ("Grant") to the Assembly in the aggregate amount of $2,500,000 in accordance with the terms and conditions of this letter. As you know, the Foundation contributed $1,000,000 to the Assembly on February 4, 2000 to fund the Assembly's earnest money deposit for the purchase of the Property. The Foundation will contribute the remaining $1,500,000 of the Grant on or before the closing date for the purchase of the Property (which is currently scheduled for February 16, 2000). We understand that the Assembly has also received a commitment for another $1,000,000 from the Vanguard Charitable Endowment Program - Cafesjian Family Foundation Charitable Fund.

Exhibit 1

Mr. Hirair Hovnanian
February 16, 2000
Page 2

(b)     The Foundation will also make a contribution to the Assembly, from time to time upon the Assembly's request, as and when needed, in an amount equal to the cost of designing and installing a memorial commemorating the Armenian Genocide to be included in the Project and located in the Property, which is discussed in more detail below.

2.     Loan.     Recognizing the accelerated timing of the acquisition of the Property, the Foundation is also prepared to make a bridge loan ("Loan") to the Assembly in the amount of $4,000,000 to enable the Assembly to close on the purchase of the Property before receiving all necessary pledges. This loan will be due in 90 days, will be non-interest bearing and will be evidenced by a promissory note.

3.     Use of Funds.     The proceeds of the Grant and the Loan will be used solely to fund the acquisition of the Property and the related transaction costs.

4.     Use of the Property and Scope of the Project; Committee.

(a)     We understand that (i) the Property will be used as a memorial and museum for the Armenian Genocide, as office space for the Assembly and the ANI, and for other commercial uses permitted by the applicable zoning and use laws, (ii) design and renovation of the Property shall commence shortly after the closing of its purchase, and (iii) completion of all renovation activities is expected by March 2002.

(b)     The ultimate use of the Property and scope of the Project shall be determined by the Assembly's Memorial and Museum Planning and Development Committee ("Committee"), a new subcommittee of the Board of Trustees of the Assembly ("Board"). The Committee shall be comprised of one representative of each donor who contributes at least $1,000,000 (including the Foundation) with respect to the Project and one representative of each of the Assembly and ANI. All decisions of the Committee shall be made with the unanimous consent of all members of the Committee. The Committee shall be responsible for (i) establishing the vision for the Project and the Property, (ii) preparing and adopting a site redevelopment plan (and material modifications thereto), which shall address the design, development, renovation, potential expansion and initial utilization of the Property, and submitting such plan to the Assembly's Board for approval on or before December 1, 2000 and (iii) adopting and executing a contribution and endowment program to fund the completion of the redevelopment plan and the operation of the memorial and the museum. Recognizing our prior conversations regarding the Foundation's vision, the Committee shall consider including in the Project a labyrinth, a portion of the Cafesjian Collection and a suitable restaurant in any commercial portion of the Property's ground floor. The term of the Committee shall expire on December 31 of the year following the year in which the grand opening of the Property occurs. The Foundation recognizes that all final decisions

Mr. Hirair Hovnanian
February 16, 2000
Page 3

will rest with the Assembly and its participation in the Committee is designed to further the charitable purposes for which the Foundation's funds are being used. In the event the Assembly forms a new, wholly owned subsidiary to operate the museum, the Foundation shall have the right to designate one member to the Board of Directors of the new subsidiary.

5.    Memorial.

(a)    The Assembly will make available space acceptable to the Foundation in the Property that is suitable for the memorial. The design of the memorial commemorating the Armenian Genocide has not yet been finalized, pending identification of the final site and an analysis of the site's unique characteristics. At this time, the initial concept consists of a walk-in, contemplative, chapel-like space, with interior walls of native Armenian stone and a glass sculpture by Stanislav Libensky as the focal point. As we have discussed, examples of suitable space in the Property would include a structure to be built on the vacant expansion site south of the building or on the Main Hall level of the building. This space is not expected to be less than 1,200 square feet of floor space or not less than 40,000 cubic feet and shall have the necessary structural support and ready access to adequate external lighting.

(b)    The Assembly will cooperate with the Foundation's design firm, artist and other representatives to assure the successful completion of the memorial.

(c)    After installation, (i) the Foundation shall have the right to participate in all material decisions regarding the memorial, (ii) the Assembly shall operate and maintain the memorial in perpetuity in its original condition (ordinary wear and tear excepted) and shall be solely responsible for all operating and maintenance costs, (iii) the Assembly shall not make any alteration to the memorial, the Libensky sculpture or the Property in a way which adversely affects the memorial or the sculpture without the Foundation's prior written approval and (iv) in the event the parties decide to alter the memorial in a way that diminishes or eliminates the role the Libensky sculpture plays in the memorial, the legal rights to the sculpture shall be assigned, at no consideration, to the Foundation and the Foundation shall have the right, at its expense, to remove the sculpture.

6.    Conditions. The Foundation's obligation to make the Grant and the Loan are subject to the following conditions:

(a)    The Assembly shall have received firm pledges for the Project, for which at least $7,000,000 is available for the acquisition of the Property (including the Grant and the $1,000,000 Vanguard contribution referred to above), evidenced by documentation in form reasonably acceptable to the Foundation. Any pledge that can only be used for the renovation of the Property or the operation or endowment for the museum shall not be considered for purposes of satisfying this condition.

Mr. Hirair Hovnanian
February 16, 2000
Page 4

(b)    The memorial shall be named the "Gerard L. Cafesjian Memorial" or such other name acceptable to the Foundation.  The Foundation shall have the right to participate in any other lead donor naming rights established by the Assembly in connection with the Project.

(c)    The Assembly shall be a tax-exempt organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and shall not be a private foundation.  The Assembly shall deliver to the Foundation a copy of its IRS determination letter and such other documentation reasonably requested by the Foundation including, without limitation, evidence that the Grant and the other contributions expected in connection with the Project (including those described in paragraph 5(a) above) shall cause not it to be treated as a private foundation.

(d)    The Assembly shall provide the Foundation with evidence, reasonably satisfactory to the Foundation, that the Assembly is in the process of satisfying the terms and conditions of this letter.

7.    <u>Representations</u>.    The Assembly represents and warrants to the Foundation as follows:

(a)    The acquisition, renovation and utilization of the Property will be solely in furtherance of the Assembly's stated charitable purposes.

(b)    The Assembly's status as an organization described in Section 501(c)(3) of the Internal Revenue Code and an organization which is not a private foundation is in full force and effect and there is no IRS reexamination of such status pending or, to the Assembly's knowledge, threatened.

8.    <u>Ongoing Covenants</u>.

(a)    The Assembly shall make available suitable space in the Property for the memorial, as discussed above.

(b)    Until completion of the Project and operation of the completed facility for 12 months, the Assembly will provide written reports to the Foundation at least quarterly.  Such reports shall include details on (i) the amount and nature of the expenditures made from the Grant and the Loan and (ii) the progress made in acquiring, designing, renovating, and utilizing the Property and completing the Project.  In such reports, an officer of the Assembly shall certify the Assembly's compliance with the terms and conditions of the Grant and the Loan.  The Assembly shall maintain complete records of receipts and expenditures relating to the Project and the acquisition, design and renovation of the Property for at least four years

Mr. Hirair Hovnanian
February 16, 2000
Page 5

after the Grant and the Loan have been expended by the Assembly, and such records shall be available to the Foundation and its representatives for inspection and copying at all reasonable times.

9.    _Miscellaneous_.  In the event the purchase of the Property has not been consummated by March 15, 2000, this letter agreement shall be void and of no further obligation to any party; provided, however, that the Assembly shall return all proceeds of the Grant and the Loan that have not been used to fund expenses incurred in connection with the acquisition of the Property to the Foundation on or before March 20, 2000.

If the foregoing accurately sets forth our agreement regarding the above-described matters, please execute this letter in the space provided below.

We are thrilled with the prospect of this project and look forward to working with you, members of the Assembly's staff and the other donors toward its completion.

THE CAFESJIAN FAMILY FOUNDATION, INC.

John J. Waters, Jr.


Acknowledged and agreed this ___ day of March, 2000:

ARMENIAN ASSEMBLY OF AMERICA, INC.


By: _____

Its: _____

CAFESJIAN FAMILY FOUNDATION



GERARD L CAFESJIAN, PRESIDENT / CEO

September 13, 2006

SENT VIA FEDERAL EXPRESS MAIL
Mr. Hirair Hovnanian
One Hovechild Plaza
4000 Route 66
Tinton Falls, NJ  07753

Mr. Robert Aram Kaloosdian
43 Mount Auburn Street
Watertown, MA  02472

Ms. Anoush Mathevosian
30 Candy Lane
Great Neck, NY  11023

Re:    Armenian Genocide Museum and Memorial, Inc. ("AGM&M")

Dear Trustees:

This is to serve as notice of my resignation as Chairman of the Board of Trustees and President of
AGM&M effective immediately.  I take this action only after a great deal of thought and with the
hope that this change will break the current impasse and ultimately provide AGM&M with the
greatest opportunity to achieve its specific purposes.

John Waters intends to resign as secretary and treasurer of AGM&M and to transfer all administrative
functions as soon as the Board of Trustees identify his successor and makes alternative arrangements
for the administrative functions.  He would certainly appreciate prompt direction from the Board.

I intend to continue to serve directly or to have my designees serve on the Board of Trustees of
AGM&M.  In either case, I am prepared to work with you to assure that the affairs of AGM&M are
handled in a responsible manner.

**Exhibit 2**

Letter to the Trustees
September 13, 2006
Page 2

In light of these changes, I expect that the Board of Trustees of AGM&M should plan to meet as soon as practicable to develop a future course for the organization.

