UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

The Cafesjian Family Foundation, Inc. and
John J. Waters, Jr., individually and on
behalf of the Armenian Genocide Museum
and Memorial, Inc.,

       Plaintiff,

   v.

Armenian Genocide Museum and
Memorial, Inc., Hirair Hovnanian, Anoush
Mathevosian, Van Krikorian and the
Armenian Assembly of America, Inc.,

       Defendants.

Civil File No. 07-1746 (RWR)

**AMENDED COMPLAINT**

---

The Cafesjian Family Foundation, Inc. ("CFF") and John J. Waters, Jr. ("Waters"), individually and on behalf of the Armenian Genocide Museum and Memorial ("AGM&M"), complains against the AGM&M, Hirair Hovnanian, Anoush Mathevosian, Van Krikorian and the Armenian Assembly of America, Inc. ("Assembly") as follows:

## PARTIES

1.    The Cafesjian Family Foundation is a Florida non-profit corporation.

2.    John J. Waters, Jr. is the CFF designated trustee to the AGM&M Board of Trustees and a resident of Minnesota.

3.    AGM&M is a D.C. nonprofit corporation.

4.    The Assembly is a D.C. nonprofit corporation.

5.    Hirair Hovnanian is a resident of New Jersey.

6.      Anoush Mathevosian is a resident of New York.

7.      Van Krikorian is a resident of New York.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332: citizenship is diverse and the amount in controversy exceeds $75,000.

9.      This Court has personal jurisdiction over all defendants and venue is proper.

## FACTUAL BACKGROUND

**AGM&M's Corporate Structure**

10.     AGM&M was incorporated pursuant to the District of Columbia Nonprofit Corporation Act.  Articles of Incorporation Art. IV (Exhibit A).

11.     AGM&M is governed by a Board of Trustees ("Trustees").  Articles of Incorporation Art. VII.  The Trustees serve as the Board of Directors of AGM&M for purposes of the District of Columbia Nonprofit Corporation Act.  By-Laws § 2.2 (Exhibit B); Articles of Incorporation Art. VI.

12.     AGM&M has no members.  By-Laws § 2.1; Articles of Incorporation Art. V.

13.     The Trustees are appointed by individuals and organizations that contribute or pledge $5,000,000 or more to AGM&M.  By-Laws § 2.1; Grant Agreement § 5.2 (Exhibit C).  Currently the Trustees exercise a total of six votes.

14.    Pursuant to the charter documents, the Grant Agreement, and by virtue of significant donations and pledges for the benefit of AGM&M, CFF is entitled to appoint Trustees and controls three of the six Trustee votes.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(G).  Waters is the current CFF-appointed trustee who exercises the three CFF votes.  CFF has pledged in excess of $17.5 million and has contributed in excess of $14.5 million and loaned $500,000 for the benefit of AGM&M.

15.    Pursuant to the charter documents and the Grant Agreement, Hovnanian is a Trustee of AGM&M and controls one vote.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(G).  Hovnanian has pledged $5 million and as of September 2006 has contributed $1.5 million for the benefit of AGM&M.

16.    Pursuant to the charter documents and the Grant Agreement, and in recognition of her important and significant early contribution to the AGM&M, Mathevosian is a Trustee of AGM&M and controls one vote.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(C).  Mathevosian has pledged and  contributed $3.5 million for the benefit of AGM&M.

17.    Pursuant to the charter documents and the Grant Agreement, the Assembly is a Trustee of AGM&M and controls one vote.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(D).  Van Krikorian is the Assembly-appointed Trustee.

18.    AGM&M's By-Laws provide that "[p]ersons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called."  By-Laws § 2.6.  To convene the Trustees, notice of the time and place of meetings must be provided.  *Id.* § 2.14.

19.    The By-Laws further require that "all [AGM&M] questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  *Id.* § 2.7.

20.    On August 31, 2007, AGM&M announced that phase I contracts had been awarded to two design firms.  The contracts are supposedly intended to initiate the development of a museum at the site of the former National Bank of Washington.

21.    The decisions to award phase I contracts and to initiate the development at the site of the former National Bank of Washington were apparently made by a planning, development and building committee that was created during a rump Trustee meeting on May 7, 2007.

22.    Notice of the May 7, 2007 meeting was provided by letter that was faxed to the CFF Trustee designee on May 1, 2007.  The items listed on the agenda included (a) the chairman's report and update, (b) a financial report, (c) the authorization of a planning, development and building committee, and (d) election of officers.  (Exhibit D).

23.    The meeting occurred on May 7, 2007.  Hovnanian, Mathevosian, and Krikorian (on behalf of the Assembly), who each control one Trustee vote, and Waters,

the CFF designee Trustee who controls three Trustee votes, attended the meeting. Waters attended by telephone.

24.    Immediately upon being convened, the meeting departed from the agenda and attacked Waters regarding the ramifications of an unrelated litigation involving CFF. Waters, without counsel present, declined to be subjected to the grilling that was being perpetrated. Notably at least two lawyers were present on behalf of the Trustees who were challenging Waters.

25.    Hovnanian, Mathevosian and Krikorian (on behalf of the Assembly) then prevented Waters, as the CFF designated Trustee, from participating in the May 7, 2007 meeting by trumping up conflict of interest charges. Waters objected to this exclusion, requested an adjournment, and ultimately departed the meeting under protest.

26.    The exclusion of the CFF designated Trustee from the May 7, 2007 meeting and the subsequent continuation of the May 7, 2007 board meeting in the absence of the CFF designated Trustee violated AGM&M by-laws and applicable law.

27.    CFF has requested the minutes and recordings from the entire May 7 meeting. AGM&M has withheld those corporate records.

28.    Following the ostracization of the CFF designated Trustee, the remaining Trustees apparently voted to create a planning, development and building committee and to delegate significant, if not plenary, authority to that committee. This committee is supposedly responsible for the planning, building management and development of the

museum at the former National Bank Building site.  This action taken in the absence of the CFF designated Trustee violates AGM&M by-laws and applicable law.

**AGM&M and the Grant and Transfer Agreements**

29.    From 2000 to 2003, the Assembly and CFF cooperated to promote and develop a museum and memorial to commemorate the Armenian Genocide.  In 2003, an independent entity, the AGM&M, was incorporated to achieve that purpose.

30.    AGM&M was created to:

> further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

Articles of Incorporation Art. IV.

31.    With contributions substantially funded by CFF's generosity, the former National Bank Building had been acquired as a site for the museum and memorial.  CFF and the Assembly soon concluded that the bank building and parcel alone would not be sufficient to house the project necessary to achieve AGM&M's stated purpose.  To provide the real estate necessary for a proper memorial, CFF and the Assembly then executed the Grant Agreement.  Pursuant to this agreement, CFF committed to make significant charitable grants, some to the Assembly, for the purpose of providing an

appropriate site. The CFF grants and pledges were in excess of $15 million. The Grant Agreement obligated the Assembly to expend all CFF contributions to purchase the various properties on which the AGM&M would be developed.

32.    Pursuant to the Grant Agreement, the various properties could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc." Grant Agreement § 3.1(A) The Grant Agreement requires CFF's participation "in all material decisions regarding the Memorial." *Id.* § 3.2(C).

33.    To separate AGM&M from the Assembly, those entities entered into the Transfer Agreement. The Transfer Agreement effected a conveyance of the real property on which the AGM&M would be developed as well as other assets and liabilities, including all pledges from the Assembly to AGM&M.

34.    CFF's grant obligations were conditioned upon AGM&M's agreement to use these properties "in furtherance of AGM&M's stated charitable purpose." Transfer Agreement § 4.6. AGM&M also agreed to "honor all of the existing [CFF] donor requirements existing at the time of transfer," including the requirement that the CFF designated Trustee participate in all material decisions relating to the museum and memorial. Grant Agreement § 5.3; *see also* Transfer Agreement § 1.2 (Exhibit E).

