## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Cafesjian Family Foundation, Inc. and John J. Waters, Jr., Individually and on behalf of the Armenian Genocide Museum and Memorial, Inc. <br><br> Plaintiff, <br><br> v. <br><br> The Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and the Armenian Assembly of America, Inc. <br><br> Defendants. | Civil File No. 1:07-cv-01746 (RWR) |

## I.   DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(B)(6)

The Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and the Armenian Assembly of America, Inc. (hereinafter "Defendants"), through their counsel, respectfully move this Court, pursuant to Fed.R.Civ.P. 12(b)(6), for an Order which dismisses Plaintiffs' claims with prejudice because Plaintiffs lack standing to assert derivative claims on behalf of the Armenian Genocide Museum and Memorial, Inc., and because Plaintiffs have failed to allege facts which establish that they are entitled to the relief requested.  In support of their Motion, the Defendants rely on the accompanying Memorandum of Points and Authorities In Support of Defendants Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), filed herewith.

WHEREFORE, Defendants respectfully request that the Court: dismiss Plaintiffs' Amended Complaint, with prejudice, on the basis that Plaintiffs' Amended Complaint fails to state claims on which relief can be granted.

Respectfully submitted,

Dated:  March 4, 2008

**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**

By:     /s/  David. T. Case
David T. Case (D.C. Bar No. 384062)
Bruce H. Nielson (D.C. Bar No. 414440)
1601 K Street, N.W.
Washington, D.C. 20006
Tel:  (202) 778-9000
Fax:  (202) 778-9100

AND

     /s/    Arnold R. Rosenfeld
Arnold R. Rosenfeld (MA Bar No. 428860)
Naoka E. Carey (MA Bar No. 655312)
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3155
Fax: (617) 261-3175

**COUNSEL FOR DEFENDANTS**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Cafesjian Family Foundation, Inc. and John J. Waters, Jr., Individually and on behalf of the Armenian Genocide Museum and Memorial, Inc.<br><br>                    Plaintiff,<br><br>v.<br><br>The Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and the Armenian Assembly of America, Inc.<br><br>                    Defendants. | Civil File No. 1:07-cv-01746 (RWR) |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)

Defendants, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M"), Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and the Armenian Assembly of America, Inc. ("the Assembly") (hereinafter collectively "Defendants"), through their counsel, hereby submit their Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6).

## II.    INTRODUCTION

This matter arises out of the unremitting campaign by the Plaintiffs, Cafesjian Family Foundation, Inc. ("CFF") and John J. Waters ("Waters" and collectively with CFF, "Plaintiffs"), to halt Defendants' major recent advancements toward building a museum and memorial to the victims and survivors of the Armenian Genocide.  Plaintiffs' efforts to prevent the museum from being built, despite the fact that the Assembly and the Armenian-American community have devoted a decade of planning and financial support to making the project a reality, has no legal basis but instead appears to be motivated by the personal pique and/or desire for personal profit of CFF's controlling officer and Trustee, Gerard L. Cafesjian ("Cafesjian").  In addition to four

separate lawsuits,[1] Cafesjian has also engaged in a publicity war, using the newspaper which he controls to disparage the other AGM&M Trustees.[2]

Despite Cafesjian's efforts to disguise this action as one in which Plaintiffs are seeking to act on behalf of AGM&M, the true agenda behind this Amended Complaint is Cafesjian's plan to bring a halt to the museum project, dissolve AGM&M, and obtain distribution of substantially appreciated real estate from AGM&M. This is apparent from the other litigation filed by Plaintiffs, as well as the Amended Complaint and claims in this action, all of which are unsupported by either the facts alleged or applicable law.

Leaving aside, as the Court must, the Amended Complaint's numerous self-serving characterizations and unsupported assertions, Plaintiffs' allegations confirm that the Defendants' actions have been entirely consistent with both the letter and spirit of AGM&M's corporate purpose, as well as Defendants' fiduciary duties to AGM&M. The facts, as pled by Plaintiffs, demonstrate that on May 7, 2007, a duly noticed and convened meeting of the AGM&M Board of Trustees occurred, at which all of the persons eligible to vote were present. At the meeting, Defendants questioned Waters (CFF's designee Trustee) regarding his and Cafesjian's actions during their tenure managing AGM&M, and their actions in threatening to and then filing a suit

---

[1] In addition to this action, CFF, Cafesjian, and Waters also have filed three Complaints in the U.S. District Court, District of Minnesota: (1) a Complaint (Docket No. 07-cv-2079) which seeks, *inter alia*, recission of a Grant Agreement between Cafesjian, CFF and the Assembly which provided significant funding for AGM&M; (2) a Complaint for Injunctive Relief (Docket No. 07-cv-4212) which seeks to halt an Arbitration proceeding filed by AGM&M and the Assembly with the American Arbitration Association, which Arbitration proceeding has since been withdrawn; and (3) a Complaint (Docket No. 08-cv-373) which seeks declaratory relief with respect to the claims originally asserted by AGM&M and the Assembly in the Arbitration proceedings. The dismissal of CFF's first action has already been recommended by the Magistrate Judge in Minnesota; a Motion to Dismiss the second action on mootness grounds is pending.

[2] See, e.g., Affidavit of Naoka E. Carey filed in support of Defendants' Opposition to Plaintiff's Application for Preliminary Injunction ("Carey Aff.") at Exhibit 13.

which sought rescission of all of CFF's donations to AGM&M.   The Defendants requested that Waters explain or respond to these and other conflicts of interest on the part of Waters, Cafesjian and CFF with respect to the development of the museum.[3]  Unwilling to answer the other Trustees' legitimate fiduciary inquiries, Waters voluntarily departed the meeting.  Under D.C. corporation law, a quorum continued to exist despite Waters' departure.  Accordingly, the remaining Trustees continued with the business of the meeting, including authorizing a Building and Operations Committee to direct the development of the museum, as permitted by the By-Laws.   As a matter of law, none of the Defendants' actions were *ultra vires* or otherwise inconsistent with Defendants' duties to AGM&M.