Very truly yours,

Gerard L. Cafesjian

4082718_1.DOC

**CAFESJIAN FAMILY FOUNDATION**

 

**GERARD L CAFESJIAN, PRESIDENT / CEO**

May 2, 2007

Ms. Anoush Mathevosian                Mr. Van Z. Krikorian
30 Candy Lane                         Global Gold Corporation
Great Neck, NY 11023                  45 East Putnam Avenue
                                      Greenwich, CT 06830

Mr. Hirair Hovnanian
Hovsons Inc.
One Hovchild Plaza
4000 Route 66
Tinton Falls, NJ 07753

Dear Ms. Mathevosian, Mr. Krikorian and Mr. Hovnanian:

Please be informed that I hereby resign as a Trustee of the Armenian Genocide Museum and Memorial, Inc., effective immediately.

Please be advised that effective May 2, 2007, The Cafesjian Family Foundation, Inc., has named John J. Waters, Jr. as The Cafesjian Family Foundation elected Trustee. Mr. Waters holds all three of the Cafesjian Family Foundation votes.

The Cafesjian Family Foundation has designated Ross Vartian as its successor Trustee, again, effective May 2, 2007.

Sincerely,

Gerard L. Cafesjian

Cc:    John J. Waters, Jr.
       Ross Vartian

Exhibit 3

15 SOUTH FIFTH STREET SUITE 900 MINNEAPOLIS, MINNESOTA 55402 PHONE 612.359.8991 FAX 612.359.8994
4001 TAMIAMI TRAIL NORTH SUITE 425 NAPLES, FLORIDA 34103 PHONE 941.263.1999 FAX 941.263.2952

# ARMENIAN GENOCIDE MUSEUM AND MEMORIAL

1140 19TH STREET, NW, SUITE 600
WASHINGTON, DC 20036
PHONE (202) 383-9009 FAX (202) 383-9012



AGMM Board of Trustees meeting, May 7, 2007, Great Neck, NY

Draft Transcript ~ Part One

VZK Can you hear us John?

JJW I can, thank you.

HH This is Hirair Hovnanian calling, I have present Anoush Mathevosian and her attorney Denise Darmanian, Rouben Adalian of the Armenian National Institute, and Van Krikorian whom I have designed as the secretary treasurer of the company after Gerry's and your resignation, and we have a quorum I presume.

VZK John, we are also taping the meeting.

JJW OK.

VZK Are you alone or do you have somebody there?

JJW No, I am alone, thank you.

VZK Hirair circulated the agenda. When we got Gerry's letter though, appointing you as trustee, I thought it would make sense, actually I requested, that I ask you a few questions, John, to find out exactly where we are, what's happened, and how you see your role, because we also received your complaint against the Assembly seeking to rescind the grant agreement and get your properties back. At the same time I tried to recreate records and go through records. I wasn't able to find any signed minutes from meetings except from the initial signed writings from October, November 2003 where the company was set up and the grant agreements, transfer agreements were dealt with. Do you know if there are any signed meeting minutes or approved meeting minutes except for those?

JJW Again you know, allow you to go back to whatever record and correspondence. We have sent everything that we have in our possession.

VZK Right. We looked through everything, and I tell you, just haven't found anything that was either signed or ratified except for those 2003 minutes. So if you are not aware of anything else, and we didn't find anything else, it sounds like there wasn't anything else. And I am trying to be really careful here because I am new member of this board. I have tried to immerse myself in this as much as I can and catch up. At the same time there is this issue where you recorded a lien on the property signing both for AGMM and the Cafesjian Foundation. What's the story with that, you know?

JJW You know, I am not going to answer any of those questions in this context.

1                                                                                    **Exhibit 4**

VZK It is a board meeting and you acted on behalf of AGMM. I think you kind of have to.

JJW No, I don't have to. I think in the context of the letters that have been exchanged back and forth and the information that has been set forth, the answers that are out there are the answers that are out there. Anything else will have to be done on the advice of legal counsel.

VZK We are acting as the AGMM board. If you not going to answer, then you are not going to answer. That's clear. May be you can tell us what exactly your Foundation's position is though? Because on the one hand ?????? to ask us to unwind everything and try to get the properties back. It that the position that you have?

JJW You want to ask me that question. I want to ask you the same question. So.

VZK But we haven't filed a lawsuit. Our position, I am representing the Assembly, the Assembly's position, we want to develop the museum, we want to exercise our fiduciary duties properly, be faithful to the donations that were made, and build a museum. We want to use all the properties that were donated and be faithful to all of that. We see a need for it. So, I answered I your question and I think Anoush and Hirair are agreeing with me for their part, even though they are not talking right now. What's yours? What's the story?

JJW Again, you know, I'll go back on it and I'll say we have been at this for a little over six years, we have been working hard and attentively to get this thing done up until the last couple of months when it seemed less possible. I know Gerry is still open and willing to listening to whatever suggestions are made. At the same time the conversation is where the conversation is at. I am here to represent the Cafesjian Family Foundation, interest, and like everybody else, to execute their fiduciary responsibility, and making sure that AGMM Inc goes forward in a positive fashion.

VZK OK, we'll come back to that. Looking at the fiduciary issue though, when you filed documents placing liens on the properties, was there any board authorization for that?

JJW You know if you want to take a deposition at some point, let's go ahead with that. You're not going to conduct one in the context of this meeting.

VZK John, these are issues that the board has to decide and we have a list of them, like the tax returns, that were filed and need to be filed. We didn't see anything on those. We got a situation which very much left the project in a lurch. If your interest is in moving forward, the actions taken up exercising your duties on behalf of the foundation will now make sense. That's clear. We got issues like the rugs that were donated by Jim Keshishian or his estate. Do you know where those are?

JJW Yap. I believe I know where they are.

2

VZK Where are they?

JJW They're in the Keshishian warehouse.

VZK OK. In the tax returns that were filed with the balance sheets, we didn't see, or I didn't see, those reflected anywhere. Have those been reported anywhere, as assets of AGMM?

JJW I will have to say that to the best of knowledge, yes, but I don't have the balance sheets in front of me, and I don't know the exact answer.

VZK OK. Then we have the Devedjian business. Have you had any communications with her?

JJW No.

VZK No? Don't feel like you've being deposed. I just have a checklist of issues that I want some comfort on because I am sincerely not sure where you guys are. On the one hand you file a complaint trying to rescind, on the other hand we're trying to develop a museum. So that's what I am really trying to get at. Issues like the real estate taxes, the repairs that need to be done on the properties, those kinds of questions, I think you acted as secretary and treasurer of the company, you got to report to the board at some point. Did you prepare any reports? John?

JJW No sir.

VZK No reports. OK. How about the prior fund raising activities. You said that you were working at it diligently. You have a list of the people that you had solicited for funding.

JJW Again, we can fire questions at me all day long, I suggest you proceed with the agenda of the meeting. If the agenda of the meeting if to ask John question, which John is not in a position to answer, then it's going to be a long repeat of the same sense of the pattern.

VZK I don't know John, I am asking you who did you approach for funding? We need to know. You said you worked on it diligently. Yet in April of last year we got a letter from Gerry saying he wanted to resign as a trustee, he wanted his foundation to resign as a trustee, basically take back the properties, after that you file a lien. You owe duties to this board, to report the same way in any corporate board meeting, the person who acted as secretary and treasurer would have to report. I am trying to change the subject, because what I also could gather from the documents, the Deborah Devedjian project, or initiative, was put on hold because you wanted to look at funding sources before you went ahead with any grand plan. So I am asking what happened in all that? You got to give an account of what happened during your tenure for three years. And you said you

3

haven't made any reports, if there aren't any minutes, and yet documents have been filed. I am trying to go to something simple. Who have you solicited for funding? John?

JJW I am still here.

VZK Well, are you going to answer?

JJW I already said I wasn't going to answer the question.

VZK Is there a reason why you are not going to answer the question, who you solicited for funding?

JJW I am not going to answer a whole series of questions that are in the form of some kind of a deposition, just because you have a list of questions that you want to ask me and answer. You ask the rest of the board members.

VZK I will.

JJW We had a meeting last April. Everybody got together. We talked about a couple of different polls. We had a prepared plan that was presented to everybody in the context of how we would move forward to fund raise. That plan was voted down. I don't know what...

VZK All you have to do is tell me whether you approached anyone for funding or not?

JJW I don't think I have to.

VZK You do John. The Foundation was managing the project.

JJW I think that's a mischaracterization. You try that mischaracterization most of the time. It's not going to work.

VZK. OK. Gerry Cafesjian was chairman and president. John Waters was the secretary treasurer, recently appointed as a trustee. Under any circumstance you owe a report to the board. Any board has the right to ask its officers what they did and that officer has to respond with a report, that is not 'I am not going to answer,' but is, 'here's what we did,' because you have fiduciary duties to the AGMM. I can ask anyone else what they did, any corporate board, any officer, it is quite regular to get those reports. These are basic issues, John. Tax returns were filed without board approval, [without] the board seeing them. A lien was recorded on properties belonging to AGMM. A considerable donation was made and we don't have record of it, and we don't know where it is. You apparently know where it is. I haven't seen any correspondence on it, but as I recall those rugs were valued at a million dollars. You got to give reports on this stuff. We did get a letter from your attorney saying that the Cafesjian Foundation donated in excess of 14 million 500 thousand to the project. This affects how many votes people are entitled to. Is that accurate? Can you tell me how much you guys have donated so far?

JJW If that number is out there that number is approximately correct.

VZK You have been allocated 3 votes in the past, but apparently the donations don't equal that amount.

JJW I don't think you want to go down that path.

VZK Why?

JJW Other people will have their vote ??????

VZK Well they would have because they remained as initial trustees. Everyone was named in the bylaws as initial trustee. The question of additional votes beyond the one for initial trustees, yes.

JJW Again, you can try to be clever that way, but it won't work.

VZK I am not trying to be clever, I am asking you how much you guys contributed.

JJW I don't have that exact number in front of me.

VZK We do have an issue still that we have to come back to it, the recording of the lien. Are you willing to remove those liens?

JJW No sir.

VZK OK. The tax returns that were filed on behalf of the corporation in previous years, who prepared those?

JJW Returns were prepared by Deloitte Touche.