35.    Like the By-Laws, the Transfer Agreement requires 80% Trustee approval for actions. Transfer Agreement § 3.4(E).

## COUNT I:  ULTRA VIRES ACT
### (CFF and Waters individually against defendant AGM&M)

36.    CFF is entitled to appoint up to three Trustees and controls three Trustee votes.  The Trustees also serve as Directors of AGM&M.

37.    Waters is the current CFF designee to the AGM&M Board of Trustees.

38.    The delegation of meaningful authority by the AGM&M Trustees to any committee requires an 80 percent affirmative vote of the Trustees present at a properly noticed meeting at which a quorum is present.  Impeccable compliance with the super majority provision is required for this action because the AGM&M's singular purpose is the development of a museum and memorial to commemorate the Armenian Genocide.

39.    The exclusion of the CFF designated Trustee requires a unanimous affirmative vote of the Trustees present at a properly noticed meeting where a quorum is present.

40.    On May 7, 2007, a quorum of six Trustee votes were present.  Three AGM&M Trustees purported to create and to delegate authority to a planning, development and building committee.  The CFF designated Trustee, who controls the other three votes, attended the May 7, 2007 meeting but was denied the opportunity to vote on the proposed building committee.  After being subjected to filibustering and brow-beating, the CFF designated Trustee was driven out of the meeting, under protest.

41.    The exclusion of CFF and the CFF designated Trustee from the May 7, 2007 meeting was improper, unfair and ultra vires under common law and the District of Columbia Non-Profit Corporation Act, D.C. Code § 29-301.06.

42.    The creation of a planning, development and building committee and the delegation of fundamental Trustee prerogative to that committee in the absence of CFF and CFF designated Trustee participation was improper, unfair and ultra vires under common law and the District of Columbia Non-Profit Corporation Act, D.C. Code § 29-301.06.

43.    Being in excess of the rump quorum's authority, these ultra vires actions are null and void, and AGM&M must be enjoined from pursuing any further development of the museum and memorial without proper Trustee authorization.

**COUNT II:  DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY**
**(CFF and Waters on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)**

44.    The District of Columbia Non-Profit Corporation Act authorizes directors of non-profit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

45.    Hovnanian, Mathevosian, Krikorian and the Assembly, by reason of their positions as fiduciaries, owe duties to AGM&M, its directors and trustees of undivided loyalty, good faith, fair dealing, due care, candid disclosure and diligence in the management and administration of AGM&M's affairs.

46.    Hovnanian, Mathevosian, Krikorian and the Assembly have breached their fiduciary duties to AGM&M, its directors and trustees by excluding the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank site without corporate authority, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act, and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

47.    As a direct and proximate cause of this breach of fiduciary duty, AGM&M has sustained, and will continue to sustain, substantial harm.

48.    Hovnanian, Mathevosian, Krikorian and the Assembly are liable to AGM&M as a result.

49.    The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF and Waters to the Board of Directors would have been futile because either the Trustees would be dead locked or Hovnanian, Mathevosian, Krikorian and the Assembly would continue to exclude CFF and the CFF designated Trustee from participation in the formulation of the Trustees' response.

## COUNT III:  DERIVATIVE CLAIM FOR WASTE OF CORPORATE ASSETS
### (CFF and Waters on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)

50.     The District of Columbia Non-Profit Corporation Act authorizes directors of non-profit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

51.     Hovnanian, Mathevosian, Krikorian and the Assembly owe to AGM&M the obligation to protect AGM&M's assets from undue loss or waste and to utilize these assets as required by AGM&M's by-laws and to fulfill AGM&M's stated purpose.

52.     Hovnanian, Mathevosian, Krikorian and the Assembly have breached their obligation to AGM&M and wasted corporate assets, by, among other things, knowingly or recklessly proposing, implementing, agreeing to, approving, and ratifying the decisions to authorize the creation and delegation of authority to a planning, development and building committee and to develop the museum and memorial at the National Bank of Washington site, without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act.

53.     As a direct and proximate result of this waste of corporate assets, AGM&M has sustained, and will continue to sustain, substantial harm.

54.     Hovnanian, Mathevosian, Krikorian and the Assembly are liable to the AGM&M as a result of these acts.

55.    The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF and Waters to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Krikorian and the Assembly would continue to exclude CFF and the CFF designated Trustee from participation in the formulation of the Trustees' response.

### COUNT IV:  DERIVATIVE CLAIM FOR ABUSE OF CONTROL
### (CFF and Waters on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)

56.    The District of Columbia Non-Profit Corporation Act authorizes directors of non-profit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

57.    Hovnanian, Mathevosian, Krikorian and the Assembly have abused their control and influence over AGM&M by excluding CFF and the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank of Washington site without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

58.     As a direct and proximate cause of this abuse of control, AGM&M has sustained, and will continue to sustain, substantial harm.

59.     Hovnanian, Mathevosian, Krikorian and the Assembly are liable to AGM&M as a result.

60.     The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF or Waters to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Krikorian and the Assembly would continue to exclude CFF and the CFF designated Trustee from participation in the formulation of the Trustees' response.

### COUNT V:  DERIVATIVE CLAIM FOR FRUSTRATION OF PURPOSE
### (CFF and Waters on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)

61.     The District of Columbia Non-Profit Corporation Act authorizes directors of non-profit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

62.     The AGM&M was organized and operates exclusively for charitable, educational, and other beneficial purposes to, among other things, "own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide," secure universal affirmation of the Armenian Genocide, and establish a memorial and public programs to further these purposes.   Articles of Incorporation Art. IV.

63.    CFF made significant grants and pledges for the purpose of creating a museum and memorial dedicated to the memory of the Armenian Genocide:  a museum and memorial developed with the broadest possible participation and support of the Armenian Community and a museum and memorial that properly and significantly presents the tragedy of the Armenian Genocide, that would serve as a permanent reminder in our Nation's capitol of the horrific atrocities committed against the Armenian people.   CFF's obligation to make these grants was conditioned on AGM&M's commitment that CFF would participate in all material decisions relating to the museum and memorial.

64.    The Grant Agreement further mandates that the grant properties be used only as part of the AGM&M and that all plans for the AGM&M be approved by the Trustees.

65.    Hovnanian, Mathevosian, Krikorian and the Assembly have refused to allow CFF and its designated trustee to participate in material decisions relating to the museum and memorial by excluding CFF and the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank of Washington site without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

66.     This interference has frustrated the corporate purpose of AGM&M.

67.     As a direct and proximate cause of this abuse of control, AGM&M has sustained, and will continue to sustain, substantial harm.

68.      Hovnanian, Mathevosian, Krikorian and the Assembly are liable to AGM&M as a result.

69.     The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF or Waters to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Krikorian and the Assembly would continue to exclude CFF and the CFF designated Trustee from participation in the formulation of the Trustees' response.