Even construing the facts in the light most favorable to Plaintiffs, the Amended Complaint must be dismissed.  First, Plaintiffs lack standing to assert derivative claims on behalf of AGM&M, including having interests which are patently in conflict with AGM&M.  Second, the facts as alleged by Plaintiffs do not support Plaintiffs' assertion that Defendants committed an *ultra vires* act or breached their duty to AGM&M.  Finally, even assuming *arguendo* that the actions alleged by Plaintiffs were *ultra vires* or breached some sort of duty to AGM&M, no harm to AGM&M has been alleged, and, therefore, such claims must fail as a matter of law.  Dismissal of Plaintiffs's Amended Complaint, in its entirety, is required.

## III.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    *The Inception Of The Armenian Genocide Museum And Memorial Project*

In the 1990s, the Assembly formed the Armenian National Institute (ANI), dedicated to the reaffirmation of the Armenian Genocide.  In support of the formation of ANI, Anoush

---

[3] Cafesjian's, Waters' and CFF's breaches of fiduciary duty to AGM&M and the Assembly are the subject of separate action filed in the District Court for the District of Columbia (Docket No. 08-cv-255).

Mathevosian, an Armenian-American philanthropist, made an initial pledge of $3,500,000 to the Assembly for the purpose of constructing a permanent museum to the victims and survivors of the Armenian Genocide ("the museum").  Plaintiff's Amended Complaint (hereinafter "Cmplt.") ¶ 16.  Encouraged by Ms. Mathevosian's generosity, the Assembly began exploring possible sites for the museum in Washington, D.C. and solicited donations from the Armenian-American community for the purpose of establishing and constructing the museum.  See Affidavit of Robert A. Kaloosdian ("Kaloosdian Aff.") ¶ 5, Carey Aff. at Exhibit 2.

In or around 1999, a possible site for the museum was identified at the National Bank of Washington Building at 14th and G Streets, N.W. (619 14th Street, NW), Washington, D.C. ("the Bank site").  In addition to being an impressive, museum quality building, the Bank site is in a highly desirable location near the White House.  The Bank site was purchased in 2000 with donations from Mathevosian and Cafesjian (through his personal foundation, CFF, one of the Plaintiffs).  Kaloosdian Aff. ¶ 8; Cmplt. ¶ 31.  While the Assembly took the lead in developing the project initially, Cafesjian first began acquiring properties adjacent to the Bank site for his own "Cafesjian Art Museum."  See Plaintiff's Application for Preliminary Injunction at n.1.  Cafesjian subsequently became more involved in the museum project and eventually demanded that a new non-profit organization be created, the AGM&M, to which Cafesjian would provide funding and which he apparently hoped to control.  See Kaloosdian Aff. ¶ 10.

### B.    *Incorporation and Organizational Structure of AGM&M*

In October of 2003, the AGM&M was incorporated as a District of Columbia not-for-profit corporation. Cmplt. ¶ 29.  Pursuant to the Articles of Incorporation and the By-Laws (attached at Exhibit A and Exhibit B to Cmplt., respectively), the purpose of AGM&M is as follows:

> **[AGM&M] will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.**

See By-Laws at § 1.2, Articles of Incorporation ("Articles") at IV-A, Cmplt. ¶ 32.  The Articles of Incorporation and By-Laws of AGM&M were ratified and adopted, respectively, pursuant to a Unanimous Written Consent of the Initial Trustees of AGM&M (hereinafter "Consent") executed on October 30, 2003, Exhibit 3 to Carey Aff.  The By-Laws, Articles of Incorporation, and Consent, together, constitute the operative organizational documents of AGM&M.

Pursuant to the By-Laws and Articles, AGM&M has no members.  Articles § V, By-Laws § 2.1.  The Board of Trustees serves as the Board of Directors for purposes of the D.C. Non-Profit Corporations Act. By-Laws § 2.2.  Pursuant to the Articles of Incorporation, the initial Trustees of the AGM&M were Cafesjian, Mathevosian, Hovnanian, and Robert A. Kaloosdian ("Kaloosdian").  Articles at IX.  As noted in the Consent, Cafesjian and Kaloosdian were appointed as Trustees on behalf of CFF and the Assembly respectively, two of the four named "Initial Donors" of the Corporation (the other two Initial Donors are Mathevosian and Hovnanian).  Consent at 2.  The Consent also identified the initial officers of AGM&M: Cafesjian (President), Hovnanian (Vice-President), and Waters (Secretary and Treasurer).[4]

Under the AGM&M By-Laws, each Initial Trustee is entitled to exercise one trustee vote. By-Laws § 2.4.   In addition, for each additional $5,000,000 contributed to AGM&M, initial or

---

[4] Under the AGM&M By-Laws, only Trustees can hold office as Secretary or Treasurer.  At Cafesjian's insistence, Waters, a long time employee and agent of Cafesjian, was appointed as Secretary and Treasurer even though it was contrary to AGM&M's By-Laws.

subsequent Donors are entitled to elect additional Trustees, or to confer additional votes to their existing Trustees.  Id. § 2.5.  Importantly, the election of additional Trustees (or votes for Trustees) is contingent upon each $5,000,000 contribution being accepted by the Board of Trustees "on behalf of [AGM&M] by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  Id.  Absent a ratification of a purported contribution, none of the initial Trustees are entitled to have more than one vote.

By Plaintiffs' admission, CFF has contributed, approximately, $14,500,000 to AGM&M. Cmplt. ¶ 14.  Accordingly, even assuming that a vote as required by § 2.5 of the By-Laws had occurred, CFF is entitled to no more than two Trustee votes.[5]

All questions to be decided by the AGM&M Board of Trustees are to be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present.  Id. § 2.7.  A quorum exists when persons representing one-half of the aggregate eligible votes are present a meeting. Id. § 2.6 (emphasis supplied).  The Board of Trustees is also empowered to "organize, appoint and supervise one or more committees, including an Executive Committee, and may delegate to any such committee any or all of their powers which may be delegated by law." Id. § 2.10.  Robert's Rules of Order Revised govern matters of parliamentary procedure not otherwise prescribed by law, the Articles, or the By-Laws.  Id. § 3.1.