VZK OK. Have they been tasked to prepare the returns for 2006?

JJW I am not certain of that. No.

VZK You know who is managing that? You were acting as secretary-treasurer, somebody is going to have to file tax returns.

JJW I would call Ellen Gordon and ask her.

VZK Why, was Ellen involved with prior returns?

JJW Yap.

VZK She was involved with the prior returns?

5

JJW I didn't hear the question.

VZK Was Ellen involved with the prior returns? Does she know someone at Deloitte Touche to call? Ellen is the comptroller for the Assembly.

JJW Ellen was the person that we were directed to send all the books and records to, the person who is now in receipt of all the books and records, and the person who has been working out financials and tax returns. I know that she knows who to talk to because she has spoken with them.

VZK OK. I don't know really what the best way to go forward here, John, because we've got some fundamental conflict of interest issues here. I think what would help rather than the general language of Gerry would like to see something happen, you qualify what that something is. Because I'll tell you clearly, I am not going to be comfortable talking about plans to move the museum project forward. At the same time we are looking at this lawsuit seeking to rescind it to take the properties back, which I understand have appreciated in value. Are you going to respond to that?

JJW Again, I am going to repeat the fact that the series of questions, and in the way the questions are being asked, feels more like a deposition than a board meeting, that I am not inclined to answer any of these questions at this stage without advice of counsel. So I am not going to answer the question.

VZK Why don't you tell us what you are prepared to talk about? That would be easier.

JJW I am looking at an agenda, chairman's report, financial report, authorization of a committee and election of officers.

VZK OK. So? I mean financial report, that would be something that you would provide, but you're saying that you're not going to provide it. You've been acting as secretary treasurer for a while, and yet there is no board authorization for a lot of things that you did. There is a lot of questions. There were restricted donations that came in and went out, again without board authorization. It is going to be hard to get a financial report except if you're going to answer those questions.

JJW Well I don't necessarily agree with your characterization. All of the financial information, detailed financial information, have all been turned over to the new secretary treasurer and as directed to Ellen Gordon of the Assembly.

VZK I don't know if we have a new secretary treasurer.

HH Why don't you take a few minutes Van. John, this is Hirair talking.

JJW Yes sir.

HH The reason that Van was pushing, requesting the answers to the previous donors. We would like to know who did you approach, because we do have the plans, we are working on it, to build the whole thing. As to what form or shape it's going to take, we really don't know. We would like to know who have you met and what the result was. I do know that you or Gerry have written to the Lincy Foundation and you did get back a letter from them. I would like to know what were the contents of the letter before I approach them. I do know you approached Vartan Gregorian. I don't know what happened, what transpired. I know you approached Louise, correct me if I am wrong on any of these issues, Louise Simone, Carolyn Mugar, and a few others. I would like to know what responses you got from those people. Just so in the future, contact with those individuals becomes important as soon as we possibly can.

JJW I understand you Hirair. I will take a look.

HH OK. That would be very very helpful. And the other issue is as Van brought up, this litigation, I did understand in your initial statement you said that Gerry is interested in seeing the completion of this building. What did you think he had in mind? How could we possibly resolve this, if there is a way to resolving this, with all these lawsuits hanging all over us, what method and what avenue would you suggest? What Gerry suggests?

JJW Again, Hirair, if we just go back a little bit over time, we sent the letter to the board with suggestion of how to move forward. There was a response to that letter. I have to say the nature of that response and the characterization of that response made it difficult to think that there was a way to move forward. We have responded to that letter. After several weeks of no response, in an effort to address at least one of the major issues raised in the letter that we received from Mr. Sills, to protect the Foundation's interest, we moved forward with the filing of a lawsuit for the collection of the 500,000 dollars and the repair of the breach under that grant agreement. I will suggest if there is a desire to move forward, I place a greater degree of that burden on you and Anoush and Van and the current members of the board, to make a recommendation on how to move forward. We have been trying to figure that out for a little over six years without much success. So if there is a thought or a plan to move forward in some fashion, I guess we would be very happy to hear that and take a look at that. It's sort of hard to respond to what has been put forward so far.

HH I believe as a board we do have a fiduciary responsibility, from what we gather from the rough numbers that I have seen, is that during your leadership, or Gerry Cafesjian's leadership, you had collected approximately 3 million plus dollars. We really don't know where that money went. We would like to know that. What you are saying that we rejected it [the plan], I really don't think you have any consideration for that money. I don't want to go into any details of it. That's fine, but I would like to know what happened to those 3 million dollars.

JJW Again, Hirair, I know this is being recorded and we are talking for the record, but first of all, you or folks at the Assembly otherwise have in their possession all of the documents and I assume you are getting copies of the letters we are sending forward.

7

That general breakdown and details of where very dollar has been spent are in your possession, or should be in your possession. There is nothing unusual or exceptional in the list of things that have been paid for. I mean real estate taxes, insurance, a little maintenance and upkeep, it's all there in the records. We have had really nothing of significance if you look at the overall expenditures other than sort of the maintenance of the existing assets of the foundation.

HH The one thing that we did not know and just find out. When we got your files and tax returns, there was a 500,000 dollar interest collected on the investment. That was a total surprise to us. And when you say that everything is already recorded, that was a total surprise to me.

JJW That's an interesting observation. I guess I would have to look at exactly what you are pointing to. The only things that are that would sort of creep into my memory from that kind of a conversation is that if you go back all the way back to the formation, the first acquisition of the AGMM, all the funds were collected by and through the Assembly, both on behalf of the project and on behalf of ANI, and those funds were kept in the Assembly endowment fund, and so the only significant source of any gain or interest would have come from those two accounts held by the Assembly. I don't think there was ever enough sufficient cash or capital within AGMM accounts that would have allowed for that kind of interest income. But again, I am happy at some point to go back and review the documents step by step to see if I can give you a better explanation for that.

VZK John this is Van again. You characterize the lawsuit a little bit differently than the document reads. The lawsuit seeks the rescission of the grant agreement and restitution of all donations made. What that means is that basically that you are either trying to get back all the properties, as I said before they have appreciated in value, or are you trying to get all the money back that you donated? And that's I think what we have to take as the basis because you filed it in court what you want to do. And I hope that you understand that if that's what you want to do, there is a pretty ????? cross??? with the purpose of this corporation in terms of trying to move the project forward and build a museum. I am not going ask you to agree with it, but do you understand what I am saying at least?

JJW I can understand you trying to argue that. I think you got to down the...If one starts going to go down that path, I think you have to go down that path for every member of the board. Why over time has the Assembly refused to turn over money? Why the Assembly refused to reissue its loan? Why, why, why? And then the Assembly is in conflict with the corporation. We can go down that list if you want.

VZK Ya, we can do that because the two things that you mentioned, the Assembly didn't pay the note because you guys forgave it.

JJW OK, Van, you know.

8

VZK There is an explanation

HH I think this is going too far to what you call it... John let me just give you a very broad view for where we are at this point. I believe when the AGMM was formed, Gerry Cafesjian and you had taken over sort of all the responsibility, and me being the vice-chairman, I had indicated to you and everybody else at the time including Devedjian, when she came in I tried to help her as much as I could, that I really did not have any time, any time at all to get involved in the planning or the fund raising and so forth and so on, except when the proper architectural plans were done, I was supposed to show that to Mr. [Kirk] Kerkorian. That's exactly what happened, and next thing I know we got that letter that I did not have the vision and so forth and so on. Having said that, I believe you and Gerry had assumed this entire responsibility for the building of this museum along with the community of your choosing. All we are asking right now, since having withdrawn from that original inception, that we are looking at some background material, for us to start reconstructing this whole issue all from the beginning. And I do know that you told me that they wanted 400,000 dollars to demolish those three buildings. I think these informations are very very important to us. And we fully intend to start building this museum. That's why Van is asking all these very intricate questions that you feel like it is a deposition. It is not. It is to reveal what we really don't know because you guys were in charge for four five years.

VZK ??????? Just to be practical about it too, John, please understand we have a situation where Deborah Devedjian has a claim, we have financial liabilities, we have contributions that need to be accounted for, and we also have the commitment to building the museum. So I think you took it the wrong way when you said towards the argument I am constructing, the Cafesjian Foundation has filed a lawsuit which it seeks to get the properties back. The only place the Cafesjian Foundation has done it, ?????? Gerry's letters, and your lawyers offered Gerry's letters going back over a year where he proposed we sign the other properties back to the Foundation, and then resigning from the trustees. It's really a mixed up situation. Very clearly, we need to know. We have your position in writing, and that is you want the properties back. You sued for that. And I hope you'd understand that because that's what I feel we have to go by.

JJW So?

VZK Take your choice. You want to remove the lien from the properties that you signed on behalf of AGMM without authorization? I'd be prepared to give you a few days to do that, but then I think this board would have to authorize somebody else to withdraw that recording. The Deborah Devedjian situation threatening financial liability to the corporation and we understand your point that she was done, she was paid for the work that she did, however, we have one former board member who clearly says that you have asked her to do additional work thereafter for which she apparently was not paid. You want to assume responsibility and indemnify the AGMM for those liabilities since you were managing it. I hope that you are going to tell us where those rugs are, and point out where those have been reflected as an asset. I hope that they have been insured. I hope that fiduciary duties have been respected with regard to those. The building situation.

9

We got property in poor condition. Those things have to be taken care of. The demolition wasn't done, so the tax exempt status was threatened, we had to pay taxes on it. These are very practical things. Now if your position is we want to build a museum, well that's pretty inconsistent with what we have in writing from Gerry, from the Foundation's lawyers, from the Foundation, and in this complaint. That's really why the fundamental question is, what do you want to do? If you want to get the properties back, then I don't see how you can participate in developing the museum. At a minimum though, on these practical issues, and even though we may disagree on that conflict of interest issue, it strikes me as pretty obvious. If we disagree on those, on these practical things, may be you can help us. Got to. Take your pick. Those are the concerns that I have.