WHEREFORE, CFF and Waters, individually, and on behalf of AGM&M, request the following relief:

1.     Declare that:

(a)     The actions by three of the AGM&M Trustees in the absence of CFF and the CFF designated Trustee to create a planning, development and building committee and delegate fundamental Trustee prerogative to that committee are ultra vires;

(b)     Hovnanian, Mathevosian, Krikorian and the Assembly have breached their fiduciary duties to AGM&M;

(c)     Hovnanian, Mathevosian, Krikorian and the Assembly have wasted AGM&M's corporate assets;

(d)     Hovnanian, Mathevosian, Krikorian and the Assembly have abused their control of AGM&M;

(e)     Hovnanian, Mathevosian, Krikorian and the Assembly have frustrated the corporate purpose of AGM&M;

2.     Enjoin AGM&M from any further development of the museum and memorial without proper Trustee notice, participation and approval;

3.     Award AGM&M money damages, against defendants Hovnanian, Mathevosian, Krikorian and the Assembly, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, including but not limited to disgorgement of any assets expended to pursue these ultra vires acts and transactions and reimbursement to AGM&M of costs expended to pursue these ultra vires acts and transactions; and

4.     Award to CFF and Waters and AGM&M all costs and expenses incurred to pursue this action on behalf of AGM&M.

Dated: December 14, 2007

**BRIGGS AND MORGAN, P.A.**

By:  <u>s/ Timothy R. Thornton</u>
  Timothy R. Thornton (Minn.
  #109630)
  Molly M. Borg (Minn. #0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400


Dated: December 14, 2007

**HOGAN AND HARTSON LLP**

By:  <u>s/ Peter C. Lallas</u>
  Ty Cobb (D.C. Bar No. 270736)
  Peter C. Lallas (D.C. Bar No. 495944)
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

**ATTORNEYS FOR PLAINTIFFS**

**VERIFICATION**

I, John J. Waters, Jr. am an officer and director of The Cafesjian Family Foundation, Inc.  I serve as the Secretary and Treasurer and as Vice President.  The factual allegations of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  The basis of my knowledge, information and belief is personal knowledge, information from The Cafesjian Family Foundation business records, and reports to me from other The Cafesjian Family Foundation employees in the regular course of business.

/s John J. Waters, Jr._____
John J. Waters, Jr.

Subscribed and sworn to before
me this 14th day of December, 2007.


s/ Donald Anthony Kovacovich
Notary Public
Commission expires January 31, 2010

# ARTICLES OF INCORPORATION

## OF

## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

To:    Department of Consumer and Regulatory Affairs
Business Regulation Administration
Corporations Division
Washington, D.C.

THE UNDERSIGNED, all of whom are natural persons of the age of eighteen years or more, acting as incorporators of a corporation pursuant to the District of Columbia Nonprofit Corporation Act hereby adopt the following Articles of Incorporation:

### ARTICLE I. NAME

The name of the Corporation is the Armenian Genocide Museum and Memorial, Inc. (the "Corporation").

### ARTICLE II. DURATION

The period of duration of the Corporation is perpetual.

### ARTICLE III. ADDRESS

The address of the Corporation's registered office in the District of Columbia is Armenian National Institute, 122 C Street NW, Suite 360, Washington, DC 20001. The name of the Corporation's registered agent at such address is Rouben Adalian.

DOC# 190529 v4                     Page 1 of 7

**EXHIBIT A**

## ARTICLE IV. PURPOSE

A.    The Corporation is a nonprofit organization organized and operated exclusively for charitable, educational, and other purposes beneficial to social welfare within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). All references to sections of the Code include the corresponding provision of any subsequent federal tax law. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

B.    In furtherance of these purposes, the Corporation shall have all powers granted to a corporation under the District of Columbia Nonprofit Corporation Act and the power to do all things necessary, proper, and consistent with maintaining its tax-exempt status under section 501(c)(3) of the Code.

C.    No part of the net earnings of the Corporation shall inure to the benefit of or be distributed to any trustee, employee or other individual, partnership, estate, trust or corporation having a personal or private interest in the Corporation. Compensation for services actually rendered and reimbursement for expenses actually incurred in attending to the affairs of the Corporation shall be limited to reasonable amounts. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence

legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

D.      Notwithstanding any other provisions of these Articles, the Corporation shall not carry on any activity not permitted to be carried on by (a) a corporation exempt from federal income tax under section 501(c)(3) of the Code, or (b) a corporation, contributions to which are deductible under section 170(a) and (c)(2) of the Code.

## ARTICLE V. MEMBERS

The Corporation shall have no members.

## ARTICLE VI. BOARD OF TRUSTEES

The Board of Directors of the Corporation shall be referred to as the Board of Trustees. The manner of election or appointment to the Board of Trustees shall be as provided in the By-Laws of the Corporation.

## ARTICLE VII. REGULATION OF INTERNAL AFFAIRS

A.      The affairs of the Corporation shall be managed and controlled by the Board of Trustees.

B.      The initial By-Laws shall be adopted by the Board of Trustees, which may alter, amend or repeal the By-Laws or adopt new By-Laws.

C.      In the event of the dissolution or final liquidation of the Corporation:

1.    None of the property of the Corporation nor any proceeds thereof shall be distributed to or divided among any of the trustees or officers of the Corporation or inure to the benefit of any individual.

2.    After all liabilities and obligations of the Corporation have been paid, satisfied and discharged, or adequate provision made therefor, all remaining property and assets of the Corporation shall be distributed to one or more organizations organized and operated exclusively for religious, charitable, scientific, literary, educational or social welfare purposes, provided that such organizations shall be exempt from federal income taxes by reason of section 501(c)(3) of the Code, and subject to any additional restrictions imposed by the By-Laws of the Corporation.

3.    The private property of the trustees or officers of the Corporation shall not be subject to payment of corporate debts to any extent whatsoever.

## ARTICLE VIII. PRIVATE FOUNDATION RULES

The Corporation shall at all times be organized and operated so as to qualify as an organization that is not a private foundation, as defined in section 509(a) of the Code. If, however, at any time, the Corporation shall be classified as a private foundation under federal tax laws, then at such time or times the Corporation shall be subject to the following restrictions:

1.    The Corporation shall not engage in any act of self-dealing as defined in section 4941(d) of the Code.

2.    The Corporation shall make distributions for each taxable year at such time and in such manner so as not to become subject to the tax on undistributed income imposed by section 4942 of the Code.

3.    The Corporation shall not retain any excess business holdings as defined in section 4943(c) of the Code.

4.    The Corporation shall not make any investments in such manner as to subject it to tax under section 4944 of the Code.

5.    The Corporation shall not make any taxable expenditures as defined in section 4945(d) of the Code.

## ARTICLE IX. TRUSTEES

The number of Trustees may be increased or decreased from time to time by the Board of Trustees, but shall in no event be less than three (3). The names and addresses of the persons who shall serve as initial Trustees until their successors are elected and qualify, are:

| NAME | ADDRESS |
|---|---|
| Gerald L. Cafesjian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Hirair S. Hovnanian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Anoush Mathevosian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Robert A. Kaloosdian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |

## ARTICLE X. INCORPORATORS

The name and addresses of the incorporators are as follows:

| NAME | ADDRESS |
|------|---------|
| Kristen M. Gurdin | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Sharon P. Light | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Lloyd H. Mayer | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |

IN WITNESS WHEREOF, we, the undersigned, being the Incorporators hereinabove named, do hereby affirm under penalties of perjury that these Articles are our act and deed, and the facts herein stated are true and, accordingly, we have executed these Articles this _____ day of _____, 2003.

Kristen M. Gurdin _____

Sharon P. Light _____

Lloyd H. Mayer _____

DISTRICT OF COLUMBIA    )
                                 ) SS:
                                 )

I, _____, a Notary Public in and for the District of Columbia, do hereby certify that Kristen M. Gurdin, Sharon P. Light and Lloyd H. Mayer whose names are signed to the foregoing Articles of Incorporation of Armenian Genocide Museum and Memorial, Inc., bearing the date of _____, 2003, personally appeared before me in said District, the said persons being personally well known to me as the persons who executed the said Articles of Incorporation, and each acknowledged the same to be his or her act and deed.

                                                  _____
                                                  Notary Public

# BY-LAWS

## OF

## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

### ARTICLE I

### EFFECT, NAME, PURPOSES, POLICY AND RELATED MATTERS

Section 1.1. General. These By-Laws shall become effective as of October 30, 2003.

Section 1.2. Name and Purpose. The Corporation shall conduct its programs and activities under the name of the Armenian Genocide Museum and Memorial. The Corporation is organized exclusively for educational purposes. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

Section 1.3. Policy. The Corporation, its Trustees, officers, and employees shall ever be mindful of the pluralistic character of the Armenian community world-wide, and the worth of its institutions and organizations.