### C.    The Grant Agreement

On November 1, 2003, the Assembly executed a Grant Agreement with Cafesjian and CFF.  See Grant Agreement, Exhibit C to Cmplt.  The Grant Agreement is not incorporated into,

---

[5] Plaintiffs assert that CFF has pledged in excess of $15,000,000 to AGM&M and is therefore entitled to exercise three Trustee votes.  Plaintiffs can point to no evidence that the alleged contributions have ever been approved by the Board of Trustees as required by the By-Laws. Defendants also dispute Plaintiffs' contention that the terms "pledges" can be substituted for "contributions" and have called upon Plaintiffs to prove that they have, in fact, contributed in excess of $15,000,000 to AGM&M.

or referenced by, the organizational documents of AGM&M.  Rather, the Grant Agreement is a contract by and between the Assembly, CFF and Cafesjian of which the AGM&M is a beneficiary.  <u>Plaintiffs have not alleged any breach of the Grant Agreement in this action.</u>[6]

Under the terms of the Grant Agreement, there is a reversionary provision regarding certain "Grant Property" donated by CFF and Cafesjian.  The reversionary clause is critical to understanding Plaintiffs' true agenda, which is to delay the development of the museum long enough to compel the return of all of the grant property to CFF or Cafesjian.  The Grant Agreement provides as follows:

> **(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by the AGM&M Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:**
>
> **i.    in the event any portion of the Grants has not been funded, this Agreement terminates; and**
>
> **ii.    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.**

See Grant Agreement at Section 3.1(B).  This provision clearly put Cafesjian, who was in control of the operations of AGM&M for many years, in the position of being able to force the reversion of his donations simply by doing nothing to establish the museum on a timely basis or by creating a conflict with the other members of the Board of Trustees, while still enjoying the tax benefit of a "donation."  Moreover, as the AGM&M, and not Cafesjian or CFF, will have borne the taxes and other costs associated with the properties during the interim, and as the properties

---

[6] In the first Minnesota case brought by Cafesjian against the Assembly, Cafesjian alleged a breach of the Grant Agreement and demanded a rescission of all the grants made to AGM&M.  It is in this case that the Magistrate Judge recommended dismissal on jurisdictional grounds.  <u>See</u> note 1, *supra*.

have appreciated in value significantly during the intervening time period, if the time requirement is not met, CFF will receive a significant windfall at the direct expense of AGM&M.

### D.    Cafesjian And Waters Breach Their Fiduciary Duties As Officers And Trustee Of AGM&M

Between November 1, 2003 and the fall of 2006, the AGM&M was operated, managed, and in fact, controlled by Cafesjian and Waters, acting as President and acting Secretary/Treasurer, respectively.  Kaloosdian Aff. ¶ 16.  During this time, Cafesjian and Waters presented a potentially controversial museum design proposal by architect Edgar Papazian to the non-CFF Trustees.  Id. ¶ 17.   The design envisioned a museum which was dominated, both literally and metaphorically, by an enormous "Cafesjian Memorial" which, in the words of the architect, "violently penetrate[d]" the museum, towering over, and literally through, the rest of the museum.  See article by Edgar Papazian at 6, Exhibit 4 to Carey Aff.   The non-Cafesjian Trustees inquired of Cafesjian and Waters whether the design would meet the District of Columbia's stringent zoning and permitting requirements.  Kaloosdian Aff. ¶ 17.  Since the bank building itself is historic and protected, and despite bold assertions that there was a "vision issue," Cafesjian knew well that the Papazian design was neither legally nor financially feasible.  Indeed, despite request, Cafesjian produced no confirmation that the proposed design could be permitted or financed.  In early 2006, Cafesjian and Waters presented the non-Cafesjian Trustees with a "Financial Overview" of AGM&M's expenditures during 2005, as well as its estimated budget for 2006, which disclosed uncontrolled spending by Cafesjian and Waters, in their fiduciary capacity as the officers of AGM&M.  See Financial Overview, Exhibit 5 to Carey Aff.

In light of the impractical and self-aggrandizing design promoted by Cafesjian, as well as the disclosure that Cafesjian and Waters had depleted the operating assets of AGM&M, the other

AGM&M Trustees began scrutinizing Cafesjian's and Water's management of the project.  It quickly became apparent to the other Trustees that little progress had been made on the museum's development plan and that Cafesjian had not consulted with, or even informed, the other Trustees and officers of actions he and Waters had taken on behalf of AGM&M. Kaloosdian Aff. ¶ 20.

In response to these inquiries regarding his plans for the museum and memorial, Cafesjian became contemptuous of the other members of the Board of Trustees and indicated, via a letter from his then counsel, that he intended to abandon the museum project and seek immediate return of his donations and pledges, including the now siginficantly appreciated real estate.  See Exhibit 6 to Carey Aff.  Concerned, the other Trustees sent a letter in response, noting that Cafesjian had acted as the chief executive officer of the project, had unilaterally decided whom to engage as the architect, and had hired a business consultant without interference.  See Exhibit 7 to Carey Aff.  The other Trustees, hoping to avoid further delay in the project, urged Cafesjian to continue with the project with his vision.  Id.; Kaloosdian Aff. ¶ 21.

In response to this letter, the other Trustees received a letter in which Cafesjian demanded that the other Trustees immediately return all of Cafesjian's donations or else "liquidate" the museum, leaving no doubt that Cafesjian now intended to dissolve the AGM&M and reacquire properties transferred to AGM&M.  Exhibit 8 to Carey Aff.  The other Trustees realized that, because the properties had increased in value, Cafesjian could now profit by his involvement in the museum project, at the expense of the AGM&M and the Assembly, and to the great detriment of the museum and memorial project.  Kaloosdian Aff. ¶ 22.

Unable to force the Board of Trustees to comply with his demands to return the donated property to CFF and, in essence, eliminate the museum and memorial in its entirety, Cafesjian resigned as the President of AGM&M and turned to litigation which, *inter alia*, sought immediate return of all of his donations. On April 26, 2007, Cafesjian and CFF filed a Complaint against the Assembly in the United States District Court for the District of Minnesota (Docket No. 07 cv 2079, <u>Exhibit 9</u> to Carey Aff.). The Complaint seeks, *inter alia*, rescission of the Grant Agreement and restitution of all donations made pursuant to that Agreement. After offers by the other Trustees to compromise were summarily rejected by Cafesjian, the Assembly moved to dismiss the action, which request was preliminarily granted pursuant to the Report and Recommendation of Magistrate Judge Jeanne J. Graham, <u>Exhibit 10</u> to Carey Aff. Faced with the likely dismissal of its Minnesota action, CFF filed an Application for Preliminary Injunction in this action, this time seeking to halt progress on the museum entirely, a transparent effort to further Cafesjian's scheme to profit from the Grant Agreement's reversionary clause.