JJW And we've got a long list of concerns. They have all been set forth in writing. I think on a very practical???? basis, you go back and look at the issues, for 3 years this property, this project was in the domain of the Assembly family, during which time certain steps were taken but little overall progress was made. So, it was moved to the AGMM Inc. Again for a 3 year period attempts were made but limited success was achieved in moving the project forward. Everybody can have their viewpoint as to why it did not move forward more significantly during that 6 year period. That said, you can start right now from today and say, in order for this project to move forward, certain things need to happen, and so if proposals are put on the table, in the normal course of business, if they are reviewed and found to be acceptable by all the parties, the project will move forward. If they are not, it will continue to languish as in the last period of time. So I don't quite…if you want to use this meeting for me to spend time characterizing and you to spend [time] characterizing, I think when you go through day by day, and step by step and reconstruct the history in any way that you may want, the facts will pretty much allow anybody to determine what that history looks like. So, I haven't heard anything today that says we're sitting on a million dollars, we'd like to…here's out budget for the upcoming year, we're going to spend this much money on this activity and that activity. We got this person and that person to do something. We need to spend some time on coming up with a plan on how to develop the business of developing the museum project. So I hear you saying it, but I don't really see evidence or any activity on that front either. To hear and listen to a bunch of characterizations and mischaracterizations, I don't see that moving anything forward.

VZK You know what. You didn't quite address the issue, either of the issues that are on the table though, John. The first one is, if the Foundation, and you as the Foundation's representative, are interested as you have been for a year in getting the properties back, to have you participate or be privy to the board's deliberations on how to move the property forward, as board members, it would be illegal. You got a real conflict of interest here, John. I am saying that not in an adversarial way at all, but in a very commonsensical way. You don't have to respond to it. I'll make it easy for you. You don't have to respond. You can, I'm sure we'll get a little bit more into it, on this second set of issues, at a very practical level, I'd like to hear you say, ya, we have accounted for those rugs, they are insured, they are being taken care of. If anything else, that would be comforting.

10

I'd like to hear you say ya, we are willing to assume responsibility for dealing with Deborah Devedjian to take that burden off the AGMM hands.

JJW Van you can keep saying these things over and over again, and it's not going to happen. Alright? Every step was taken in the past... I don't need to respond.

VZK You don't need to respond.

JJW All these allegations have been contained in the correspondence that have gone back and forth, and so asking them again over and over in the context of a meeting isn't going to change anything. So, now my question to you.

VZK Great.

JJW Do we have anything on the agenda today worth talking about.

VZK I think that we do, but I have checked the law and I don't feel comfortable. In fact I think it is a conflict of interest for you to be present when we discuss those things.

JJW If you want to...I mean I am not going to sign off of this meeting and I am not going to allow the meeting to move forward without our participation. If you think we are in a conflict position, then you should take some action to allege???? That...you probably need a court order to do that, because you can't do it in the context of this board.

VZK I think actually we can do, because the law is pretty clear, is to have you not participate in the discussion for the vote on those issues on which a conflict exists. And I think that the board is well within its right to note that you filed a complaint seeking to take back all of the properties that are in the AGMM, and therefore your participation in discussion on how to proceed with those is about as clear a conflict of interest as there could be. I think that on the other issue of the lien that you filed on behalf of the AGMM, without authority from the board, is another one. So, I think that the action that we would take would be to ask you not to participate in those discussions on proposals on how to go forward or the votes, and then bring you back when we're done with those.

JJW Well, no I am not going to allow that to happen.

VZK How you are not going to allow that to happen.

JJW Well I exercise six votes, I mean three out of the six votes.

VZK Well you are not allowed to vote on this because you got a conflict on voting on your own situation.

JJW That's your own interpretation. I say you're conflicted out. So I have 3 votes against your 3 votes that says you're conflicted out, so this meeting can be just as easily be adjourned as anything.

11

VZK I don't see that.

JJW I'm sorry that you don't see that. You better take it up with counsel.

VZK I think I already have.

JJW Fine.

VZK But I don't see how you could do that because...

JJW I don't see how you could do it, so now we are both sitting staring at each other wondering how we can do something.

VZK I'm not. I going to make a motion that the Cafesjian Foundation be precluded from participating in discussions on proposals on how to develop the museum or have them lift???? the lien that have been placed on the properties because it filed a lawsuit seeking rescission of its grant agreement, restitution of all donations made pursuant to the agreement, and have also for a year asked for those properties back, which have appreciated in value. Is there a second?

HH I second. Anoush?

JJW All opposed? You have got 3 votes against that motion.

VZK You are not allowed to vote on that because it affects you.

JJW No I am allowed to vote on it.

VZK OK. You know what, you're not though, John.

JJW What? OK. I really think this meeting for all intents and purposes is over. I hereby move to adjourn.

HH I would like to go into more discussion, John, on the issues that I brought up getting some more direction for us to really start building and raising funds for this project. I would like to have some more of the other details that I brought up.

JJW Hirair, with all due respect, I'd love to have a meaningful conversation, but in the face of an effort to first of all to conduct a deposition in the form of a meeting, to basically attempt to exclude Cafesjian from participation in this meeting, it's just not going to happen.

VZK You're mischaracterized them John.

JJW You've been ????? mischaracterization for an hour...for someone else to figure out.

12

VZK We don't vote. The Assembly is not going to second or vote in favor of adjourning.

JJW We got a stalemate for all intents and purposes.

VZK We don't got a stalemate actually because I think it's very clear that you can't vote on a motion to disqualify yourself. You just can't. It's basic parliamentary procedure. It's basic law. You cannot do that.

JJW Well then, I'll give notice in five days and do the exact same thing.

VZK What does that mean?

JJW I guess since you know everything, mind as well go read the Bible.

VZK You'll give notice and you'll do what same thing? Hold a meeting?

JJW Yap.

VZK OK. It won't change that. Let me try to put it in a different way.

JJW No. Let me try, because I am getting off the phone here in a second.

VZK Alright.

JJW I am going to be leaving the meeting under protest. Anything that you do from this point forward, you can consider it to be a quorum if you like, because it says that it is. Anything you vote on, you can do whatever you want, but…anyway…My participation in this meeting is over.

VZK Well, OK. Feel free to call afterwards…Leave the tape recorder on. Let's proceed with the meeting because we're entitled to proceed.

HH Absolutely.

VZK We're entitled to proceed with the meeting. We had a lot of business that needs to be taken care of, whether they are going to participate or not.

HH Let the record show that John got off the phone at a quarter after eleven. The meeting is being continued.

CAFESJIAN FAMILY FOUNDATION



May 17, 2007

Ms. Anoush Mathevosian                    Mr. Van Z. Krikorian
30 Candy Lane                             Global Gold Corporation
Great Neck, NY  11023                     45 East Putnam Avenue
                                          Greenwich, CT  06830

Mr. Hirair Hovnanian                      Armenian Genocide Museum
Hovsons Inc.                              Memorial
One Hovchild Plaza                        1140 19th Street NW
4000 Route 66                             Suite 600
Tinton Falls, NJ  07753                   Washington, DC  20026

              Re:     Exclusion of Cafesjian Interests

Dear Ms. Mathevosian, Mr. Krikorian and Mr. Hovnanian:

During the last board of trustees meeting, three board members insisted that the Cafesjian representative be barred from participating, based upon a perceived conflict of interest.  The Cafesjian interests have brought a lawsuit against the Armenian Assembly, but no claims have been asserted against AGM&M.  Nonetheless, as the Cafesjian board representative I was ostracized.  The conflict of interest charge is without foundation in fact or law.

This unilateral and inappropriate action of the non-Cafesjian trustees compels us to make the following demands.

First, please provide us with a copy of the minutes and the tape recording of the entire meeting – including the portion from which I was excluded.

Second, any action taken in the absence of a Cafesjian representative by the rump board was invalid.  Hence, any decisions rendered in my absence must be set aside.

Third, there can be no further board meetings without Cafesjian representation.  Therefore, immediately refrain from attempting to conduct any such sessions in which Cafesjian interests do not fully participate.

Finally, the trustees now seem to be hopelessly deadlocked.  While the three non-Cafesjian trustees ordain that I have a conflict of interest, at least two of the three other board members are equally conflicted.  The impasse cannot be gainsaid.  Under the circumstances dissolution seems to be the only available course of action.   When can we negotiate that process in order to avoid judicial involvement?

Sincerely,

John C. Waters, Jr.
Vice President

Cc:     Gerard L. Cafesjian                                          **Exhibit 5**
        Timothy Thornton, Briggs and Morgan

15 SOUTH FIFTH STREET  SUITE 900  MINNEAPOLIS, MINNESOTA 55402  PHONE 612.359.8991  FAX 612.359.8994
4001 TAMIAMI TRAIL NORTH  SUITE 425  NAPLES, FLORIDA 34103  PHONE 941.263.1999  FAX 941.263.2952

**Armenian Genocide Museum and Memorial, Inc.**
1140 19th Street NW, Suite 600, Washington DC 20036
Phone: 202-383-9009, Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
August 31, 2007
CONTACT: Rouben Adalian
Phone: (202) 383-9009
E-mail: ani@agmm.org
Web: www.armenian-genocide.org

## Armenian Genocide Museum and Memorial Begins Conversion of Historic Washington, DC Sites into a New Museum

Washington, DC - The Armenian Genocide Museum and Memorial (AGMM) announced today that its Building and Operations Committee signed contracts with Washington area firms specializing in museum planning and construction to begin the development and construction of a stellar museum in the historic National Bank of Washington building and adjacent properties.

AGMM selected two firms previously invited to submit proposals for the site. The Committee awarded its phase one museum planning contract to the prestigious firm of Gallagher & Associates, www.gallagherdesign.com, which specializes in the planning, design and management of innovative, informative, and immersive experiences for museums, learning facilities and visitor centers. Based in the Washington area, this premier museum planning firm has steered to completion numerous projects ranging from exhibit and visitor centers at Jamestown Settlement in Virginia and the Gettysburg National Battlefield in Pennsylvania, to a multimedia re-creation of the 1969 Woodstock Music Festival in New York. Significantly, Gallagher & Associates was also selected by the United States National Archives to showcase its vast collection of historic documents in a new permanent exhibit on the Washington Mall. The firm also designed the Montreal Holocaust Museum and has commenced master planning for the new Woodrow Wilson Presidential Museum. The Gallagher proposal for AGMM was reviewed by leading scholars in the fields of Armenian and genocide studies.