Section 1.4. Location. The principal office of the Corporation shall be located in the District of Columbia Metropolitan area. The Trustees, by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, may change the location of the principal office from time to time to any other place within the United States of America. The Trustees, by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, may open and operate other offices of the Corporation in the United States and abroad. The Corporation shall have and continuously maintain in the District of Columbia a registered office and a registered agent whose business office is identical with such registered office, as required by the District of Columbia Nonprofit Corporation Act. The address of the registered office and the identity of the registered agent may be changed from time to time by the Board of Trustees.

Section 1.5. Fiscal Year. The fiscal year of the Corporation shall, unless otherwise decided by the Trustees, end on December 31 of each year.

**EXHIBIT B**

## ARTICLE II

## BOARD OF TRUSTEES

Section 2.1. Members. The Corporation shall have no members.

Section 2.2. Board of Trustees. The Board of Trustees of the Corporation shall serve as the Board of Directors of the Corporation for purposes of the District of Columbia Nonprofit Corporation Act.

Section 2.3. Number and Election. The Board of Trustees shall consist of not less than three (3) nor more than fifteen (15) members. At no time, however, shall the total number of votes exercised by the Board of Trustees exceed fifteen (15), even if the Board of Trustees has not reached its maximum size authorized under these By-Laws.

Section 2.4. Initial Trustees. The initial Trustees shall be the Trustees of the Corporation serving as such as of the date of the adoption of these By-Laws. The term of office of an initial Trustee shall be perpetual. Each donor that elected an initial Trustee (as identified by the initial Trustees in the unanimous written consent in lieu of the organization meeting of the Board of Trustees of the Corporation) (an "Initial Donor") shall appoint a successor within thirty (30) days of the adoption of these By-Laws to serve as Trustee should the initial Trustee be unable to serve for any reason. If an Initial Donor fails to appoint such a successor, the initial Trustee elected by that Initial Donor shall be automatically removed from the Board of Trustees effective thirty-one (31) days after the adoption of these By-Laws, but shall be automatically reinstated to the Board of Trustees if and when the Initial Donor appoints a successor to that Trustee. Each Initial Donor shall have the same rights as donors described in Section 2.5 of these By-Laws with respect to the initial Trustee elected by the Initial Donor and the successors to that initial Trustee, including the right, if an Initial Donor makes contributions to the Corporation in excess of $5 million, to elect an additional Trustee for each $5 million increment above the initial $5 million in contributions by that Initial Donor or to grant to the Trustee previously elected by that Initial Donor the right to exercise as many additional votes as the donor has contributed whole increments of $5 million above the initial $5 million in contributions by that Initial Donor.

Section 2.5. Additional Trustees. Additional Trustees shall be elected to the Board of Trustees according to the following procedure:

Each contribution of $5 million to the Corporation entitles the donor to elect one Trustee to the Board of Trustees, provided:

(1) the Board of Trustees has accepted the contribution on behalf of the Corporation by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present; and

(2) the donor has appointed a successor to the Trustee elected by the donor to serve on the Board of Trustees should that Trustee be unable to serve for any reason,

until such time as the total number of votes exercised by the Board of Trustees reaches fifteen (15).

When the Corporation has accepted multiple $5 million contributions from a single donor, the donor may either elect one Trustee for each $5 million increment or elect one Trustee who shall exercise as many votes as the donor has contributed whole increments of $5 million. The donor must appoint a successor or successors to the Trustee or Trustees at the time of election.

An individual donor may elect himself or herself as a Trustee or appoint himself or herself as a successor.

An institutional donor shall retain the right to elect Trustees and to appoint successors in perpetuity, which rights, and the right to pass these rights to successor institutions, shall pass to any institution that the governing body of the institutional donor designates as its successor. If an institutional donor dissolves or otherwise ceases to exist without having designated a successor, the institutional donor's rights shall expire. A Trustee elected by such an institutional donor before the expiration of the donor's right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor or successors appointed by such an institutional donor prior to the expiration of the donor's right to appoint one or more successors shall succeed to the Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

An individual donor may appoint an individual or an institution to succeed to the donor's right to elect one or more Trustees, to appoint one or more successors, and, if the person appointed to succeed to these rights is an individual, to appoint an individual or institution to succeed to all of these rights. If the person so appointed is an institution, the immediately preceding paragraph of this section 2.5 shall apply with respect to the donor's rights as if the appointed institution was an institutional donor. If an individual donor or an individual appointed to succeed to the donor's rights fails to appoint such an individual or institution, the donor's rights shall expire on the death of the individual holding those rights or the declaration by a court of legal incompetence of the individual holding those rights. A Trustee elected by such an individual before the expiration of the right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor to that Trustee position appointed by such an individual prior to the expiration of the right to appoint that successor shall succeed to that Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

The term of office of a Trustee shall be perpetual. However, the donor or the individual or institution that has succeeded to the donor's rights may remove the elected Trustee and elect a new Trustee or appoint a different successor at any time, with or without cause.

All elections of Trustees, appointments of successors to Trustees and appointments of successors to a donor's rights must be in writing and delivered to the Chairman, the President, the Secretary or the Executive Director of the Corporation to be effective. Any such election or appointment shall take effect on the date of receipt of such election or appointment or at any later time therein specified, and the acceptance of such election or appointment shall not be necessary to make it effective.

If the position of a successor to a Trustee becomes vacant for any reason, and the donor who has the right to appoint that successor fails to do so within thirty (30) days of that position becoming vacant, the Trustee for whom the successor position is vacant shall be automatically removed from the Board of Trustees effective thirty-one (31) days after that successor position becomes vacant but shall be automatically reinstated to the Board of Trustees if and when that donor appoints a successor to that Trustee.

If a Trustee position becomes vacant for any reason and remains vacant for a continuous period of three (3) years, then the donor who has the right to elect that Trustee and to appoint the successor to that Trustee, and, in the case of an individual donor, to appoint an individual or institution to succeed to these rights, shall lose all of his, her or its rights with respect to that Trustee position and the vote(s) associated with that Trustee position shall expire.

Section 2.6. Quorum. Persons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called. If less than a quorum of Trustees is present at a meeting, a majority of Trustees present may adjourn the meeting without further notice.

Section 2.7. Action by Vote. Unless otherwise provided herein or in the Articles of Incorporation, all questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present.

Section 2.8. Action by Writing. Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting if all Trustees then in office consent to the action in writing and the written consents are filed with the records of meetings of Trustees. Such consents shall be treated for all purposes as votes at a meeting.

Section 2.9. Powers and Duties. The Board of Trustees shall meet from time to time and not less than twice yearly, shall manage and direct the Corporation's funds and investments, shall review the programs and affairs of the Corporation, and shall generally have and exercise all powers of the Trustees except such powers as are expressly prohibited to it by law, at all times in furtherance of the policy and purposes of the Corporation. Without limiting the generality of the foregoing, they shall elect their officers, expand their numbers, examine the

budget, and to the extent approved, provide and allocate funds necessary to carry out the programs reflected therein.

Section 2.10. **Committees.** The Board of Trustees may organize, appoint and supervise one or more committees, including an Executive Committee, and may delegate to any such committee any or all of their powers which may be delegated by law. The members of any committees shall remain in office at the pleasure of the Board of Trustees.

Section 2.11. **Other Appointments.** The Board of Trustees may from time to time designate certain persons or groups of persons as benefactors, patrons, contributors, advisors, friends, or otherwise of the Corporation or with such other titles, upon such terms, for such periods and with such qualifications as they may deem appropriate. Such persons shall serve in an honorary capacity and shall in such capacity have no right to notice of or to vote at any meeting of the Trustees, shall not be considered for the purposes of establishing a quorum, and shall have only such rights or responsibilities as the Board of Trustees may designate from time to time.