### E.     *The May 2007 AGM&M Trustees Meeting*

On May 1, 2007, notice of a May 7, 2007 AGM&M Trustees meeting was duly issued. Cmplt. ¶ 22. The items on the agenda included the authorization of a planning, development and building committee. <u>Id</u>., <u>see also</u> Ex. D to Cmplt. On May 7, 2007, the meeting was convened with all of the Trustees present in person except for Waters, who participated by telephone. Cmplt. ¶ 23. Plaintiffs concede that the May 7, 2007 meeting was properly noticed and convened <u>see</u> Complt. ¶ 22-23, and that a quorum was present. Cmplt. ¶ 40.

At the meeting, a discussion occurred regarding whether or not Cafesjian's and CFF's actions in filing the action against the Assembly in Minnesota, as well as Waters'[7] ultra vires

---

[7] Waters was identified as CFF's designated Trustee on May 2, 2007.

actions in filing a Memorandum of Agreement Reserving Rights which clouded title to

AGM&M property,[8] created a conflict of interest and breach of fiduciary duty which prohibited

Waters and/or CFF from participating in the discussions or voting on proposals for going

forward with the development of the museum.[9] See Exhibit 4 to Affidavit of John J. Waters Jr.

(hereinafter "Waters Aff. Ex. 4").  The other Trustees also inquired of Waters regarding

fundraising efforts and the status of donations that had been made to AGM&M during the time

Waters and Cafesjian were officers of AGM&M.  Id. at 4.  Waters refused to confirm whether

he and Cafesjian had ever approached anyone about funding for the project, nor would he

address how much CFF itself had donated to the museum.  Id. at 4-5.  Waters also stated that he

would not remove the liens he had unilaterally and without authorization placed on the properties

belonging to AGM&M.  Id. at 5; see also Minutes of May 7, 2007 Board Meeting, Part 1

(hereinafter "Minutes Pt. 1"), Carey Aff. at Exhibit 11.

In light of Waters refusal to answer fundamental questions regarding his and Cafesjian's

activities as officers and Trustees of AGM&M, Van Krikorian[10] ("Krikorian") moved that

Waters be prohibited from voting on any motions with regard to the building, operation, and

management of the museum because of the conflict of interest.  Id. at 12.  Before that motion

was voted on, Waters moved to adjourn the meeting, but there was no second to his motion.  Id.

When the remaining Trustees attempted to explain to Waters that he could not vote on the

---

[8] Waters unilaterally executed and recorded the Memorandum of Agreement Reserving Rights between AGM&M and CFF, allegedly as an authorized officer of both AGM&M and CFF. Waters failed to advise or seek approval from the Board of Trustees regarding either the execution or recording of the Agreement.

[9] Cafesjian and Waters had already been suspended from the Assembly's Board of Trustees for non-compliance with the Assembly's Conflict of Interest policies.  See Affidavit of Anthony Barsamian, Exhibit 14 to Carey Aff.

[10] Krikorian was designated as the Assembly Trustee on April 30, 2007, replacing Kaloosdian.

existence of a conflict of interest with respect to himself, Waters became irrational and petulant, stating:

> **[Waters]: Well then, I'll give notice in five days and do the exact same thing.**
>
> **[Krikorian]: What does that mean?**
>
> **[Waters]: I guess since you know everything, mind [stet.] as well go read the Bible.**
>
> **[Krikorian]: You'll give notice and you'll do what same thing? Hold a meeting?**
>
> **[Waters]: Yap.**
>
> **[Krikorian]: OK. It won't change that. Let me try to put it in a different way.**
>
> **[Waters]: No, let me try, because I am getting off the phone here in a second.**
>
> **[Krikorian]: Alright.**
>
> **[Waters]: I am going to be leaving the meeting under protest. Anything that you do from this point forward, you can consider it to be a quorum if you like because it says that it is, anything you vote on, you can do whatever you want, but anyway my participation in this meeting is over.**
>
> **[Krikorian]: Well, OK. Feel free to call afterwards . . . Leave the tape recorder on. Let's proceed with the meeting because we're entitled to proceed.**

Id. at 13.

After Waters left the meeting, the remaining Trustees proceeded to address the remaining items on the agenda. See Minutes of May 7, 2007 Board Meeting, Part 2 (hereinafter "Minutes Pt. 2"), Exhibit 12 to Carey Aff. Pursuant to § 2.10 of the AGM&M By-Laws, the Trustees duly organized and appointed a Building and Operations Committee to ensure that the museum and memorial would become a reality. See id. As stated in the press releases filed in support of Plaintiffs' Application for Preliminary Injunction, the proposed plans call for "a stellar museum

in the historic National Bank of Washington building and adjacent properties." Affidavit of

Molly Borg ("Borg Aff.") Ex. 6.  Per the November 21, 2007 release, "the current plans for the

facility call for a 50,000 square foot complex with room to expand in the future."  Borg Aff. Ex.

7. The plans are viewable on the AGM&M website (http://www.armeniangenocidemuseum.org).

Subsequent to the May 7, 2007 meeting, Waters sent a letter to the other Trustees on CFF

letterhead expressly requesting dissolution of AGM&M.  See Waters Aff.  Ex. 5.

## IV.    LEGAL ARGUMENT

Plaintiffs' Amended Complaint must be dismissed, as Plaintiffs lack standing to bring

derivative claims on behalf of AGM&M, and because Plaintiffs have failed to allege either facts

or law which establish claims upon which relief may be granted.

### A.    *As Plaintiffs Lack Standing To Bring A Derivative Action On Behalf Of AGM&M, Each Of The Four Derivative Claims Asserted In The Amended Complaint Must Be Dismissed*

Four of the five claims asserted in the Amended Complaint, which is filed by Plaintiffs

"individually and on behalf of AGM&M," are derivative actions allegedly brought by Plaintiffs

on behalf of AGM&M.  As discussed below, however, Plaintiffs do not have standing to bring a

derivative action on behalf of AGM&M under general derivative standing doctrines.  Moreover,

even if Plaintiffs did have standing, Plaintiffs have not and cannot comply with the pleading

requirements for derivative lawsuits, as set forth in Fed.R.Civ.P. 23.1.