The Committee also awarded a phase one contract to the firm of Martinez & Johnson Architecture, www.mjarchitecture.com, which is recognized in Washington for its expertise in the design of complex, multi-functional facilities, as well as the restoration of architecturally significant buildings. Most recently the firm renovated the Boston Opera House, regarded as a masterpiece of American Baroque architecture. Among many other projects in the District of Columbia, Martinez & Johnson renovated and converted the landmark Gothic Revival structure known as the Alban Towers facing the

Exhibit 6

National Cathedral. The firm will be preparing plans for the complete renovation and restoration of the onetime bank structure, whose exterior and interior are designated as landmarks on the National Register of Historic Buildings, as well as its conversion into a public space for exhibit and community use.

The two firms also have a track record of cooperation on a number of museum projects including the National Museum of Civil War Medicine in Frederick, Maryland, and the National Music Center and Museum in Washington, DC. Presently they are collaborating on The Artists Hall of Honor and Museum of the Mississippi Arts and Entertainment Center.

With their announcement the Committee thanked Hirair Hovnanian, Chairman of AGMM, who has characteristically stepped up with financial contributions to allow this phase of development to go forward, and Anoush Mathevosian, who first proposed the idea of an Armenian Genocide museum in Washington, for their continued commitment to the project, which has reached a new stage towards the goal of seeing a memorial museum in the United States become a reality.

Van Z. Krikorian, in his capacity as chairman of the AGMM Committee, which was fully authorized to proceed with all aspects of the project's development and operation, added: "Despite reports that this project might not get off the ground, I am delighted to inform opponents that their expectations will not be met. The Committee, Hirair Hovnanian, Anoush Mathevosian, the Armenian Assembly of America, and all of our friends are resolved to build this center in our nation's capital. Here the Armenian Genocide and its legacy will be properly memorialized and explained through innovative exhibits and a state-of-the-art museum facility. The future museum will be located at an exceptional site in the heart of Washington, steps from the White House, and will include special emphasis on the role of the United States in genocide prevention and punishment."

Krikorian is joined on the AGMM Committee by Denise Darmanian, Esq., Edele Hovnanian, Richard Papalian and Zaven Tachdjian, all of whom have brought their experience and strong commitment to the Armenian community to work with the two outstanding firms that will plan, design, and assemble the museum. The Committee also assigned Dr. Rouben Adalian, Director of the Armenian National Institute (ANI), to lead the exhibit planning and historical depiction process.

For more information, please contact the Armenian National Institute at 202-383-9009.

**Photo caption:** *Landmark Washington building, the former National Bank of Washington site and future Armenian Genocide Museum and Memorial.*

## Armenian Genocide Museum and Memorial, Inc.
### 1140 19th Street, NW, Suite 600, Washington, DC 20036
### Phone: 202-383-9009, Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
November 21, 2007
CONTACT: Rouben Adalian
Phone: (202) 383-9009
E-mail: ani@agmm.org
Web: www.armenian-genocide.org

# ARMENIAN GENOCIDE MUSEUM UNVEILS PLANS
## Phase Two Contracts Signed and Development Underway

Washington, November 21, 2007- At the Armenian Assembly of America's 35th Anniversary Banquet in Beverly Hills, California, on November 3, a video and a brochure issued simultaneously unveiled the architecture and exhibit designs for the renamed Armenian Genocide Museum of America. The current plans for the facility call for a 50,000 square foot complex with room to expand in the future.

With renderings prepared by the museum planning firm of Gallagher & Associates and the architectural firm of Martinez & Johnson, the public had an opportunity to see the future museum. A community that had anxiously waited for years to hear about progress on the project welcomed the announcement and applauded the headway made in planning the museum.

The video presented on the museum's development as well as the brochure are now available on the Armenian Genocide Museum and Memorial, Inc.'s web site: www.armeniangenocidemuseum.org.

The plans were issued with an appeal by the grandson of Ambassador Morgenthau, Henry Morgenthau III, who writes:

> *Ambassador Henry Morgenthau would have welcomed this new and daring project to raise a museum in the heart of our nation's capital dedicated to the purpose of informing about the Armenian Genocide and educating the public about the need to prevent such crimes against humanity.*

> *As he sought ways to save the Armenians, Ambassador Morgenthau envisioned a home for them in America. I am certain he would have felt his mission fulfilled to see the Armenian people celebrate their resilience in their adopted country.*

Among its many exhibits, the Armenian Genocide Museum of America will feature a Human Rights and Genocide Exhibit, a Multi-Media Armenian Identity Experience, a Survivors Theater, and a Taking Action Center. The Museum is envisioned as a center of learning accessible to all ages, with interactive media and an immersive experience to encourage visitors to engage the problems facing humanity and to defeat the scourge of genocide.

As the announcements were issued, contracts were finalized for Phase Two with Martinez and Johnson embarking upon the preparation of schematic design, design development and construction documents. Gallagher & Associates has also begun the preparation of the schematic design package based on the interpretive plans established during the conceptual design phase. The Armenian Genocide Museum project is now completely on track.

NR#2007-004

**Exhibit 7**

**Armenian Genocide Museum and Memorial, Inc.**
1140 19th Street, N.W., Suite 600, Washington, DC 20036
Phone: 202-383-9009, Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
October 31, 2007
CONTACT: Rouben Adalian
Phone: (202) 383-9009
E-mail: ani@agmm.org
Web: www.armenian-genocide.org

## MINNESOTA COURT RULES AGAINST CAFESJIAN AND IN FAVOR OF THE ARMENIAN ASSEMBLY AND THE ARMENIAN GENOCIDE MUSEUM
### Armenian Genocide Museum Proceeds to Phase Two Contracts
### New Plans to Be Unveiled at Armenian Assembly Gala in Los Angeles

Washington-October 31, 2007. The U.S. District Court in Minnesota has granted a motion to dismiss the lawsuit filed by Gerard Cafesjian and the Cafesjian Family Foundation against the Armenian Assembly of America and the Armenian Genocide Museum and Memorial (AGMM). The lawsuit sought to rescind the grant agreement the Foundation had made with the Assembly with respect to the Armenian Genocide Museum project, so that Cafesjian could recover the substantially appreciated real estate.

At the same time, AGMM announced the signing of Phase Two contracts with the architectural firm of Martinez & Johnson (www.mjarchitecture.com) and the museum planning firm of Gallagher & Associates (www.gallagherdesign.com). Architectural and exhibit planning are proceeding on schedule and the museum is slated to open before 2011.

In a statement issued today, the Armenian Assembly and the AGMM said: "We regret that Gerard Cafesjian has filed these lawsuits and is now attempting to try the case in the press. We appreciate the Minnesota court's ruling in our favor to dismiss the lawsuit, and do not expect any court to accept the misrepresentations promoted to stop or cloud the completion of the museum.

Cafesjian formally abandoned the project in 2006 demanding return of appreciated real estate. This left the other trustees with serious problems, including unpaid taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left in tatters a project that the Armenian-American community strongly endorsed and wants completed. Unbeknownst to the other trustees, the District of Columbia had reclassified the properties. In early 2007, after flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy and after legal review, Cafesjian and John Waters were suspended from the Assembly board. Cafesjian's formation of his personal

Exhibit 8

lobbying organization, USAPAC, has caused additional damage.

In May 2007, at a properly noticed meeting with a quorum, the trustees voted to proceed with the project expeditiously. Cafesjian's appointed trustee and long-time employee, John Waters, attended the meeting despite his conflict of interest, but refused to account or report on basic corporate and financial matters, in a clear breach of fiduciary duties, interested only in Cafesjian's attempts to extract the appreciated real estate. Waters voluntarily left when he could not get his way, leaving the meeting with a quorum and the authority to proceed. According to the recording (made without objection) of the meeting and the transcript, Waters stated the following as he departed:

> 'Anything that you do from this point forward, you can consider it to be a quorum if you like, because it says that it is. Anything you vote on, you can do whatever you want, but. . .anyway. . .My participation in this meeting is over.'

In a series of front page stories in *The Armenian Reporter*, a newspaper which he controls, Cafesjian and his staff have spared no effort in disparaging the project, the Assembly, and other community members, with no regard to journalistic ethics. Cafesjian has filed legal proceedings characterized as frivolous, including one against the museum, and the other trustees, Anoush Mathevosian, Hirair Hovnanian, and Van Krikorian, personally. Yet the facts, confirmed by records made available after Cafesjian abandoned the project, are that Cafesjian acquired the properties adjacent to the intended museum building to construct a monument to himself in the form of a "Cafesjian Museum," which would dwarf the Armenian Genocide Museum. (See the attached drawing commissioned in secret). Only when his attention turned elsewhere, he transferred the properties to AGMM. Taking control of AGMM, he failed to fund the project, mismanaged development, resigned, and abandoned the properties and project in 2006.

*The Armenian Reporter* also failed to inform the public that the Assembly and AGMM have filed papers with the American Arbitration Association in a good faith effort to reach an amicable conclusion without making a public spectacle. Cafesjian has rejected this offer of mediation and filed in court to stop the American Arbitration Association from proceeding. Upon the Minnesota District Court's decision to dismiss, the AGMM and Assembly renewed the offer for mediation to Cafesjian attorneys and again was rebuffed.

Once more we want to thank the people who have supported our efforts to date and who continue to express confidence in the museum project, despite the litigation unnecessarily started by Cafesjian. No court will sanction the windfall profit return of appreciated property to the Cafesjian Foundation or derail the process of completing the Armenian Genocide Museum. The other museum trustees and stakeholders sincerely wish that Cafesjian had not embarked on his misleading and destructive course of action in public and hope that he will reconsider and resolve the matter responsibly.