Section 2.12. **Meetings.** An annual meeting of the Board of Trustees shall be held at a time to be determined by the Board of Trustees, and at such place as the Board shall determine to conduct such business as may properly come before the meeting. Regular meetings of the Board of Trustees may be held at such places and at such times as the Board shall determine. Special meetings of the Board of Trustees may be called by or at the request of the Chairman and the President and shall be called by the Secretary or his or her designee at the request of Trustees who are authorized to exercise one-half of the votes exercisable by the Trustees then in office. The person or persons authorized to call such special meetings may fix any place as the place for holding such meeting.

Section 2.13. **Telephonic Meetings.** A Trustee may participate in any meeting of the Board of Trustees or any meeting of any committee of the Board by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another, and such participation shall constitute presence in person at the meeting.

Section 2.14. **Notice.** Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated by mail, telegram, facsimile or email to each Trustee, charges prepaid, addressed to him or her at his or her address as shown by the records of the Corporation. Meeting notices, delivered by any method, shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting. Whenever any notice is required to be given to any Trustee under the provisions of these By-Laws or the Articles of Incorporation, or by the District of Columbia Nonprofit Corporation Act, a written waiver thereof signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Presence at a meeting without objection also constitutes a waiver of notice. Neither the business to be transacted at, nor the purpose of, any annual, regular or special meeting of the Board need be specified in the

notice of such meeting or any waiver of notice, unless specifically required by law, the Articles of Incorporation, or these By-Laws.

Section 2.15. Officers, Agents and Employees. The Board of Trustees shall elect from time to time by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, from among its members, a Chairman, a President, one or more Vice Chairmen, a Treasurer and a Secretary. The Trustees may elect such other officers, if any, as they may from time to time determine, and such other officers need not be Trustees. The Trustees may also have such agents, if any, as they may appoint. Any two (2) or more offices, except those of President and Secretary, may be held by the same person at the same time. Any officer may resign at any time by giving written notice to the Board of Trustees or the President. Any such resignation shall take effect on the date of receipt of such notice unless another date is specified therein, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. Any officer elected by the Board of Trustees may be removed, with or without cause, by the Board of Trustees whenever, in its judgment, the best interests of the Corporation would be served thereby. Any such removal shall be without prejudice to the contract rights, if any, of the person so removed. The Executive Director shall be appointed by the Board of Trustees and shall be the chief executive officer of the Corporation. With the consent of the Board of Trustees, the Executive Committee, or the designee of either the Board or the Executive Committee, the Executive Director shall sign all deeds, contracts and other documents in the name of the Corporation, and shall have the general power to carry on negotiations of any and every character in the name of the Corporation. The Executive Director shall perform such other duties as assigned by the Board of Trustees or the Executive Committee. The Executive Director shall, among other things, supervise the employees and the hiring of employees. The Executive Director shall be a non-voting ex-officio member of all committees, except the Nominating Committee, if one exists.

Section 2.16. Duties of Officers. Each officer shall have the duties usual to his office unless otherwise prescribed by the Board of Trustees and shall serve for one year and until his or her successor is elected and qualified, unless another term is prescribed by the Board of Trustees. The Chairman or, in his or her absence, the President shall preside at all meetings of the Trustees.

Section 2.17. Resignation and Removal. Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal. Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.

Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote.

Any Trustee may resign his or her office at any time at any time by giving written notice to the Board of Trustees, the Chairman or the Secretary. Any such resignation shall take effect on the date of receipt of such notice or at any later time therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee. The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Upon removal by the donor, or by the individual or institution that has succeeded to an. donor's rights to elect one or more Trustees and appoint one or more successors, the appointed successor to that Trustee shall become a Trustee, unless the donor, or the individual or institution that has succeeded to the donor's rights, has elected a Trustee to replace that Trustee immediately upon removal. If the appointed successor becomes the Trustee, the donor, or the individual or institution that has succeeded to the donor's rights, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Section 2.18. Endowment Fund. The Trustees may from time to time establish, hold, invest and administer such endowment fund or funds to be collectively designated the "Armenian Genocide Museum and Memorial Endowment Fund", upon such terms and conditions as the Board of Trustees may from time to time deem advisable. Except as otherwise required by law, only the "net income" therefrom as hereafter defined shall be applied to the programs and activities of the Corporation and the principal of such funds shall be preserved. As used herein, "net income" shall mean the fair value of the assets of the Fund over the sum of the contributions to the fund, whether such contributions are made by donors to the Corporation or by the Board of Trustees from other funds of the Corporation, with each contribution increased by any increase in the Consumer Price Index-All Urban Consumers (CPI-U), published by the Bureau of Labor Statistics, U.S. Department of Labor, or any successor to CPI-U adopted by the Bureau of Labor Statistics, from the date of its contribution to the Fund, calculated as of December 31 of each calendar year. Any such endowment fund or funds may be given such designations as the Board of Trustees may from time to time determine, including, without implied limitation, a designation which will commemorate any donor or person, place, event or entity designated by any donor.

## ARTICLE III

## MISCELLANEOUS

Section 3.1. Rules of Order. Robert's Rules of Order Revised shall govern in matters of parliamentary procedure not otherwise prescribed by law, the Articles of Incorporation, or these By-Laws.

Section 3.2. Amendments. Unless otherwise provided herein or in the Articles of Incorporation and with reasonable prior written notice, amendments to these By-Laws or to the Articles of Incorporation shall be approved by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present. The affirmative vote of all Trustees then in office shall be required to amend the Purpose (Section 1.2) and Dissolution (Section 3.4) clauses of these By-Laws or the Purposes (Article IV) and Dissolution (Paragraph C of Article VII) clauses of the Articles of Incorporation.

Section 3.3. Prohibited Activities. Notwithstanding any other provision of these By-Laws, there shall not be carried on any activities or conduct not permitted to a corporation exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law or (b) to a Corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law. No part of the net earnings shall inure to the benefit of, or be distributable to, the Trustees, officers or others except that the Trustees shall be authorized and empowered, if they so elect, to pay to Trustees, officers or others reasonable compensation for service rendered and to make payments and distribution in furtherance of the purposes set forth in these By-Laws. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

Section 3.4. Dissolution. In the event this Corporation is terminated, all endowment funds and net assets of the Corporation shall be transferred to one or more corporations or entities designated by the Board of Trustees as successors to the Corporation, or such one or more Eligible Institutions (as hereinafter defined) as one or more permanent endowment funds to support such Permissible Purposes (as hereinafter defined) and upon such terms and conditions as the Trustees shall determine by a unanimous affirmative vote of all Trustees then in office. As used herein, Eligible Institutions shall mean those charitable/educational institutions located in the United States which then have and maintain active programs that promote greater awareness of the Armenian Genocide and/or promote educational and charitable programs that benefit the citizens of the Republic of Armenia. Presently such designated Eligible Institutions are the Armenian Assembly of America, the Armenian General Benevolent Union, the Cafesjian Family Foundation, the H. Hovnanian Foundation, the Robert Aram and Marianne Kaloosdian and Stephen P. & Marian Mugar Endowed Chair of Armenian Genocide Studies at Clark University, provided that each recipient must be an organization that is described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any subsequent federal tax law. As used herein, Permissible Purposes shall be the specific purposes listed in the third sentence of Section 1.2 of these By-Laws.

Section 3.5. Interpretation. Any ambiguity in these By-Laws or any question requiring interpretation of these By-Laws shall be resolved by the Board of Trustees, whose determination shall be binding and conclusive.