1.    Plaintiffs Lack Standing to Assert Derivative Claims on Behalf of AGM&M as Plaintiffs Have Not Alleged and Cannot Show That the Parties with Standing to Assert Rights on Behalf of AGM&M Have Unreasonably Refused to Bring Such an Action

"Under 'prudential principles' of standing, a plaintiff may assert only its own legal rights,

may not attempt to litigate 'generalized grievances,' and may assert only interests that 'fall

within the zone of interests to be protected or regulated by the statute or constitutional guarantee

in question.'" <u>Community Credit Union Services, Inc. v. Federal Exp. Services Corp</u>. 534 A.2d

331, 333 (D.C. App. 1987) quoting <u>Valley Forge Christian College v. Americans United for</u>

<u>Separation of Church & State, Inc</u>., 454 U.S. 464, 474-75 (1982).  Derivative actions on behalf

of other individuals or entities are authorized only "to pursue valuable actions when the party

with direct standing or express statutory authorization to have standing unreasonably refuses to

bring suit."  <u>The Plan Committee v. PricewaterhouseCoopers, LLP</u>, 335 B.R. 234, 242 (D.D.C.

2005)(internal citations omitted); <u>see also</u> Fed.R.Civ.P. 23.1 (requiring plaintiffs in derivative

actions to allege with particularity "the efforts made by the plaintiff to obtain the action the

plaintiff desires from the directors or comparable authority and . . . the reasons for the plaintiff's

failure to obtain the action or for not making the effort.").

Plaintiffs have failed to allege, and cannot show, either that the instant action is

"valuable" to AGM&M[11] or that the parties who could legitimately assert a claim on behalf of

AGM&M have unreasonably refused to bring suit.  The reason Plaintiffs cannot show that the

other Trustees have unreasonably refused to take the requested action is apparent: any request by

Plaintiffs for involvement by CFF's designated Trustees would necessitate a vote by the other

Trustees on Plaintiffs' existing conflicts of interest with respect to the museum's development, a

vote which Plaintiffs seek to avoid at all costs.  While Plaintiffs allege that it would be "futile" to

request action from the other Trustees, Plaintiffs proffer no facts in support of this allegation.

Accordingly, all of Plaintiffs' derivative claims (Claims II – V) must be dismissed. <u>See</u> <u>Papasan</u>

<u>v. Allain</u>, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as

true a legal conclusion couched as a factual allegation.")

---

[11] Such a showing is, in fact, impossible, in light of the fact that CFF has failed to allege any
facts which show that there is or would be any legally cognizable injury to AGM&M if the
requested relief is not granted.

2.      Fed.R.Civ.P. 23.1 Bars Plaintiffs' Derivative Claims, as Plaintiffs Do Not Fairly and Adequately Represent the Interests of the Other Shareholders and Members

Fed.R.Civ.P. 23.1 states that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders of members similarly situated in enforcing the right of the corporation or association." Fed.R.Civ.P. 23.1. Even assuming *arguendo* that Plaintiffs otherwise have standing to enforce the rights of the AGM&M, Plaintiffs still must show that they adequately represents the over 100 other donors to the AGM&M, none of whom have joined in this lawsuit.[12] Such a showing is impossible, as Plaintiffs' interests are in fundamental conflict with the corporation and the other donors, as demonstrated by lawsuits Plaintiffs have filed against the AGM&M and by the various breaches of fiduciary duty Plaintiffs and their affiliates committed during their tenure as officers of AGM&M. As Plaintiffs have failed to demonstrate that their interests are sufficiently in line with either AGM&M or the other donors, their efforts to bring a derivative claim on behalf of AGM&M and/or its interest holders must be rejected.

**B.      *Plaintiffs Have Failed To State Claims Upon Which Relief Can Be Granted***

Even assuming that Plaintiffs have standing to assert the derivative claims on behalf of AGM&M, all five of Plaintiffs' claims fail as a matter of law, as the facts as alleged by Plaintiffs do not support the claims asserted, and as Plaintiffs have not shown that any actual injury to either Plaintiffs or AGM&M has resulted from any of the purported breaches by Defendants.

Dismissal of a complaint is warranted where, as here, a plaintiff fails "to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6); see also Kopff v. World Research

---

[12] Over 100 other donors besides Cafesjian have made pledges or donations to the museum project, ranging from $25 to $5,000,000. See Exhibit 15 to Carey Aff. In order to maintain the privacy of these donors, their names have been redacted subject to the entry of a Confidentiality Stipulation or Order in this action.

Group, LLC, WL 3274791, *1 -2 (D.D.C. 2007).  "[T]o provide the 'grounds' of 'entitle[ment]

to relief,' a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action.'" Kopff, at *2, quoting Bell Atlantic Corp. v. Twombly, 127

S.Ct. 1955, 1964-65 (2007).  Rather, the "[f]actual allegations must be enough to raise a right to

relief above the speculative level, on the assumption that all the allegations in the complaint are

true." Twombly, 127 S.Ct. at 1965 (internal citations omitted). The Court should not "accept

inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the

complaint; nor must the Court accept plaintiff's legal conclusions." Kopff, at *2; see also

Papasan, 478 U.S. at 286.  As discussed below, the facts as alleged by Plaintiffs do not support

the relief requested on any of the claims asserted.

      1.     <u>Plaintiffs' Pleadings Demonstrate That No Ultra Vires Acts Have Occurred</u>

      Plaintiffs first asserts a claim on its own behalf, namely that AGM&M performed an ultra

vires act in (a) allegedly denying it the opportunity to participate in the May 7, 2007 meeting;

and (b) authorizing the Buildings and Operations Committee to proceed with the development of

the museum project.  Both of these claims fail as a matter of law.

      In order to establish a claim for an *ultra vires* act, a complainant must show that the

activity alleged to be *ultra vires* is beyond the limitations of the corporate charter and beyond the

limitations otherwise set by the statute under which the corporation has been incorporated.  See

Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo-Mitsubishi Ltd., 15 F.Supp.2d 1,

7 (D.D.C. 1997) ("in its true sense the phrase *ultra vires* describes action which is beyond the

purpose or power of the corporation"); see also Hight v. Richmond Park Improvement Co., 47

D.C. App. 518, 531 (D.C. Cir. 1918); see also 19 C.J.S. *Corporations* § 673.  The complainant

bears the burden of proving the *ultra vires* nature of the act. See 19 C.J.S. *Corporations* § 673.