The Armenian Genocide Museum trustees and the Armenian Assembly are looking

forward to unveiling the magnificent designs developed by our two outstanding planning firms this weekend at the Assembly's 35th Anniversary Gala event in Los Angeles.  Remarkable progress has been made in the last three months.



AGYM and Gerard L. Cafesjian Museum of Contemporary Art  
Washington, DC

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

The Cafesjian Family Foundation, Inc.,
individually and on behalf of the Armenian
Genocide Museum and Memorial, Inc.,

        Plaintiff,

    v.

Armenian Genocide Museum and Memorial,
Inc., Hirair Hovnanian, Anoush Mathevosian,
Van Krikorian and the Armenian Assembly of
America, Inc.,

        Defendants.

Civil File No. 07-1746 (RWR)

**AFFIDAVIT OF MOLLY M. BORG IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

| COUNTY OF HENNEPIN | ) | |
| | )ss | |
| STATE OF MINNESOTA | ) | |

I, Molly M. Borg, under oath attest as follows:

1.    I am an attorney admitted *pro hac vice* in this Court and am counsel of record for plaintiff. I have personal knowledge of the facts set forth in this affidavit.

2.    Attached as Exhibit 9 is a photocopy of the newspaper article, Daniel Browning, Cafesjian's Museum Dream Lands in Federal Court, Minneapolis Star Tribune, June 21, 2007, at 5B.

3.    Attached as Exhibit 10 is a photocopy of Exhibit A, "Statement in Support of Application of Exempt Status," to the Armenian Genocide Museum & Memorial, Inc.'s Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code dated October 31, 2003, which was attached as Exhibit 1 to the Affidavit of Arnold Rosenfeld

dated November 19, 2007 and filed in *Cafesjian v. The Armenian Assembly of America,* 07-2079 (D. Minn.).

4.      Attached as Exhibit 11 is a photocopy of the press release issued by the Armenian Assembly of America dated November 14, 2007, available at www.aaainc.org/index/php?id=491&type=98.

5.      Attached as Exhibit 12 is a photocopy of the brochure of the Armenian Genocide Museum of America published by the Armenian Genocide Museum and Memorial, Inc., available at www.armeniangenocidemuseum.org.

This concludes my affidavit.

                                                    s/ Molly M. Borg
                                                    Molly M. Borg

Subscribed and sworn to me
this 27th day of November, 2007

s/ Barbara J. McNabb
Notary Public
My Commission Expires: January 31, 2010

2111270v1

Westlaw.                                                          NewsRoom

6/22/07 STTRMSP 5B                                                         Page 1

6/22/07 Star Trib. (Minneapolis-St. Paul) 5B
2007 WLNR 11801338

Star Tribune: Newspaper of the Twin Cities (Minneapolis, MN)
Copyright 2007 Star Tribune: Newspaper of the Twin Cities

June 22, 2007

Section: NEWS

**Cafesjian's** museum dream lands in federal court: The rescuer of the carousel that bears his name has wanted to build an Armenian Genocide Museum in Washington, D.C.

Dan Browning
Staff Writer

Gerard Cafesjian's ambitious plan to develop an Armenian Genocide Museum and Memorial just blocks from the White House is at an impasse, according to a federal lawsuit pending in Minneapolis.

Cafesjian, a retired West Publishing executive, is a major benefactor of the project and has been working for more than seven years with the Armenian Assembly of America to build the museum in the old National Bank of Washington building.

The Armenian genocide took place between 1915 and 1918, when the Ottoman Empire ordered Armenians into exile in Syria and Iraq. The Armenian National Institute in Washington says up to 1.5 million died in the purge. The Turkish government, which succeeded Ottomans, puts the figure at 300,000 to 600,000.

Cafesjian, who now lives in Naples, Fla., could not be reached for comment. He is best known in Minnesota as an art aficionado and as the primary benefactor who helped preserve the historic State Fair carousel that now bears his name in Como Park.

Biographical material on one of Cafesjian's foundation websites says the Armenian genocide had a profound effect on him. His father lost his parents and siblings in the genocide, and his mother had already been twice widowed when she married his father.

He hired New Jersey architect Edgar Papasian to design an elaborate memorial that attaches to the existing bank building. But the other members of the museum board balked, fearing it would be too difficult to get permits.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Exhibit 9**

6/22/07 STTRMSP 5B                                                          Page 2

"It was a very daring design, I have to admit," Papasian said in a recent
interview. But he insists that it's buildable. Papasian said he hasn't heard
anything about the project in about a year, when he was told that Cafesjian was
looking to get out of it.

.

End of 'grandiose' plans

The Armenian Assembly says in its court filings that it asked Cafesjian to stay on
and pursue his vision of the project. But it says that Cafesjian failed to deliver
on his "grandiose" plans and now wants to recoup four lots around the bank
building, which he and his Cafesjian Family Foundation bought for more than $12.85
million and donated for the project.

Robert Kaloosdian, a Massachusetts lawyer and founding member of the Armenian
Assembly of America, says in a sworn statement that the idea of the genocide
museum began in the 1990s. In 1997, Kaloosdian and others sought Cafesjian's help.

Cafesjian agreed to work with the group and the bank site was found in 2000,
Kaloosdian says. Cafesjian and his foundation contributed $4 million as a grant to
help buy the site, on top of $1 million that had already been contributed by the
Cafesjian Family Foundation Charitable Trust. As part of the grant agreement, the
Armenian Assembly signed a promissory note for $500,000, which was needed to close
the deal.

.

'This isn't going to work out'

Cafesjian filed suit April 26 in U.S. District Court in Minneapolis demanding that
the note be paid. He also seeks to be reimbursed for all donations. His attorney,
Timothy Thornton of Minneapolis, said that means he wants the four lots back,
together with his interest in the bank building.

"The only one who's put any real money into this is Cafesjian," Thornton said.
"These people have sat back and sniped and carped and did everything they could to
prevent this from going forward," he said. "And having failed to perform their end
of the bargain, it's just apparent that this isn't going to work out."

Arnold Rosenfeld, a Boston lawyer representing the Armenian Assembly, said it was
always understood that Cafesjian would forgive the $500,000 note. "The big problem
is that Mr. Cafesjian does not want to continue with this. Until that's resolved,
it's unclear right now how and when we're going to be able to proceed to build the
museum," Rosenfeld said. "I think what may happen is the whole project may be
downsized ... to just be the old National Bank Building."

Rosenfeld said the lots surrounding the bank may be worth $18 million to $20
million now. Cafesjian could have whatever he donated back, Rosenfeld said, but
the appreciated value of the real estate should go to the genocide museum.

Rosenfeld is scheduled to argue Aug. 23 that the case should be dismissed from

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

federal court in Minnesota on jurisdictional grounds. He wants to arbitrate the matter in Washington.

But Thornton says Minnesota is the proper venue because the promissory note says that any dispute would be resolved here.

.

Dan Browning - 612-673-4493

---- INDEX REFERENCES ----

COMPANY: NATIONAL BANK; WHITE HOUSE

NEWS SUBJECT: (Foundations (1FO95); Legal (1LE33); Social Issues (1SO05); Judicial (1JU36); Philanthropy (1PH09))

REGION: (Armenia (1AR09); Americas (1AM92); Minnesota (1MI53); North America (1NO39); New England (1NE37); Massachusetts (1MA15); District of Columbia (1DI60); Europe (1EU83); USA (1US73); Eastern Europe (1EA48))

Language: EN

OTHER INDEXING: (ARMENIAN; ARMENIAN ASSEMBLY; ARMENIAN GENOCIDE MUSEUM; ARMENIAN NATIONAL INSTITUTE; CAFESJIAN FAMILY FOUNDATION; CAFESJIAN FAMILY FOUNDATION CHARITABLE TRUST; MINNESOTA; NATIONAL BANK; NATIONAL BANK BUILDING; OTTOMAN EMPIRE; OTTOMANS; STATE FAIR; US DISTRICT COURT; WHITE HOUSE) (Arnold Rosenfeld; Biographical; Cafesjian; Dan Browning; Edgar Papasian; Gerard Cafesjian; Kaloosdian; Papasian; Robert Kaloosdian; Rosenfeld; Thornton; Timothy Thornton)

KEYWORDS: (lawsuit); (building)

EDITION: METRO

Word Count: 882
6/22/07 STTRMSP 5B
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Armenian Genocide Museum and Memorial, Inc.**
122 C Street, N.W., Suite 350
Washington, D.C. 20001
EIN: 20-0344096

**Exhibit A**
Form 1023, Part II, Questions 1 & 5

## Statement in Support of Application for Exempt Status

The following sets forth background information on the formation of the Armenian

Genocide Museum and Memorial, Inc. (the "AGMM") as well as pertinent information

regarding its structure, purposes, and proposed activities.  It also discusses the applicable legal

authorities that support a favorable action by the Internal Revenue Service on this request for

recognition of its exempt status under section 501(c)(3) of the Internal Revenue Code of 1986

(the "Code").[1]

### A.  General Statement and Proposed Activities

1.    **Background.**

The AGMM is a recently formed nonprofit corporation, duly organized under the

District of Columbia Nonprofit Corporation Act.  Its Articles of Incorporation were issued on

October 29, 2003.  As of the date of this application, the AGMM has been engaged primarily

in organizational activities.[2]

Between 1915 and 1923, the Turkish tried to rid the Ottoman Empire of the minority

Armenians, resulting in the deaths of 1.5 million Armenians through mass murder, disease,

starvation, and exposure.  Another 500,000 were forced from their homes.  By the end, fewer

than 100,000 Armenians remained in their ancestral homeland.  On April 24, 2001, President

---

[1]      All references to the Code are to the Internal Revenue Code of 1986, as amended, U.S. Code, Title 26.
All regulation references are to the Treasury Regulations under the Internal Revenue Code, 26 C.F.R.