## ARTICLE IV

### INDEMNIFICATION AND INSURANCE

Section 4.1. Indemnification and Insurance. Unless otherwise prohibited by law or sections 4.3 and 4.4 of these By-Laws, the Corporation shall indemnify any Trustee or officer of the Corporation, any former Trustee or officer of the Corporation, or any person who may have served at its request as a trustee, director or officer of another corporation or entity, whether for profit or not for profit, and may, by resolution of the Board of Trustees, indemnify any employee or agent of the Corporation against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, civil, criminal, administrative or investigative, including appeals) in which he or she is or may be made a party by reason of having been such Trustee, officer, person, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters as to which he or she shall be adjudged in such claim, action, suit or proceeding to be guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation. Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; and judgments, fines, and penalties against, and amounts paid in settlement by such Trustee, officer, person, employee or agent. The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any such Trustee, officer, person, employee or agent; provided, however, that such Trustee, officer, person, employee or agent shall undertake to repay or to reimburse such expense if it should be ultimately determined that he or she is not entitled to indemnification under this Section. The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such Trustee, officer, person, employee or agent may be entitled under any statute, By-Law, agreement, vote of the Board of Trustees or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

Section 4.2. Insurance. The Board of Trustees may authorize the purchase of insurance on behalf of any person against any liability asserted against or incurred by him which arises out of such person's status as a Trustee, officer, employee or agent of the Corporation or out of a person's having served at the request of the Corporation as a trustee, director or officer of another corporation or entity or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

Section 4.3. Limitation. In no case, however, shall the Corporation indemnify, reimburse or insure any person for any taxes imposed on such individual under chapter 42 of the Internal Revenue Code of 1986, as now in effect or as may hereafter be amended ("the Code"). Further, if at any time the Corporation is deemed to be a private foundation within the meaning of Section 509 of the Code than, during such time, no payment shall be made under this Article if

such payment would constitute an act of self-dealing or a taxable expenditure, as defined in Section 4941(d) or Section 4945(d), respectively, of the Code.

Section 4.4. Severability. If any part of this Article shall be found in any action, suit or proceeding to be invalid of ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

I certify that the foregoing Bylaws of ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. were approved and adopted for the Corporation by its Board of Trustees by unanimous consent affective on October 30, 2003, and that they are currently in effect.

Secretary of the Corporation

10/30/03
Date



CONFIDENTIAL



# ARMENIAN ASSEMBLY OF AMERICA

50 NORTH LA CIENEGA BLVD. • SUITE 202 • BEVERLY HILLS, CA 90211 • (310) 360-0091 • FAX (310) 360-0094

November 1, 2003

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Re:     Grant Agreement

Dear Mr. Cafesjian:

Thank you for your very generous grants to support the Armenian Assembly of America, Inc. (the "Assembly"). The purpose of this letter (the "Agreement") is to set forth the terms and conditions of the grants, as described below (the "Grants"), from you, Gerard L. Cafesjian ("GLC"), and The Cafesjian Family Foundation (the "Foundation"; and together with GLC, the "Grantor"), to the Assembly for the purposes of establishing the Armenian Genocide Museum and Memorial (the "AGM&M"). If this Agreement correctly sets forth your understanding with respect to the subject matter hereof, please indicate your agreement by countersigning below and returning the executed original Agreement to the Assembly. The enclosed duplicate original of the Agreement is for your records.

## SECTION 1   First Grant.

1.1     Amount of First Grant. The Grantor shall grant the Assembly $4,000,000 in accordance with the terms of this Agreement (the "First Grant"). This amount is in addition to the $1,000,000 delivered to the Assembly on or about February 16, 2000 by the Vanguard Charitable Endowment Program – Cafesjian Family Foundation Charitable Trust, as directed by GLC as donor advisor to said Trust.

1.2     Use of First Grant. The Assembly shall use First Grant funds solely: (i) to purchase the property at 14th and G Streets, N.W., Washington, D.C., known as the National Bank of Washington Building (the "First Grant Property"); (ii) to pay for any transaction costs related to the purchase of the First Grant Property; and (iii) for the installation of a Memorial as described in Section 3.2 of this Agreement.

**EXHIBIT C**





1.3   Payment of First Grant. The Foundation shall have made First Grant funds available in the following manner:

    (A)   the Foundation transmitted $1,000,000 to the Assembly on February 4, 2000; *per later to DSA custument*

    (B)   the Foundation transmitted $1,500,000 to the Assembly on or before the closing date for the purchase of the First Grant Property, which was on or about February 16, 2000; and

    (C)   the Grantor shall transmit $1,500,000 to the Assembly at such time as mutually agreed to by the parties to fund the purchase and installation of the Memorial described in Section 3.2 of the Agreement.

## SECTION 2   Second Grant

2.1   Amount of Second Grant. The Grantor shall grant the Assembly $12,850,000 in accordance with the terms of this Agreement (the "Second Grant").

2.2   Use of Second Grant. The Assembly shall use Second Grant funds solely to purchase the four parcels of real estate located at 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (collectively, the "Second Grant Property") and for any related transaction costs.

2.3   Payment of Second Grant. The Grantor shall make Second Grant funds available in the following manner:

    (A)   the Grantor shall transmit $6,700,000 to the Assembly on or before the closing date for the purchase of 1334-36 G Street, which is November 4, 2003, of which the Assembly shall use approximately $6,500,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

    (B)   the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1338 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

    (C)   the Grantor shall transmit $800,000, to the Assembly on or before the closing date for the purchase of 1340 G Street, of which the Assembly shall use approximately $750,000 to pay the current owner of 1340 G Street an amount equal to the current owner's current cost basis in 1340 G Street and shall use the remaining amount to pay any related transaction costs;

    (D)   the Grantor shall transmit seven annual payments of $150,000 each to the Assembly on or before the March due date of each of the seven



annual payments (the "Annual Payments") of $150,000 owed or to be owed by the Assembly under the 1340 G Street contract of deed currently held by the current owner of 1340 G Street and to be assumed by the Assembly (the "Contract of Deed"), which the Assembly shall use to pay the Annual Payments;

(E)   the Grantor shall transmit $1,500,000 to the Assembly on or before the due date of the final balloon payment (the "Balloon Payment") of $1,500,000 owed or to be owed by the Assembly under the Contract of Deed, which the Assembly shall use to pay the Balloon Payment; and

(F)   the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1342 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs.

SECTION 3  General Conditions and Covenants.

3.1   Use of the Grant Property.

(A)   The First Grant Property and the Second Grant Property (together, the "Grant Property") may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the "Plans"), and subject to any leases in place at the time of the acquisition of the Grant Property by the Assembly with respect to all or a portion of the Grant Property (and with respect to which the Assembly shall take any necessary steps to terminate such leases as soon as possible, subject to the terms of such leases and applicable law, and shall not consent to any renewals or extensions).

(B)   If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

(i)   in the event any portion of the Grants has not been funded, this Agreement terminates; and

(ii)   to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

3.2   Memorial: The Assembly shall:



(A)   make available in the Grant Property space acceptable to the Foundation for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by the Foundation;

(B)   cooperate with the design firms, artists and others selected by the Foundation to design and ensure the successful completion of the Memorial;

(C)   permit the Foundation to participate in all material decisions regarding the Memorial;

(D)   operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by the Foundation in writing;

(E)   be solely responsible for the costs of maintaining the Memorial; and

(F)   name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by the Foundation in writing.

3.3   **Use of Grant Funds.** The Assembly shall use Grant funds only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.4   **Private Foundation Grants.** The Assembly may not use any portion of the Grants that have been received from the Foundation to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

3.5   **Financial Records.** The Assembly shall maintain financial records regarding the use of the Grants consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

3.6   **Reports and Records.**

(A)   Until completion of the AGM&M and operation of the completed facility for 12 months, the Assembly shall provide written reports to the Grantor at least quarterly.

(B)   Such reports shall include details on:

(i)   the amount and nature of the expenditures made from the Grant; and



(ii)    the progress made in acquiring, designing, renovating, and utilizing the Grant Property and completing the AGM&M.

(C)    In such reports, an officer of the Assembly shall certify its compliance with the terms and conditions of this Agreement.

(D)    The Assembly shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the Grant Property and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

3.7    <u>No Other Rights or Obligations</u>. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence the Assembly's use of any funds provided in accordance with this Agreement.

3.8    <u>No Further Grants Required</u>. It is expressly understood that by making these Grants the Grantor has no obligation to provide additional funding to the Assembly for the AGM&M or for any other purpose.