"[I]f a corporation's act is within the corporate powers, but is performed without authority or in

an unauthorized manner, the act is not *ultra vires*." 19 C.J.S. *Corporations* § 675; see also Columbia Hosp. for Women, 15 F.Supp.2d at 7.

First, the actions taken by the Board of Trustee were duly authorized per the procedures set forth in the By-Laws. It is undisputed that a quorum was present at the May 7, 2007 meeting, see Cmplt. ¶ 40, as Waters himself acknowledged prior to his voluntary departure. Thus, the sole basis for Plaintiffs' assertion that the challenged acts were *ultra vires* appears to be the assertion that Waters' departure from the meeting had the effect of breaking the quorum and rendering any acts taken subsequent to his departure *ultra vires*. Even assuming Plaintiffs' factual allegations are true, such an assertion fails as a matter of law. The By-Laws require one-half of the aggregate eligible votes for a quorum to be present, By-Laws § 2.6, a number which Plaintiffs concede was satisfied at the meeting in question. Under applicable law, the existence of the quorum was not affected by Waters' departure mid-meeting. See Robert's Rules of Order § 39 (once a quorum is present "the continued presence of a quorum is presumed"); D.C. Code § 29-301.17(b) ("the members present at a duly organized meeting may continue to do business until adjournment, notwithstanding the withdrawal of enough members to leave less than a quorum"). Plaintiffs do not dispute that the challenged actions were voted upon and approved by the remaining Trustees present at the meeting. Cmplt. ¶ 28. Accordingly, the challenged actions were *per se* duly authorized.[13]

---

[13] Plaintiffs' assertion that the meeting "departed from the agenda," Cmplt. ¶ 24, is irrelevant to Plaintiffs' claims. As set forth in Robert's Rules of Order, "unless a pre-circulated agenda is formally adopted at the session to which it applies, it is not binding as to detail or order of consideration." Robert's Rules of Order §40, at 369-70 (9th Ed. 1990). Allegedly deficient "meeting notices" cannot "affect the legitimacy of the majority vote of a quorum of the Board after provision of notice of the meeting to all [trustees] and a full discussion by those [trustees] present." Independence Federal Savings Bank v. Bender, 326 F.Supp.2d 36, 45 (D.D.C. 2004).

Plaintiffs do not and cannot indentify any corporate action that was taken after a vote with less than 80 percent approval "of the Trustees present at a meeting where a quorum was present." In fact, in the portion of the meeting at which Waters was present, <u>no</u> questions were taken to vote, including Waters request to adjourn the meeting, which was not seconded. As the Minutes demonstrate, <u>see</u> Ex. 12 to Carey Aff., the actions taken by the remaining Trustees were in accordance with the By-Laws, as the remaining trustees unanimously approved the noted resolutions, including the creation of the Buildings and Operations Committee and delegation of authority thereto, as confirmed by their signatures and approvals to the Minutes. <u>See</u> <u>id.</u>

Plaintiffs fail to assert any facts or law which demonstrate that Waters was forcibly removed from the meeting in a manner that would render the subsequent acts of the Trustees *ultra vires.* Indeed, the facts as alleged by Plaintiffs demonstrate that (1) the meeting was duly noticed, including notice that a building and operations committee would be authorized at the meeting, Cmplt. ¶ 22, (2) all persons eligible to vote were present at the meeting, Cmplt. ¶ 23, (3) the other Trustees made inquiry of Waters regarding conflicts of interest pertaining to other litigation involving CFF, Cmplt. ¶¶ 24-25; and (4) Waters "declined" to participate in the meeting in order to avoid responding to the conflict of interest changes and "departed" from the meeting of his own accord. <u>Id.</u> Plaintiffs offer no facts to show that the other Trustees requested or demanded Waters' departure from the meeting, or in any way coerced Waters into departing; rather, the facts as alleged by Plaintiffs demonstrate that Waters voluntarily left the meeting rather than address the legitimate fiduciary concerns of the other Trustees regarding the propriety of his voting on the development of the museum in light of a demonstrable conflict of interest.

That Waters' departure from the May 7, 2007 was voluntary is confirmed by Waters' own words memorialized in the transcript of that meeting attached as Exhibit 4 to Waters'

Affidavit, submitted in support of Plaintiffs' Application for Preliminary Injunction (hereinafter "Waters Aff."). The transcript makes clear that, although Krikorian made a motion for Waters' removal, which was seconded by Hovnanian, that motion was never taken to a vote because Waters abruptly and voluntarily departed before a vote could be taken. See Waters Aff. Ex. 4, Carey Aff. Ex. 11. Waters confirmed that a quorum existed despite his departure, as he stated, "[a]nything that you do from this point forward, you can consider it to be a quorum if you like, because it says that it is. Anything you vote on, you can do whatever you want…" Waters Aff. Ex. 4. As Waters voluntarily elected to leave the meeting in an effort to avoid a valid vote regarding his conflicts of interest, he cannot now be permitted to veto or invalidate the Board of Trustees' actions taken in his absence. See Hexter v. Columbia Baking Co., 145 A. 115, 116-17 (Del. Ch. 1929) (directors cannot break a quorum at meeting by their departure in order to thwart corporate action with which they disagree).

Finally, even assuming *arguendo* that the actions taken by the Board of Trustees were performed without authority or in an unauthorized manner, they are not *ultra vires* because none of the actions taken by the Board of Trustees on May 7, 2007 are inconsistent with the corporate powers of AGM&M as set forth in the Articles of Incorporation or the By-Laws as well as the District of Columbia Nonprofit Corporations Act (hereinafter "D.C. NCA"). First, the delegation of planning authority to a Committee is clearly authorized by By-Laws §2.10, which specifically permits the Trustees to create committees and "delegate to any such committee any or all of their powers which may be delegated by law." The formation of the Committee and its agenda – to develop the museum – are entirely consistent with the purposes of AGM&M. Second, Plaintiffs' assertion that its purported exclusion from the development process is inconsistent with the corporate purposes of AGM&M is entirely unsupported by the Articles of Incorporation or the

By-Laws.   Not surprisingly, Plaintiffs can point to no language in either document which

support this assertion, as neither requires donor involvement in or ratification of the planning

process.  In order for Plaintiffs' assertion to hold water, Plaintiffs would have to demonstrate that

the AGM&M was created for the express purpose of realizing Plaintiffs' and Cafesjian's

individual vision of the museum (or real estate speculation plan), an assertion which is

unsupported by the facts alleged by Plaintiffs and contrary to the express language in AGM&M's

founding documents, which envision a museum dedicated to the affirmation of the Armenian

Genocide and an entire people, not a memorial and monument to a single, self-aggrandizing

individual, or benefits accruing to a privately held foundation controlled by a single individual.