[2]      On November 4, 2003, AGMM purchased one of the four properties that will eventually house the
AGMM exhibits.  See response to Part II, Question 8 for more information.

**Exhibit 10**

George W. Bush called this episode "one of the great tragedies of history" and noted that "[t]hese infamous killing darkened the 20th century and continue to haunt us today."

Since the 1980s, the Armenian Assembly of America (the "Assembly"), a section 501(c)(3) organization, has worked to raise public awareness of Armenian issues. In 1997, it founded the Armenian National Institute (the "Institute"), also a section 501(c)(3) organization, for the more specific purpose of raising public awareness of the Armenian Genocide. The idea for developing a museum and memorial grew out of these efforts. The Assembly determined that such an ambitious undertaking would require a separate organizational structure. Thus, the Assembly and various leaders in the Armenian-American community organized AGMM.

2.     **Purposes.**  As stated in Article IV of its Articles of Incorporation, AGMM was formed "to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes."

3.     **Proposed Activities of the AGMM.**  The AGMM will establish a permanent museum and memorial to the victims of the Armenian Genocide. It will also develop and administer rotating and traveling exhibits and public programs, all dedicated to educating the public about the Armenian Genocide and to apply those lessons to prevent genocide today.

One of the AGMM's initial activities will be to purchase the real property necessary to house the AGMM's exhibits and provide space for developing and administering the rotating

2

and traveling exhibits and public programs. The AGMM has completed the purchase of one building in Washington, D.C. and plans to purchase three adjacent buildings within the next year. Once sufficient funding is secured and the pre-existing lease expires, the building will be used to house the museum and memorial.

Before the AGMM became a separate legal entity, the Assembly received contributions from donors who intended to fund the creation of a museum dedicated to remembering and teaching the lessons of the Armenian Genocide. Once the AGMM was incorporated in the District of Columbia on October 29, 2003, the Assembly, with the consent of the donors, transferred those assets to the AGMM. These assets provided the funding to allow the AGMM to purchase the first of four pieces of property that will eventually be the site of the museum in Washington, D.C.

Over time, the AGMM will contract for design and reconstruction of the museum buildings. Once the design and construction of exhibit spaces is completed, the AGMM will install and maintain exhibits and hire staff and curators for exhibitions, as required. It will also engage in other charitable activities to teach the lessons of the Armenian Genocide, including the creation and maintenance of traveling exhibits and a memorial erected in memory of the victims of the Armenian Genocide.

### B.  Discussion of Legal Precedent

The AGMM was organized and will be operated exclusively for charitable and educational purposes and should therefore be recognized as exempt from federal income tax under section 501(c)(3).

## 1. Organizational Test.

The AGMM meets the organizational test of the statute and implementing regulations. Article IV(A) of its Articles of Incorporation provides that the AGMM's purposes are to further educational purposes through its activities, which include operation of a permanent museum and memorial to the victims and survivors of the Armenian Genocide, study of the lessons of the Armenian Genocide and related issues, support of genocide prevention, and presentation of permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

These purposes are charitable and educational in the relevant legal sense. Although the AGMM is empowered to perform various acts in furtherance of its stated exempt purposes, all of those powers are expressly limited to those permitted to organizations exempt under section 501(c)(3). Article IV(D).

In the event that the AGMM is liquidated or dissolved, its assets must be distributed in a manner calculated to carry out the purposes of the organization and all distributions must be to the section 501(c)(3) organizations named in Section 3.4 of the By-Laws which then have and maintain active programs that promote greater awareness of the Armenian Genocide and/or promote educational and charitable programs that benefit the citizens of the Republic of Armenia.

## 2. Operational Test.

Under Treas. Reg. section 1.501(c)(3)-1(c)(3)(1), an organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities that accomplish one or more purposes specified in section

501(c)(3). The AGMM's proposed activities are "charitable" and "educational" in the relevant legal sense.

The AGMM clearly serves educational purposes as defined by Treas. Reg. section 1.501(c)(3)-1(d)(3)(i)(b), which provides that the term "educational" relates to the instruction of the public on subjects that are "useful to the individual and beneficial to the community." Museums are included in the examples of educational organizations which, if they otherwise meet the requirements of section 501(c)(3), may qualify under this section. Treas. Reg. § 1.501(c)(3)-1(d)(3)(ii), Ex. 4.

The Service has long held that organizations devoted to the promotion of historical lessons may qualify as being educational or charitable in character. See, e.g., Rev. Rul. 75-470, 1975-2 C.B. 207 (organization created to promote an appreciation of history through the restoration of buildings having special historical or architectural significance is exempt under section 501(c)(3)); Rev. Rul. 77-367, 1977-2 C.B. 193 (organization created to create and operate a replica of an early American village is engaging in educational activities similar to those of a museum and is exempt under section 501(c)(3)).

The AGMM is similar to the organizations described in Revenue Rulings 75-4706-178 and 77-367 because it is organized and operated to teach lessons of history. The AGMM differs from those organizations, however, in that is establishing a an actual museum, not just a facility similar to a museum. Therefore, the AGMM's activities fall squarely under the example provided in the regulations describing educational activities.

### C.  Conclusion

The AGMM qualifies for exempt status under section 501(c)(3) because it is organized and will be operated exclusively for exempt purposes.  Because the AGMM will be supported by the general public, it will qualify as an organization described under section 509(a)(1) as a public charity rather than as a private foundation.

Case 1:07-cv-03456-RWR    Document 14-14    Filed 11/27/2007    Page 1 of 3



FOR IMMEDIATE RELEASE
CONTACT: Christine Kojoian
Email: ckojoian@aaainc.org

**ARMENIAN ASSEMBLY CELEBRATES 35 YEARS OF ADVOCACY AT NATIONAL GALA IN CALIFORNIA**

**Marks 30th Anniversary of Washington Intern Program**



Beverly Hills, CA – With old friends and new, the Armenian Assembly of America celebrated 35 years of Armenian-American advocacy and 30 years of the Terjenian-Thomas Assembly Internship Program at the 2007 National Gala on November 3rd in Beverly Hills, California.

The Gala evening began with a warm welcome from National Gala Co-Chairs Albert Cabraloff and Paul Kalemkiarian, who organized the event with their wives, Co-Chairs Diane Cabraloff and Sandra Kalemkiarian, along with an energetic planning committee.

Board of Trustees Treasurer Edele Hovnanian conveyed Board Chairman Hirair Hovnanian's appreciation to all those who have supported the Assembly since its inception.

Hovnanian explained her father's request that she address the Gala, saying "he felt that it was only appropriate that his words be given by one of the next generation of leaders."

While reflecting on the Assembly's past and current accomplishments, Hovnanian also looked to the future.

"In the face of a changing world that is moving ever faster...it takes great confidence and courage for the leaders of any institution to actively promote change and prepare for the future that lays ahead," Hovnanian said.

California State Assemblyman Greg Aghazarian (R-Stockton), who served as master of ceremonies, presented the Assembly with a resolution honoring the organization for its commitment to Armenians and Armenian causes over the past three decades. The resolution, which was spearheaded by Aghazarian, State Senator Joe Simitian (D-Palo Alto) and State Assembly Member Paul Krekorian (D-Burbank), was presented to Edele Hovnanian on behalf of the organization.

The event also paid tribute to Armenian-Turkish editor and civil rights advocate Hrant Dink, who was assassinated earlier this year by a Turkish nationalist who labeled him a "traitor" for his public statements on the Armenian Genocide. Board of Trustees President Carolyn Mugar presented Dink's widow Rakel with the Assembly's Distinguished Humanitarian Award, honoring the slain editor's life and work. The award was designed and gifted by California-based artist Ani Kupelian.

Mrs. Dink, who traveled from Turkey to accept the honor, delivered a passionate speech recalling her husband's dedication to creating peace and understanding between Turks and Armenians. [Click here for the English and Armenian text of Mrs. Dink speech.]



Board of Trustees Counselor Van Z. Krikorian, in his remarks, expressed the privilege of having known Dink, calling him a "great man," and someone who "gives us all reason to continue with what we have to do."

Among the dignitaries and special guests at the event were Chairman of the Constitutional Court Gagik Harutyunyan, Consul General of the Republic of Armenia Armen Liloyan, Massachusetts State Rep. Rachel Kaprielian (D-Watertown), Glendale Mayor Ara Najarian, Father Anton Seradarian of St. Gregory Armenian Catholic Church, Reverend Joseph Matossian of the Armenian Evangelical Union of North America and Very Rev. Fr. Dajad Yardenian of the Western Diocese of the Armenian Church.

Board of Trustees Public Affairs Chairman Anthony Barsamian and Secretary Lisa Kalustian closed the program, after which guests enjoyed an evening of music and dancing with entertainment provided by Knatchig Jingirian and Ensemble.

The National Gala was a two-day event which also included an Assembly breakfast briefing, a Major Donors Dinner and a mixer for Assembly intern alumni and young professionals. The Assembly's Board of Trustees also held a meeting to review the organization's current and long-term initiatives.

Established in 1972, the Armenian Assembly is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501(c)(3) tax-exempt membership organization.

In his capacity as Chairman of the Armenian Genocide Museum of America Building and Operations Committee, Krikorian also noted recent positive developments in the Museum planning project and credited Committee Members Denise Darmanian, Edele Hovnanian, Richard Papalian and Zaven Tachdjian who have "gone above and beyond the call of duty."

The Museum project was displayed during a powerful video presentation which included designs of the future museum and featured the principal planners sharing their vision with the public.