3.9    <u>Breach by the Assembly</u>.

(A)    If the Assembly fails to use the Grants solely for the purposes set out in this Agreement or if the Assembly fails to satisfy any of the conditions of this Agreement, Grantor is released from any remaining obligation under this Agreement to provide funds or property to the Assembly.

(B)    If the Assembly uses any portion of the Grants either for a purpose other than those set out in this Agreement or for a purpose other than those described in Section 501(c)(3) of the Code, as amended, the Assembly shall repay the portion of the Grants so spent to Grantor, plus interest.

(C)    The remedies set out in this Section 3.9 are in addition to any other remedies that may be available to the Grantor at law or equity.

## SECTION 4    Conditions Related to the Assembly.

The Grantor's obligation to make the Grants is subject to the following conditions:

4.1    <u>Total Grants and Pledges</u>. On or before October 30, 2003, the Assembly must have received actual grants or firm pledges to support the AGM&M, including the Grants, totaling at least $20,000,000. Any grant or pledge that can only be used for the post opening operation or for an endowment for the future



operation of the AGM&M may not be considered for purposes of satisfying this condition.

4.2   <u>Tax-Exempt Status.</u> The Assembly must be a tax-exempt organization described in Section 501(c)(3) of the Code, and may not be a private foundation within the meaning of Section 509(a) of the Code.

4.3   <u>Tax Status Documentation.</u> The Assembly shall deliver to the Grantor a copy of its IRS determination letter and such other documentation reasonably requested by the Grantor, including without limitation evidence that the Grants and the other contributions expected in connection with the AGM&M, including those described in Section 4.1 of this Agreement, have not caused the Assembly to be treated as a private foundation.

4.4   <u>Evidence of Satisfaction.</u> The Assembly has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

## SECTION 5   Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grants is subject to the following conditions:

5.1   <u>New Nonprofit Corporation.</u> On or before October 30, 2003, a new, independent entity described in Section 501(c)(3) of the Code, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), must be created by the Assembly and the Foundation, with the costs borne by AGM&M, Inc.

5.2   <u>Governance of AGM&M, Inc.</u>

    (A)   AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

    (B)   Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of the Transfer Agreement described in Section 5.3 of this Agreement), except that the Assembly shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by the Assembly to AGM&M, Inc.

    (C)   In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

    (D)   In recognition of its efforts in establishing the AGM&M, the

 

Assembly is included as a Major Donor and has the right to appoint a voting member of the AGM&M, Inc. Board of Trustees.

(E) Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless otherwise specified in the Articles or Bylaws of the corporation.

(F) Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G) The initial Board of Trustees of AGM&M, Inc. consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

5.3 **Transfer Agreement.**

(A) On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

(B) The Transfer Agreement will oblige AGM&M, Inc. to honor all of the existing donor requirements at time of transfer, or in the alternative, to obtain donor consent to the transfer and any modification of donor terms.

(C) Under the Transfer Agreement, AGM&M, Inc. must assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial.

5.4 **Promissory Note.**

(A) The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B) The new note must be interest free and mature on December 31, 2005.

(C) If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

5.5 **Armenian National Institute.** On or before November 1, 2003, the Assembly



shall assign its right to appoint Trustees of the Armenian National Institute to AGM&M, Inc.

## SECTION 6  Representations by the Assembly.

The Assembly hereby represents and warrants to the Grantor as follows:

6.1    Tax Status. The status of the Assembly as an organization described in Section 501(c)(3) of the Code, and as an organization that is not a private foundation within the meaning of Section 509(a) of the Code is in full force and effect and there is, to the Assembly's knowledge, no IRS reexamination of such status pending or threatened.

6.2    Organization. The Assembly is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

6.3    Power. The Assembly has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grants.

6.4    Actions. All actions required to be taken by the Assembly to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

6.5    Authorization. This Agreement has been duly and validly authorized by all necessary action of the Assembly and constitutes, when executed, a valid and binding obligation of the Assembly.

6.6    Furtherance of Charitable Purposes. The acquisition, renovation, and utilization of the Grant Property is solely in furtherance of the Assembly's stated charitable purposes.

## SECTION 7  General Provisions.

7.1    Notice.

(A)    Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)    upon personal delivery, if delivered by hand; or

(ii)    three days after the date of deposit in the U.S. mail, postage prepaid; or





(iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

(B)    Notice sent in accordance with Section 7.1(A) of this Agreement must be addressed as follows:

(i)    If to Grantor:

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

(ii)    If to the Assembly:

Armenian Assembly of America, Inc.
122 C Street, NW
Suite 350
Washington, DC 20001
Fax: 202-383-9012

(C)    Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 7.1.

7.2    Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

7.3    Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and the Assembly and are not assignable or transferable to any other person, firm or corporation without the consent of the other party, except that the Assembly may assign its rights and obligations under this Agreement to any entity that succeeds to all or substantially all of the Assembly's business and assets or as set out in Section 5.3 of this Agreement.

7.4    Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

 

7.5    <u>Entire Agreement.</u>

(A)    This Agreement represents the entire agreement between the Grantor and the Assembly concerning the Grants and all previous agreements, whether written or oral, are superseded by it.

(B)    This Agreement may be modified or waived only by a written agreement between the Grantor and the Assembly.

(C)    The Assembly acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

Thank you again for your generous grant to support the Armenian Assembly of America.

Sincerely,

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____
Hirair S. Hovnanian
Chairman of the Board of Trustees

By: _____
Peter Vosbikian
Chairman of the Board of Directors

Accepted and agreed to as of the date of this Agreement by:

THE CAFESJIAN FAMILY FOUNDATION

By: _____     Date: NOV 1, 2003
Gerard L. Cafesjian
President and CEO

GERARD L. CAFESJIAN

_____     Date: NOV. 1, 2003

11

Case 1:07-cv-01746-RWR Document 23-5 Filed 12/20/2007 Page 1 of 2

# Armenian Genocide Museum and Memorial, Inc.
### 1140 19th Street, NW, Suite 600, Washington, DC 20036

BY FAX

May 1, 2007

Anoush Mathevosian
30 Candy Lane
Great Neck, NY 11023

Van Z. Krikorian
Global Gold Corporation
45 East Putnam Ave.
Greenwich, CT 06830

Gerard L. Cafesjian
Cafesjian Family Foundation
15 South 5th St., Suite 900
Minneapolis, MN 55402

Dear Anoush, Van, and Gerry:

This is to notify you that there will be a meeting of the Armenian Genocide Museum and Memorial Board of Trustees on Monday, May 7, 2007.

Attached please find a proposed meeting agenda.

Sincerely,

Hirair Hovnanian
Chairman

**EXHIBIT D**

MAY-01-2007  11:35         ARMENIAN ASSEMBLY                    202 638 4904     P.02

# AGMM Board of Trustees Meeting

Date: Monday, May 7, 2007
Time: 10:00 a.m. EST
Location: 30 Candy Lane, Great Neck, NY 11023

Draft Meeting Agenda

1) Chairman's report and update

2) Financial report

3) Authorization of planning, development and building committee

4) Election of officers

CONFIDENTIAL

## TRANSFER AGREEMENT

This Transfer Agreement (this "Agreement") is made as of November 1, 2003, by and between:

Armenian Assembly of America, Inc. (the "Grantor"), a District of Columbia nonprofit corporation; and

Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), a District of Columbia nonprofit corporation.

## BACKGROUND

In order to complete the building of the Armenian Genocide Museum and Memorial (the "AGM&M"), the Grantor desires to transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc. under the terms and conditions set out in this Agreement.

The parties, therefore, agree as follows:

## TERMS

SECTION 1  Grant.

1.1  Nature of Grant.

    (A)  The Grantor shall contribute to AGM&M, Inc., all of its rights, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Grantor and/or held by the Grantor for the development, renovation, and construction of the AGM&M, as detailed on Schedule A (the "Grant").