     2.     <u>Plaintiffs Have Failed to Allege Facts Which, if Proven, Would Support<br>Derivative Claims for Breach of Fiduciary Duty, Waste of Corporate Assets,<br>Abuse of Control or "Frustration of Purpose"</u>

Plaintiffs' remaining claims, <u>all of which are derivative claims allegedly asserted on

behalf of AGM&M</u>, essentially are assertions that, by seeking to make the museum a reality, the

Defendants have breached their fiduciary duty to the AGM&M.  Each of these claims fails as a

matter of law, as with each claim Plaintiffs have failed to show either that the Trustees' efforts to

make the museum a reality were contrary to their duties to AGM&M, or that AGM&M has

suffered any injury or loss as a result of the alleged breach.

     a.     *Plaintiffs Have Not Alleged Facts Which, if Proven, Would Support a<br>Claim for Breach of Fiduciary Duty*

In order to establish a claim for breach of fiduciary duty, a complainant must show that

there existed such a duty, that such duty was breached, and that such breach proximately caused

the injury alleged by the complainant.  <u>See</u> <u>Nevius v. Africa Inland Mission Int'l</u>, 511 F. Supp.

2d 114, 121 (D.D.C. 2007); <u>see also</u> <u>In re Belmar</u>, 319 B.R. 748, 753 (Bkrtcy. D.D.C. 2004).  As

with any breach of duty claim, Plaintiffs have the "burden of establishing the coalescence of four

essential elements: duty, breach of duty, causation and actual loss." Henderson v. Milobsky, 595 F.2d 654, 658 (D.C. Cir. 1978).

Under the D.C. NCA, a director or trustee of a non-profit corporation can be held liable when the director "fail[s] to use due diligence in supervising the actions of those officers, employees or outside experts to whom the responsibility for making day-to-day financial or investment decisions has been delegated;" knowingly engages in self-dealing or fails to disclose a conflict of interest; or "otherwise fail[s] to perform his duties honestly, in good faith, and with a reasonable amount of diligence and care." Stern v. Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries, 381 F. Supp. 1003, 1015 (D.D.C. 1974).

Here, Plaintiffs have made no allegations that the Defendants have failed to properly supervise the committee in its planning, development, and building of the museum. Nor have Plaintiffs alleged that AGM&M or any of the other Trustees have engaged in acts of self-dealing. Finally, Plaintiffs have proffered no factual allegations which support a finding that any of the Trustees have "failed to perform [their] duties honestly, in good faith, and with a reasonable amount of diligence and care." Rather, Plaintiffs' sole allegation pertaining to breach of fiduciary duty is that "by approving and implementing plans to develop the museum and memorial," the other Trustees have breached their fiduciary duty. Cmplt. ¶ 46.

By Plaintiffs' own account, the actions of the other Trustees were in good faith and in the interest of AGM&M.[14] Even accepting as true Plaintiffs' assertion that Waters was prohibited from voting at the meeting, the exclusion was clearly rooted in legitimate concerns regarding ongoing litigation by Plaintiffs (which directly implicated AGM&M's interests, as CFF sought rescission of the Grant Agreement which would permit it to acquire the appreciated real estate)

---

[14] By contrast, CFF's, Cafesjian's and Waters' breach of fiduciary duties are substantial. See Ex. 1 to Carey Aff.

and Waters' recording of the Memorandum clouding the title of the AGM&M properties, concerns unanswered by Waters. See Waters Aff. Ex. 4, Minutes Pt. 1. CFF has no right to participate in a project that it has sought to de-fund and dissolve and against which it has filed suit. The Trustees' vote to approve a committee to develop the museum clearly serves the purpose of AGM&M. That the Trustees actions did, in fact, further the purposes of the museum, is evidenced by Plaintiffs' submissions in support of its Application for Preliminary Injunction, which demonstrate that, in the absence of the CFF designated Trustee's stonewalling and self-dealing, substantial progress toward building the museum finally has been achieved. See Borg. Aff. Exs. 6, 7.

Plaintiffs also allege that "as a direct and proximate cause" of the alleged breach of fiduciary duty, "AGM&M has sustained, and will continue to sustain, substantial harm." Plaintiffs assert absolutely no facts in support of this assertion. Accordingly, Plaintiffs cannot meet the final required element for a breach of fiduciary duty claim, which is to show injury or actual loss. In re Belmar, 319 B.R. at 753 ("plaintiffs seeking compensatory damages for a breach of fiduciary duty must demonstrate that the breach caused an actual injury"). As Plaintiffs fail to allege facts which support their assertion that AGM&M has suffered any legally cognizable harm, the Court must dismiss Plaintiffs' breach of fiduciary duty claim (Claim II).

>    b.    *Plaintiffs Have Not Alleged Facts Which, if Proven, Would Support a Claim for Waste of Corporate Assets*

Plaintiffs also assert a derivative claim that Defendants wasted corporate assets by authorizing the formation of the Building and Operations committee.

In order to establish a claim for corporate waste, a complainant must show that corporate assets were given in exchange "for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." See James A. Fanto,

*Directors' and Officers' Liability*, <u>Practicing Law Institute</u>, § 4:3 (2006).  Further, if "there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky."  <u>Id.</u>; <u>see also</u> 19 C.J.S. *Corporations* § 582 ("A board of directors' decisions do not constitute corporate waste unless they are exceptionally one-sided.").

Here, Plaintiffs fail to state with particularity what specific assets, if any, have allegedly been wasted, nor do they allege that assets were diverted for an "improper or unnecessary purpose."  Rather, Plaintiffs concede that AGM&M's assets were used "to develop the museum and memorial at the National Bank of Washington site."  Cmplt. ¶ 52.  The submissions confirm that the committee has been successful in making progress on the museum project and is using corporate assets for the purposes of building the museum.  As with their breach of fiduciary duty claim, Plaintiffs assert no facts in support of their bald assertion that AGM&M has sustained harm as the result of the Trustees alleged waste of corporate assets.  Accordingly, the Court must dismiss Plaintiffs' waste of corporate assets claim (Claim III).