# # #

NR#2007-129

Photographs from the Assembly's National Gala, November 2-3, 2007:

*Caption: Rakel Dink flanked by Anna and Hirair Hovnanian, Chairman of the Board of Trustees, at the Armenian Assembly's 35th Anniversary Gala on November 3rd at the Beverly Hilton Hotel.*

*Caption: Rakel Dink flanked by California State Assemblyman Greg Aghazarian (R-Stockton) and Massachusetts State Representative Rachel Kaprielian (D-Watertown).*

*Caption: L to R: Longtime Assembly Supporters and National Gala Committee Members Elizabeth Aghabian, Savey Tufenkian and Flora Dunaians at the 35th Anniversary Gala at the Beverly Hilton Hotel.*

*Caption: L to R: Assembly Fellow Trustee and Dink family friend Antranik Zorayan with Rakel Dink at the Major Donors Dinner at Mastro's Steakhouse.*

*Caption: Led by Chairman Hirair Hovnanian, the Armenian Assembly Board of Trustees convened on November 2 at the Beverly Hilton Hotel to review operations in the Washington, Los Angeles and Yerevan offices. L to R (top row): Executive Director Bryan Ardouny with Board Members Richard Mushegain, Peter Vosbikian, Anthony Barsamian, Van Krikorian, (bottom row) Lu Ann Ohanian, Lisa Kalustian, Hirair Hovnanian, Carolyn Mugar and Edele Hovnanian.*

*Caption: In celebration of the 30th Anniversary Terjenian-Thomas Assembly Internship Program, Intern Alumni came together for a special reunion at Trader Vic's Lounge in the Beverly Hilton Hotel. L to R: Zohrab Ghazimian, Karoon Panosyan, Tania Sahakian, Levon Kevorkian, Narseneh Sohbatian, Joseph Platt, Talene Hachigian and Shant Norhadian.*



http://www.aaainc.org/index.php?id=491&type=98

**http://www.aaainc.org/index.php?id=15**

7. *Caption: L to R: Gala Committee Member Savey Tufenkian, Sue Garabedian, Annie Balikian, Board of Trustees President Carolyn Mugar and Gala Committee Co-Chair Sandra Kalemklarian at the Breakfast Briefing on November 3rd.*

*Caption: L to R: Life Trustee Gail O'Reilly, Affiliate Member Adrienne Krikorian, and Gala Committee Member Lily Ring Balian enjoyed a wine presentation at The Wine Merchant before attending the Major Donors Dinner.*

*Caption: L to R: National Gala Co-Chair Sandra Kalemklarian, Associate Trustee Ralph Tufenkian, Kosti and Marian Shirvanian and Mina and Hacop Shirvanian.*

*Caption: L to R: Gala Committee Member Sosy Hachigian, Gala Committee Co-Chair Diane Cabraloff, Gala Committee Member Diane Barsam-Keljigian, Martin Felikian, Argine Kelegian and Gala Committee Member Michelle Shirikian heading to the Major Donors Dinner on November 2nd.*

*Caption: L to R: Assembly Associate Trustee Ani and Raffi Krikorian, Board of Trustees Treasurer Edele Hovnanian and National Gala Co-Chair Albert Cabraloff.*

Page 3 of 3

11/26/2007

Exhibit 12

# ARMENIAN GENOCIDE

## MUSEUM of AMERICA

### WASHINGTON, DC

800,000 ARMENIANS
COUNTED DESTROYED

The New York Times

Armenian Genocide Museum of America
Armenian Genocide Museum and Memorial, Inc.
(202) 383-9009
1140 19th Street, NW, Suite 600
Washington, DC 20036
www.ArmenianGenocideMuseum.org

"I am confident that the whole history of the human race contains no such horrible episode as this. The great massacres and persecutions of the past seem almost insignificant when compared with the sufferings of the Armenian race in 1915."

— Henry Morgenthau, U.S. Ambassador to the Ottoman Empire (1913-1916)

It was my grandfather's lone voice that alerted the world to the premeditated atrocities of the Young Turk leaders and the complicity of their German allies. As a man of conscience and an early champion of human rights, he consistently stepped over the line of diplomatic propriety and directly confronted top Turkish officials.

Ambassador Henry Morgenthau would have welcomed this new and daring project to raise a museum in the heart of our nation's capital dedicated to the purpose of informing about the Armenian Genocide and educating the public about the need to prevent such crimes against humanity.

I had the distinction of making a symbolic donation of $1915.00 to start the capital campaign for this magnificent project. I urge you to share in the privilege of participating in this undertaking.

As he sought ways to save the Armenians, Ambassador Morgenthau envisioned a home for them in America. I am certain he would have felt his mission fulfilled to see the Armenian people celebrate their resilience in their adopted country.

Henry Morgenthau III,
Massachusetts

CREATING *a*
PERMANENT
VOICE *in the*
NATION'S
CAPITAL

*The Museum is strategically located two blocks from the White House, walking distance from the Smithsonian Institution, and down the street from the U.S. Holocaust Memorial Museum—to ensure that Armenian-American issues and concerns, past and present, are never again ignored.*



Rendering of the Armenian Identity Multi-Media Experience



Rendering of the Human Rights and Genocide Exhibit Area

REMEMBRANCE,
RESPONSIBILITY,
REDRESS, *and*
PREVENTION

*Located in Washington, DC, the Armenian Genocide Museum of America (AGMA) will be the premier institution in the United States dedicated to educating American and international audiences about the Armenian Genocide and its continuing consequences. Visitors to the Museum will come to understand the Armenian Genocide as the prototype for modern crimes against humanity, including the Holocaust, Cambodia, Rwanda, and Darfur.*

This place of gathering—this center for Americans and Armenians alike—will be a World-Class Museum committed to bringing justice to the memory of the victims of the 20th century's first genocide. AGMA aspires to do so by also highlighting the historic identity of the Armenian people, their culture and creativity, their art and artistry, and their perseverance in the face of adversity.

Visitors will learn about the ultimate failure of the international community to hold the perpetrators accountable for their crimes and hence why a living monument to the quest for justice is vitally necessary, and why the story of the Armenians and all other peoples who have suffered similar fates must be told.



Rendering of the Taking Action Center

An important part of the Armenian Genocide Museum of America will be its *Taking Action Center*, which will assemble scholarly resources and expertise to promote the free exchange of ideas among those determined to bring justice to all parts of the world. The *Taking Action Center* will support people of conscience, equipping them with the tools necessary to establish the facts and to answer the universal question: "What can I do?"



Rendering of the Survivors Theater

# IN THE MUSEUM: RECALLING *the* PAST SAFE-GUARDING *the* FUTURE

The National Bank of Washington building at 14th & G Streets will be totally renovated, restored and expanded to serve as the home of the Museum.

# I N T E R A C T I O N
# I N S P I R A T I O N
# P R E V E N T I O N

*Powerful presentations are instrumental for prompting action and discussion. AGMA interactive exhibits and educational programs will incorporate the latest scholarship with state-of-the-art technology. An online version will offer much the same resonant content to visitors anywhere in the world. Exhibits will focus on the Armenian Genocide to reinforce the universal message of our common humanity and collective responsibility.*

*The Armenian Genocide Museum of America will offer a place for reflection, where memories and emotions can be confronted in an environment filled with hope, inspiration and a commitment to eradicating the scourge of genocide and stopping other atrocities against humankind.*

*Knowing the evil that has been done in the past can stimulate good people to take an early stand to prevent the injustices of our time. You are invited to stand with those who embrace this noble purpose by pledging your support for the Armenian Genocide Museum of America.*

" *I should like to see any power of the world destroy this race, this small tribe of unimportant people, whose history is ended, whose wars have all been fought and lost, whose structures have crumbled, whose literature is unread, whose music is unheard, whose prayers are no longer uttered. Go ahead, destroy this race. Let us say that it is again 1915.*

*There is war in the world. Destroy Armenia. See if you can do it. Send them from their homes into the desert. Let them have neither bread nor water. Burn their houses and their churches. See if the race will not live again.... for when two of them meet anywhere in the world, see if they will not create a new Armenia!"*

— William Saroyan

The Armenian Genocide Museum of America is a project of the Armenian Genocide Museum and Memorial, Inc.

*AGMA Founders:*
Anoush Mathevosian
Hirair Hovnanian
Armenian Assembly of America
Cafesjian Family Foundation

*AGMA Visionaries:*
Sarkis and Nishan Keshejian
Jante Keshishian

*AGMA Building & Operations Committee:*
Van Z. Krikorian, Chairman
Denise Darmanian
Edele Hovnanian
Richard Popalian
Zaven Tachdjian

*Project Coordinator:*
Dr. Rouben Adalian, Director
Armenian National Institute

*Museum Planner:*
Gallagher & Associates

*Museum Architect:*
Martinez & Johnson Architecture

*The Armenian Genocide Museum of America will recognize donors in a prominent location within the facility.*

| | |
|---|---|
| Founder | $ 5,000,000 and up |
| Visionary | $ 1,000,000 and up |
| Humanitarian | $ 500,000 and up |
| Philanthropist | $ 250,000 and up |
| Benefactor | $ 100,000 and up |
| Patron | $ 50,000 and up |
| Steward | $ 25,000 and up |
| Sponsor | $ 10,000 and up |
| Supporter | $ 5,000 and up |
| Friend | $ 1,000 and up |

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., individually and on behalf of the Armenian Genocide Museum and Memorial, Inc., | Civil File No. 07-1746 (RWR) |
| Plaintiff, | |
| v. | **ORDER** |
| Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian and the Armenian Assembly of America, Inc., | |
| Defendants. | |

This matter is before the Court on The Cafesjian Family Foundation, Inc.'s ("CFF") Application for Preliminary Injunction. CFF has demonstrated a likelihood of success on the merits of the claim that the actions and conduct of the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") without CFF input is improper and ultra vires. CFF has further demonstrated that CFF and AGM&M will suffer irreparable harm in the absence of an immediate injunction and that the balance of harms and public interest weight in favor of injunctive relief. The balance of equities and the need for judicial protection require that the status quo be maintained.

Accordingly, based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's Application for Preliminary Injunction is **GRANTED**; and

2.       AGM&M and its trustees, officers, agents, and committees are **ENJOINED** from any further action without the inclusion of and input from CFF or the CFF-designated trustee and accordance with the applicable contracts and by-laws.

Dated: _____, 2007

_____
Richard W. Roberts
United States District Court Judge