    (B)  Copies of all outstanding grant agreements between the Grantor and its donors relating to the AGM&M are attached to this Agreement as Exhibit A-X.

    (C)  The approximate aggregate value of the Grant is $27,784,901. Within this aggregate estimate the value of the real property is $7,250,000.00; the value of the pledges as of October 30, 2003, is $19,422,044; and the value of cash and other assets on hand is approximately $669,528.

1.2  Other Rights and Obligations Transferred.

    (A)  AGM&M, Inc. must honor all of the Grantor's donor requirements existing at time of transfer, or in the alternative, obtain donor consent

1

**EXHIBIT E**

to the transfer and any modification of donor terms.

(B)   Without limiting Section 1.2(A) of this Agreement, AGM&M, Inc. assumes and agrees to comply with the Grantor's obligations relating the memorial commemorating the Armenian Genocide under the agreement between Grantor and Gerard L. Cafesjian and The Cafesjian Family Foundation attached to this Agreement as Exhibit A.

(C)   The Grantor hereby assigns to AGM&M, Inc. the Grantor's right to appoint Trustees of the Armenian National Institute, Inc.

(D)   If at the time this Agreement is executed the promissory note executed by Grantor in favor of the The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

1.3   Use of Grant.  AGM&M, Inc. shall use the Grant solely to develop, construct and operate the AGM&M.

1.4   Transfer of Grant.

(A)   The Grantor shall begin to transfer the assets that compose the Grant upon the execution of this Agreement.

(B)   The Grantor shall diligently undertake to complete the transfer of all titles, obtain all consents or other permissions, and otherwise act to effect the completion of the Grant.

SECTION 2   General Conditions and Covenants.

2.1   Use of Grant Funds.  AGM&M, Inc. shall use the Grant only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

2.2   Private Foundation Grants.  AGM&M, Inc. may not use any portion of the Grant that has been received from a private foundation, as defined by Section 509(a) of the Code, to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

2.3   Financial Records.  AGM&M, Inc. shall maintain financial records regarding the use of the Grant consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

2.4   Reports and Records.



(A)    Until completion of the AGM&M and operation of the completed facility for 12 months, AGM&M, Inc. shall provide written reports to the Grantor at least quarterly.

(B)    Such reports shall include details on:

    (i)    the amount and nature of the expenditures made from the Grant; and

    (ii)    the progress made in acquiring, designing, renovating, and utilizing the Property and completing the AGM&M.

(C)    In such reports, an officer of AGM&M, Inc. shall certify its compliance with the terms and conditions of this Agreement.

(D)    AGM&M, Inc. shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the real property portion of the Grant and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

2.5    <u>Access to Public Spaces</u>. Upon written and reasonable notice, AGM&M, Inc. shall provide Grantor with access to the public spaces within the AGMM free of charge at least six times annually for tours, dinners or other events consistent with the nature of the AGMM in the sole judgment of the AGM&M, Inc., each not lasting longer than six hours, all costs of such events to be borne by Grantor. Grantor shall not have the right to assign, lease or otherwise transfer this right to any other entity or person. This right of access shall expire if Grantor ever ceases to be an organization described in Section 501(c)(3) of the Code.

2.6    <u>Narrative</u>. Grantor and AGM&M, Inc. shall use their best efforts to jointly prepare a narrative on the creation of the AGMM (the "Narrative") for approval by both Grantor and AGM&M, Inc. Upon approval by both Grantor and AGM&M, Inc. and completion of the AGMM, AGM&M, Inc. shall permanently and prominently memorialize the Narrative within the AGMM. AGM&M, Inc. shall include the Narrative or a condensed version thereof in all major publications and public presentations of AGM&M, Inc. that reference the creation of the AGMM.

2.7    <u>No Other Rights or Obligations</u>. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence AGM&M, Inc.'s use of the Grant provided in accordance with this Agreement.



SECTION 3   Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grant is subject to the following conditions:

3.1   Tax-Exempt Status.   AGM&M, Inc. must be a tax-exempt organization described in Section 501(c)(3) of the Code, as amended, and may not be a private foundation within the meaning of Section 509(a) of the Code.

3.2   Tax Status Documentation.   AGM&M, Inc. shall deliver to the Grantor a copy of its IRS application for recognition of exemption (when prepared), its IRS determination letter (when received), and such other documentation reasonably requested by the Grantor.

3.3   Evidence of Satisfaction.   AGM&M, Inc. has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

3.4   Governance of AGM&M, Inc.

(A)   AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

(B)   Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of this Agreement), except that the Grantor shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by Grantor to AGM&M, Inc.

(C)   In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

(D)   In recognition of its efforts in establishing the AGM&M, the Assembly is included as a Major Donor and a voting member of the AGM&M, Inc. Board of Trustees.

(E)   Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless otherwise specified in the Articles or Bylaws of the corporation.

(F)   Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.



(G)     The initial Board of Trustees of AGM&M, Inc., consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

## SECTION 4  Representations by AGM&M, Inc.

AGM&M, Inc. hereby represents and warrants to the Grantor as follows:

4.1     Tax Status. AGM&M, Inc. is an organization described in Section 501(c)(3) of the Code and an organization that is not a private foundation within the meaning of Section 509(a) of the Code, and AGM&M, Inc. shall apply by November 30, 2003 to the Internal Revenue Service for recognition of this status.

4.2     Organization.  AGM&M, Inc. is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

4.3     Power. AGM&M, Inc. has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grant.

4.4     Actions.  All actions required to be taken by AGM&M, Inc. to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

4.5     Authorization.  This Agreement has been duly and validly authorized by all necessary action of AGM&M, Inc. and constitutes, when executed, a valid and binding obligation of AGM&M, Inc..

4.6     Furtherance of Charitable Purposes.  The receipt and use of the Grant pursuant to this Agreement is solely in furtherance of AGM&M, Inc.'s stated charitable purposes.

## SECTION 5  General Provisions.

5.1     Notice.

(A)     Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)     upon personal delivery, if delivered by hand; or

(ii)    three days after the date of deposit in the U.S. mail, postage prepaid; or

(iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

(B)    Notice sent in accordance with Section 5.1(A) of this Agreement must be addressed as follows:

    (i)    If to AGM&M, Inc.:

        c/o The Cafesjian Family Foundation, Inc.
        15 South Fifth Street
        Suite 900
        Minneapolis, MN 55402
        Fax: 612-359-8994

    (ii)    If to the Grantor:

        Armenian Assembly of America, Inc.
        122 C Street, NW
        Suite 350
        Washington, DC 20001
        Fax: 202-383-9012

(C)    Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 5.1.

5.2    <u>Governing Law</u>.  This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

5.3    <u>Dispute Resolution</u>.  Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

5.4    <u>Assignments</u>.  This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party.

5.5    <u>Headings</u>.  The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

5.6    <u>Entire Agreement</u>.

    (A)    This Agreement represents the entire agreement between the Grantor

and AGM&M, Inc. concerning the Grant and all previous agreements, whether written or oral, are superseded by it.

(B)   This Agreement may be modified or waived only by a written agreement between the Grantor and AGM&M, Inc.

(C)   AGM&M, Inc. acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*[Signatures on next page.]*

IN WITNESS WHEREOF, the parties hereto have caused this Transfer Agreement to be duly executed as of the day and year first above written.

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____     Date: _Nov / 2003_
    Hirair S. Hovnanian
    Chairman of the Board of Trustees

By: _____     Date: _NOV. 1, 2003_
    Peter Vosbikian
    Chairman of the Board of Directors

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

By: _____     Date: _Nov 1, 2003_
    John J. Waters, Jr.
    Secretary and Treasurer

8

TRANSFER AGREEMENT

## Schedule A

**Transferred Assets**

(See attached.)

TRANSFER AGREEMENT

---

Exhibit A

Grant Agreement with [_____]

(See attached.)