> c.  *Plaintiffs Have Failed to Allege Facts Which, if Proven, Would Support Derivative Claims for "Abuse of Control" or "Frustration of Purpose"*

Plaintiffs further allege that Defendants (1) "abused their control and influence over AGMM" by excluding Waters from the May 7, 2007 meeting and by approving and implementing plans to develop the museum and (2) frustrated the purpose of AGMM by refusing to allow Plaintiffs to participate in the material decisions regarding the planning, development, and building of the museum.  Cmplt. ¶¶ 56-69.  Both of these claims essentially restate Plaintiffs' underlying breach of fiduciary claim, and similar allegations are made for each.  Both claims fail as a matter of law, as none of the facts alleged by Plaintiffs demonstrate that the remaining

Trustees have acted inconsistently with or frustrated the corporate purpose of AGM&M, let alone that AGM&M has suffered any harm as a result.

With respect to the abuse of control claim, Plaintiffs allege (purportedly on behalf of AGM&M) that the other Trustees have breached their fiduciary duty by "excluding the CFF designated Trustee from the May 7, 2007 meeting;" by "approving and implementing plans to develop the museum and memorial;" and "by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee." Cmplt. ¶ 57.

As discussed above, Plaintiffs offer no evidence that Waters was excluded from the meeting and indeed allege facts which demonstrate that Waters voluntarily left the meeting rather than answer questions about his (and CFF's) conflict of interest in seeing the museum developed. In addition, delegation of any of the Trustees' authority to a committee is permitted under By-Laws § 2.10. Finally, Plaintiffs offer no evidence or law in support of their bizarre assertion that seeking to develop the museum, which is entirely consistent with the corporate purpose of AGM&M, is an abuse of control by the other Trustees. Per the press releases attached at Exs. 6 and 7 to the Borg Aff., the proposed project is being spearheaded by respected architects and planners and contemplates an initial museum development with room for expansion. Plaintiffs' antagonism toward having the museum actually developed hardly satisfies the pleading requirement that Plaintiffs show that the Defendants have acted dishonestly, in bad faith, or without reasonable diligence and care.

There is nothing in the Articles of Incorporation or the By-Laws which requires all development decisions regarding the museum to be made by the Board of Trustees; such a provision would, effectively, thwart any practical progress on the museum. Indeed, Plaintiffs have failed to demonstrate that AGM&M has been harmed (or will be harmed) at all. Even if

AGM&M's By-Laws and Articles of Incorporation required donor involvement in all decisions (which they do not), and even if Plaintiffs had been unlawfully excluded from participating in planning decisions (which, on this record, they have not), in light of Plaintiffs' clear conflict of interest with regard to the land donated to the AGM&M, no legally cognizable harm could be asserted, as Plaintiffs would be prohibited from participating in such decisions in any event.  See Robert's Rules of Order § 44 ("No member should vote on a question in which he has a direct personal or pecuniary interest not common to other members of the organization."). As the facts as alleged by Plaintiffs do not support a claim for abuse of control, the claim (Claim IV) must be dismissed.

Plaintiffs' frustration of purpose claim essentially seeks to assert that, by allegedly failing to comply with the terms of the Grant Agreement, the Trustees of AGM&M have frustrated the corporate purpose of AGM&M.  Such an argument has no support in either Plaintiffs' Amended Complaint or the organizing documents of AGM&M which are attached thereto.  As noted above, neither the By-Laws nor the Articles of Incorporation incorporate or reference the Grant Agreement, nor do they incorporate its terms (both documents were, in fact, executed before the Grant Agreement was signed).  Plaintiffs' assertion that a Grant Agreement between the Assembly and one of the donors to the AGM&M could essentially define the entire corporate purpose of the AGM&M is not only implausible, it is directly contrary to the express purpose language set forth in the Articles of Incorporation and the By-Laws.  This specious assertion is a reflection of Cafesjian's own sense of self-importance, not a legally cognizable claim.[15]

---

[15] To the extent Plaintiffs are, in fact, alleging that the museum as planned would breach the Grant Agreement that CFF and Cafesjian executed with the Assembly, that claim has not been asserted in this action.  Such a claim could, by necessity, only be asserted by CFF and Cafesjian individually, and is, in any event, entirely speculative.  The museum as planned will include a

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs' Amended Complaint should be dismissed in its entirety.


Respectfully submitted,

Dated:  March 4, 2008          **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**


By:        /s/  David. T. Case
          David T. Case (D.C. Bar No. 384062)
          Bruce H. Nielson (D.C. Bar No. 414440)
          1601 K Street, N.W.
          Washington, D.C. 20006
          Tel:  (202) 778-9000
          Fax:  (202) 778-9100

          AND

                  /s/
          Arnold R. Rosenfeld (MA Bar No. 428860)
          Naoka E. Carey (MA Bar No. 655312)
          One Lincoln Street
          Boston, MA 02111
          Tel: (617) 261-3155
          Fax: (617) 261-3175

          **COUNSEL FOR DEFENDANTS**

---

memorial, just not one that "violently penetrates" the historically protected museum building. See Borg Aff. Exs. 6 & 7.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Cafesjian Family Foundation, Inc. and John J. Waters, Jr., Individually and on behalf of the Armenian Genocide Museum and Memorial, Inc. | |
| Plaintiffs, | |
| v. | Civil File No. 1:07-cv-01746 (RWR) |
| The Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and the Armenian Assembly of America, Inc. | |
| Defendants. | |

**ORDER**

This matter is before the Court on the Motion of the Defendants the Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and the Armenian Assembly of America, Inc., to Dismiss this action, with prejudice, pursuant to Fed.R.Civ.P. 12(b)(6).  Having reviewed the Motion and any concurrent and subsequent pleadings filed in opposition to or in support thereof, and having held a hearing on the matter and being otherwise fully advised in the premises, the Court now **GRANTS** the Motion.

**THEREFORE, IT IS ORDERED THAT:**

(1) Plaintiffs' Amended Complaint shall be and hereby is dismissed with prejudice; and

(2) Each party shall bear its own fees and costs.

**IT IS SO ORDERED.**

Dated at _____, this _____ day of _____, 2008.


_____
Hon. Richard W. Roberts, U.S. District Judge