UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., and John Waters, Jr., individually and on behalf of the Armenian Genocide Museum and Memorial, Inc., | Civil File No. 07-1746 (RWR) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)** |
| Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian and the Armenian Assembly of America, Inc., | |
| | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## INTRODUCTION

Defendants challenge the standing of the Armenian Genocide Museum and Memorial's (AGM&M) largest contributor to pursue derivative claims on behalf of the entity that for all practical purposes he brought into being. Yet plaintiffs' contributions and corporate office provide the stake necessary to afford standing. The Court is also told that this lawsuit should not proceed because plaintiffs have failed to "offer evidence" supporting the complaint. That request defies the strictures of Rule 12: the only appropriate inquiry is whether cognizable claims for relief have been alleged.

The Rule 12 process does not condone the extra-pleading rhetoric and storytelling with which defendants' brief are filled. To turn back a Rule 12 attack, plaintiffs are not required to prove their case. The complaint only need assert "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs have easily satisfied the standing and claim cognizibility requirements.

In fact, defendants' papers demonstrate why the Amended Verified Complaint passes Rule 12 muster. Defendants' motion is premised upon a rendition of the facts and an interpretation of evidence found no where in the complaint. Hence, defendants' brief and affidavits highlight the factual conflicts that can only be resolved by a jury.

Plaintiffs' supposed failure to proffer sufficient evidence is not a basis for Rule 12 dismissal. The allegations of the complaint are the exclusive measure of legal sufficiency. And if the Court were inclined to indulge defendants' extra-pleading arguments, Rule 56(f) would require that the motion be deferred for record development. A resolution of the merits cannot be preempted by one party's version of events.

## BACKGROUND

### A.    The Parties

The Cafesjian Family Foundation (CFF) in its capacity as an initial donor with trustee appointment power, and John J. Waters, Jr. in his capacity as the CFF designated trustee to the AGM&M board bring this action individually to enjoin a rogue group that has seized control of AGM&M and derivatively on behalf of AGM&M to hold that group to the terms of AGM&M's charter documents and enabling agreements. Two undertakings are at the center of this dispute: (1) a donor relationship among Gerard Cafesjian, CFF, the Armenian Assembly of America and AGM&M; and (2) the significant charitable contributions made by Cafesjian and CFF for the benefit of AGM&M and the commitments made by AGM&M in accepting these benefits.

One overarching fact shows the way: Cafesjian has far and away been AGM&M's biggest supporter; no other donor even comes close. Tellingly, all of the other contributions put together do not approach Cafesjian's generosity. In return for that munificence Cafesjian only seeks a say about how his gifts are used and adherence to the founding principles and procedures upon which he relied in making his contributions.

AGM&M is a D.C. nonprofit corporation that was created for a singular purpose – namely to "own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide" and "to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide." (Am. Verified Compl. ¶ 30.)[1] AGM&M is governed by a board of trustees. (*Id.* ¶¶ 10-11.) Trustees are appointed by organization supporters who contribute $5 million or more to the cause. (*Id.* ¶ 13; *id.* Exs. B, C.) The board currently comprises six votes. (*Id.* ¶ 13.)

CFF is a non-profit corporation dedicated to charitable, religious, scientific and educational purposes; Cafesjian is CFF's founder, president and a director. (*See id.* ¶ 1.) CFF is particularly devoted to promoting the Armenian community, the Armenian nation and Armenian causes. CFF has made substantial contributions of money and services to the Assembly and AGM&M. (*Id.* ¶ 14.) Specifically, CFF has provided in excess of $17 million in cash and pledges and has funded over $14.5 million (plus an additional $500,000, and so far unpaid, interest free loan) for the benefit of AGM&M. (*Id.*) The other AGM&M principals have not approached this philanthropy.

CFF's unparalleled support entitled Cafesjian to appoint AGM&M trustees and control three of the six board votes. (*Id.* ¶ 14; *id.* Exs. A – C.) From October 2003 until 2006, Cafesjian was the AGM&M chairman and president. From 2003 until May 2, 2007, Cafesjian was the CFF designated trustee. Waters is now the CFF designee to the board. (*Id.* ¶¶ 2, 14.)

The Assembly is an advocacy organization that solicits charitable contributions and drums up support for Armenian causes. (*See id.* ¶ 4.) The Assembly controls one AGM&M

---

[1] Because this is a Rule 12 proceeding, plaintiffs have drawn their statement of facts from the amended verified complaint. In contrast, defendants have strayed from the pleading as well as the truth in their rendition of "facts".

trustee vote.  (*Id.* ¶ 17.)  Defendant Van Krikorian is legal counsel to the Assembly, an Assembly

trustee and the current Assembly designated AGM&M trustee.  (*Id.*)

Defendant Hirair Hovnanian is the chairman of the Assembly board.  By virtue of his

commitments – a $5 million pledge (yet to be fully funded) for the benefit of AGM&M –

Hovnanian controls one AGM&M trustee vote.  (*Id.* ¶ 15.)[2]

Defendant Anoush Mathevosian is an unaffiliated patron who helped conceive AGM&M

and whose early support and pledge facilitated the acquisition of the initial project site.  In

recognition of that founding role, Mathevosian is vested with one trustee vote.  (*Id.* ¶ 16; *id.* Ex.

C § 5.2(C); *id.* Ex. E § 3.4(C).)

## B.    The AGM&M Project

AGM&M was intended to be a collaborative undertaking within the Armenian

community to construct a museum and memorial in honor of the struggle of the Armenian people

and the tragedy of the Armenian Genocide.  Committed to project realization, Cafesjian, together

with CFF pledged and donated in excess of $17.5 million.  (*Id.* ¶ 14.)  Cafesjian also spearheaded

the acquisition of the real estate needed to site an appropriate museum and memorial.  The first

purchase was the former National Bank of Washington.  After that, Cafesjian assembled four

adjacent parcels.  (*See id.* Ex. C.)  That additional property was conveyed to AGM&M through a

grant and transfer arrangement among Cafesjian, CFF and the Assembly, and between the

Assembly and AGM&M.  (*Id.*; *id.* Ex. E.)  Cafesjian's support was expressly conditioned on the

Assembly and AGM&M's commitment to and compliance with several contractual obligations,

---

[2]     Defendants contest CFF's three trustee votes and posit that actual "contributions"
determine a trustee's franchise.  Defendants contend that CFF has not contributed $15 million to
AGM&M, and therefore CFF is at most entitled to two trustee votes.  Defendants' argument is
not supported by the charter documents.  Applying their reasoning, however, Hovnanian, who
has pledged $5 million yet only funded $1.5 million, should have no votes.

including CFF's continued involvement in all material AGM&M decisions. (*Id.* Ex. C. §§ 3.1(A), 3.2(C); *id.* Ex. E. § 1.2(A).)

AGM&M's founding intent clearly envisioned a development that would utilize the bank building as well as the four adjacent properties. (*See id.* Ex. C §§ 5.1-5.3.) The transfer of assets from the Assembly provided the resources that allowed AGM&M to take title to the land "solely to develop, construct and operate the AGM&M" and "solely in furtherance of AGM&M, Inc.'s stated charitable purposes." (*Id.* Ex. E §§ 1.3, 4.6; *see id.* Ex. C § 3.1 (defining all five parcels as "Grant Property").) Founding intent was clear: when constructed, the AGM&M project would make a significant statement on behalf of the Armenian people and in the memory of their incredible suffering at the hand of the Turks. With AGM&M's mission in place and the terms of CFF and Cafesjian's donations confirmed, the parties filed AGM&M's charter documents and contemporaneously executed the agreements pursuant to which Cafesjian's grant was made.

C.    **AGM&M Governance**

AGM&M's articles of incorporation and by-laws establish the terms and procedures upon which corporate affairs are conducted. Those charter documents must be interpreted, however, in the context of AGM&M's singular purpose as well as in light of the donor intent that enables AGM&M to exist. AGM&M has no members; the trustees are directors for District of Columbia Nonprofit Corporation Act purposes. (Am. Verified Compl. Ex. A at Art. V; *id.* Ex. B §§ 2.1, 2.2.) Importantly, "[t]he affairs of [AGM&M] shall be managed and controlled by the Board of Trustees." (*Id.* Ex. A at Art. VII(A).)

Board action must be approved by "an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present." (*Id.* Ex. B § 2.7.) A quorum is convened when at least one-half of the aggregate eligible votes attend a validly called meeting. (*Id.* § 2.6.)

The by-laws address trustee resignation and removal as follows:

> Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal. Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.
>
> * * *
>
> Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote . . . <u>Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee.</u> The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, <u>shall appoint a new successor to replace that Trustee should he or should he be unable to serve for any reason</u>.

(*Id.* § 2.17 (emphasis added).)  Accordingly removal of a specific trustee – *e.g.* Waters – does not terminate qualifying donor board participation.  As the major contributor, CFF retains the perpetual right to designate trustees to vote on all board decisions.[3]

### D.    The Contracts

To memorialize the various AGM&M-related understandings, on November 1, 2003, the Assembly on the one hand and Cafesjian and CFF on the other executed the Grant Agreement.

---

[3]    Because Cafesjian had almost single-handedly funded AGM&M, CFF was allocated three trustee votes – one for each $5 million commitment of gifts and pledges.  Hovnanian, who pledged $5 million – but as of September 2006, had only funded $1.5 million – was afforded one trustee vote.  Anoush Mathevosian, who pledged the seminal $3.5 million, was granted one vote.  (*See* Am. Verified Compl. Exs. A-B; *see id.* Ex. C § 5.2(C); *id.* Ex. E § 3.4(C).)  The Assembly has contributed nothing and accomplished less for the benefit of AGM&M; nevertheless, Hovnanian would not allow AGM&M to be created unless the Assembly was conceded a vote.  (*See id.* Ex. C § 5.2(D).)

Arguments about CFF not being entitled to three votes are disingenuous.  The by-laws and governing contracts provide that trustee votes, with the exception of Mathevosian and the Assembly, are allocated based on each $5 million contribution.  (*Id.* Ex. B. §§ 2.4, 2.5.)  The parties understood that pledges equate with contributions.  CFF has pledged in excess of $17.85 million and funded in excess of $15 million, including outright gifts and unpaid loans.  (*See id.* ¶ 14; *id.* Ex. C.)  In comparison, while promising to give $5 million, Hovnanian's actual contributions as of September 2006 amount to less than $2 million.  He has no hesitation, however, about exercising his vote.  And, until the current dispute, CFF's three vote franchise was never questioned.

Defendants' argue that CFF should be entitled to no more than one trustee vote because additional votes are "contingent upon each $5,000,000 contribution being accepted by the Board of Trustees' on behalf of [AGM&M] by an 80 percent affirmative vote . . . ."  (Defs.' Br. at 8.)  Since gift ratification is said not to have occurred, defendants now deny CFF's additional voting rights.  At the same time, however, defendants insist upon asserting dominion over the donated real estate.  If the contributions were never accepted, then defendants have no basis for refusing to return the grant property or for proceeding with a development of gifts that have never been accepted.  Defendants' vitriol against Cafesjian can only be described as hopelessly contradictory.

(*Id.* Ex. C.)  The Grant Agreement called for a $4 million contribution[4] to purchase the bank building and a conditional pledge in excess of $12.85 million for the benefit of the newly formed AGM&M.  (*Id.*)  The Assembly agreed that these funds would be used to cause the four properties adjacent to the bank to be transferred to AGM&M.  (*Id.* § 5.3.)  The Assembly would never hold title to this real estate; rather CFF's contributions would allow the Assembly to secure the property on behalf of AGM&M.  (*See id.*)

The acquired land could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc." (*Id.* § 3.1.)  If the project was not completed prior to December 31, 2010 pursuant to trustee-approved plans or if the property was not developed in substantial compliance with such plans, then at the donors' "sole discretion," either the funds or the real estate would revert to CFF and Cafesjian.  (*Id.* § 3.1(B).)  Only a development constructed pursuant to a plan approved by 80% of the board of trustees can vitiate donor reversionary rights.  (*Id.* §§ 3.1(A), 5.2(E); *id.* Ex. E § 3.4(E); *see id.* Exs. A-B.)  This provision leaves no doubt about the essentiality of Cafesjian's role in the planning process.

The Grant Agreement requires the Assembly to:

> (A)    make available in the Grant Property space acceptable to [CFF] for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by [CFF];

---

[4]    This contribution was in addition to a $1 million grant already delivered to the Assembly by the Vanguard Endowment Program of the Cafesjian Family Foundation Charitable Trust. (*See* Am. Verified Compl. Ex. C § 1.1.)

(B)    cooperate with the design firms, artists and others selected by [CFF] to design and ensure the successful completion of the Memorial;

(C)    permit [CFF] to participate in all material decisions regarding the Memorial;

(D)    operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by [CFF] in writing;

(E)    be solely responsible for the costs of maintaining the Memorial; and

(F)    name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by [CFF] in writing.

(*Id.* Ex. C § 3.2.)

In the event the Assembly "fails to use the Grants solely for the purposes set out in [the Grant] Agreement or if the Assembly fails to satisfy any of the conditions of [the Grant] Agreement, [CFF and Cafesjian are] released from any remaining obligation under this Agreement to provide funds or property to the Assembly." (*Id.* § 3.9(A).)  "If the Assembly uses any portion of the Grants either for a purpose other than those set out in [the Grant] Agreement . . . the Assembly shall repay the portion of the Grants so spent to [CFF and Cafesjian], plus interest." (*Id.* § 3.9(B).)  In addition to contractually stipulated rights, CFF and Cafesjian retain all other legal and equitable remedies. (*Id.* § 3.9(C).)

CFF made the donations envisioned by the Grant Agreement to realize the AGM&M dream. While the Assembly had originally conceived of the Genocide remembrance, it soon became apparent that a separate entity needed to take over development and that a proper museum and memorial would require more space and flexibility than the bank building afforded. (*Id.* ¶ 31.)  The Grant Agreement called for Cafesjian, CFF and the Assembly to incorporate this

independent entity.  (*Id.* §§ 5.1-5.2.)  All Armenians, not just the Assembly regulars, would be encouraged to support and enjoy the AGM&M.

As agreed, the Assembly executed a contract with the newly formed AGM&M.  (*See id.* Ex. E.)  The Assembly and AGM&M alone are parties to the contract.  (*See id.*)  By that Transfer Agreement the Assembly covenanted to convey "all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets" that had been contributed to or held by the Assembly for the development, renovation and construction of the museum and memorial.  (*Id.* § 1.1(A).)

The contract makes the reason for the transfer of assets doubly clear: "[i]n order to complete the building of the Armenian Genocide Museum and Memorial," the Assembly shall "transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc."  (*Id.* at 1.)  Obviously if the adjacent non-bank properties had not been acquired "for the purpose of building the AGM&M," those assets would not have been transferred.  In accepting the transfer, AGM&M promised to honor the Assembly's Grant Agreement obligations and committed to use the grant properties "solely to develop, construct and operate the AGM&M" and "solely in furtherance of AGM&M, Inc.'s stated charitable purposes."  (*Id.* §§ 1.2, 1.3, 4.6.)  Hence, the transferred properties are exclusively dedicated to AGM&M purposes and that project must be completed by 2010 pursuant to a plan approved by 80% of the trustees.

### E.    CFF banished from project planning and development

Despite charter document mandates and AGM&M's obligations to CFF, the non-Cafesjian trustees have seized control of project planning and development – to the exclusion of CFF.  Three trustees appear determined to defy AGM&M's founding intent and doom the organization's existence.  The supposed justification for CFF banishment is a contrived conflict

of interest purportedly arising from the reversionary interests attached to CFF's grant. These rights, however, have been express since AGM&M's incorporation – reversion if the project was not completed on time and as intended was a condition of the gift. (*See* Ex. C. §§ 3.1, 3.2.) Until the recent dispute over control, no one suggested that the reversionary provision conflicted CFF. In fact when Cafesjian stepped down as AGM&M's chairman in hopes of breaking the planning impasse, defendants urged Cafesjian to continue his leadership, never worrying about a conflict of interest.

Unfortunately discord among the trustees had stymied progress almost from AGM&M's inception. Hovnanian has used his own vote and control over the Assembly's vote to block every proposal advanced by Cafesjian. Hovnanian apparently wanted to prevent anyone other than himself from getting credit for AGM&M fulfillment. The charter documents call for 80% trustee approval, so the board has become mired in an intractable deadlock.

Internal dissention came to a head at a May 2007 board meeting. Waters, as the CFF designee, Hovnanian, Mathevosian and the Assembly's designee, Van Krikorian, convened the session. (*Id.* ¶¶ 23-24.) Almost immediately and with a tape recorder running, Krikorian, the Assembly's lawyer, began drilling Waters about a lawsuit between the CFF interests and the Assembly. (*Id.* ¶ 24.) AGM&M is not a party to that litigation. Waters, without counsel present, declined to be cross-examined by the Assembly's attorney. (*Id.* ¶ 24.) Charging Waters with a conflict of interest, Krikorian demanded that CFF interests be denied any further participation in project planning. (*Id.* ¶ 25.)

AGM&M exists to develop and maintain a museum and memorial; hence, Krikorian's demand amounted to a total freeze out. (*Id.* ¶ 26.) Hovnanian purported to second the motion;[5] Mathevosian did not vote. Waters cast three votes in opposition and requested adjournment. (*Id.* ¶ 25.)

Hovnanian and Krikorian spurned a recess, but refused to conduct business. Effectively ejected from the conduct of board affairs, Waters had no choice but to excuse himself under protest. (*Id.*) Proffering a transcript that has never been validated and that is not encompassed by the pleadings, defendants insist that Waters voluntarily left the meeting. In fact, Hovnanian and Krikorian would not proceed to the agenda in Waters' presence, and while Waters remained on the line, Krikorian persisted in conjuring up conflict of interest accusations. (*Id.* ¶¶ 25-26.) As the Assembly's lawyer, Krikorian obviously hoped that Waters would make some admission while being taped that the Assembly could use in the pending litigation.

The meeting purported to continue following the exclusion of the CFF designee. (*Id.* ¶ 26.) Without Waters present, Krikorian and Hovnanian, if he had a vote, deputed development authority to a planning and building committee. (*Id.* ¶ 28.) This delegation lacked the requisite 80% vote of trustees present at a properly quorumed meeting. (*Id.*) Such an abrogation of board responsibility contravenes the duties with which the trustees are charged by AGM&M's charter documents. (*Id.*)

Vesting a committee that is not answerable to the board with plenary authority over AGM&M's *raison d'être* makes a mockery out of the fundamental inducement for founding donor generosity. The charter documents call for board action by a super majority and perpetual

---

[5]     Applying defendants' reasoning regarding trustee vote entitlement, Hovnanian lacks a vote.

participation by major contributors. (*Id.* Ex. B § 2.7.) Consistent with that provision, the Grant Agreement specifies that AGM&M's plans shall be subject to super majority trustee – not committee – approval. (*Id.* Ex. C §§ 3.1(A); 5.2(E); *see also id.* Ex. E § 3.4(E).) This process ensures that the contributors who have funded the AGM&M dream participate in the realization. There may have been a more efficacious way to proceed, but AGM&M founders were more concerned about respecting substantial donor prerogative than with organizational proficiency. The planning and building committee scheme flouts that intent. By empowering a committee to take charge of the project, AGM&M's major donor, who contributed relying on the promise of input, has been left out in the cold.

The rump committee has purported to initiate a bank-site only and memorial-less museum development. (*Id.* ¶¶ 20-21.) AGM&M press releases make no mention of a memorial or of the four adjacent properties that were acquired for AGM&M's benefit so that the repository and monument could do justice to the ordeal that was being recognized. (*Id.*) The non-Cafesjian interests have disregarded their duties and wasted donated funds on an architect and a museum planner who intend to build a project that would denigrate AGM&M's mission and purpose. (*Id.*)

Since the CFF designee was ostracized, the Cafesjian interests have been completely shut out of AGM&M management and oversight.[6] Neither CFF nor Waters have been invited to a board meeting. Instead, the organization has been highjacked by a committee, which was formed to subvert board governance protocol. (*See, e.g., id.* ¶¶ 20-21, 28.) The non-Cafesjian trustees' exclusion of CFF and pursuit of an inferior museum project flies in the face of

---

[6]    Obviously AGM&M has been taking actions that require board approval – not the least of which is the litigation campaign against the institution's major donor.

AGM&M's charter documents, contravenes trustee duties and irreparably harms AGM&M. If that were not enough, development pursuant to a plan not approved by 80% of the trustees makes reversion of the grant properties inevitable. (*Id.* Ex. C § 3.1.)   In order to promote AGM&M's purpose and to compel compliance with AGM&M procedures, CFF brings this action.

    F.    **<u>Procedural Posture</u>**

CFF sued on September 28, 2007.  (*See* Verified Compl.)  In late October and early November, Assembly and AGM&M-issued press releases confirmed the renegade endeavors of the rogue trustees – reporting that the planning and development for a second-rate museum were underway.  (*See* Pls.' Application for Preliminary Injunction.)  To maintain the status quo and restrain action that would contravene corporate purpose and authority, CFF sought injunctive relief.  Although this motion is still pending, at the December 19, 2007 status conference the Court directed that the properties could neither be destroyed nor modified.  Plaintiffs amended their complaint on December 20, 2007.  The parties have since engaged in settlement negotiations without success.  Defendants' motion to dismiss followed.

# ARGUMENT

## I.    STANDARD OF REVIEW

A complaint need only state factual allegations that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, – U.S. –, 127 S.Ct. 1955, 1964-65 (2007) (citation and quotation omitted). Well-pleaded allegations are presumed to be true, and doubts and inferences are resolved in the pleader's favor. *See Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979). A Rule 12 motion does not test whether the plaintiff will ultimately prevail on the merits; rather the dispositive question is whether the complaint states legally valid claims. *See* Fed. R. Civ. P. 12(b)(6). "Courts, which have considerable discretion in handling motions to dismiss, ordinarily grant them sparingly so as to ensure that plaintiffs are not improperly denied an adjudication on the merits." *Johnson v. United States*, 735 F. Supp. 1, 4 (D.D.C. 1990) (denying motion to dismiss). "Rule 12(b)(6) motions are especially disfavored and are rarely granted." *Id.*

"The Court may only consider the facts alleged in the complaint, any documents attached to the complaint as exhibits, and matters about which the Court may take judicial notice in addressing a Rule 12(b)(6) motion." *Scarborough v. Harvey*, 493 F. Supp. 2d 1, 11 (D.D.C. 2007). By relying on affidavits and documents not attached to the complaint, defendants have bastardized Rule 12 practice.

In the event the Court were inclined to consider these materials and treat the motion as for summary judgment, denial or at least deferral would be appropriate "if the party opposing the motion adequately explains why, at that time point, it cannot present by affidavit facts needed to defeat the motion." *Id.* at 12 (quoting *Strang v. U.S. Arms Control & Disarmament Agency*, 864

F.2d 859, 861 (D.C. Cir. 1989)); *see also* Federal Rule of Civil Procedure 56(f). The proffer of

extra-pleading "evidence" invokes the lack of discovery protections afforded by Rule 56(f).

## II.    <u>RULE 12 DEFIED</u>

If this motion were converted into a request for summary judgment pursuant to Rule

12(d), Rule 56(f) would require a continuance: "the court may refuse the application for

judgment or may order a continuance to permit affidavits to be obtained or depositions to be

taken or discovery to be had or may make such other order as is just." Rule 56(f) "exists to

prevent a party from being unfairly thrown out of court by a premature motion for summary

judgment." *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999).

Importantly, "summary judgment ordinarily 'is proper only after the plaintiff has been given

adequate time for discovery.'" *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274

(D.C. Cir. 1997) (citation omitted).

Defendants' memorandum is replete with charges about plaintiffs' failure to "offer

evidence" in support of their claims. (*See, e.g.*, Defs.' Br. at 26.) Yet no discovery has been

conducted, and the underlying facts have yet to be vetted. Testimony from the attendees at the

May 7, 2007 meeting is critical to the disposition of this case. (Rule 56(f) Affidavit of Timothy

R. Thornton ¶¶ 6-7 ("Thornton Rule 56(f) Aff.").) Besides that all documents from and referring

to the May 7, 2007 session as well as the tape of the portion of the meeting from which Waters

was excluded must be scrutinized. (*Id.*)

CFF has requested a copy of the full transcript and audio recordings; AGM&M has only

produced the record of when Waters was present. (Am. Verified Compl. ¶ 27.) The minutes

from part 2 – but not the transcript or the tape – surfaced only after defendants responded to

plaintiffs' preliminary injunction motion. (Thornton Rule 56(f) Aff. ¶ 7.)

As it is, these minutes call into question the propriety of the minority's conduct and the delegation of authority: each board motion, at most, garnered two votes and therefore lacked the requisite 80% approval. (*Id.*) The Cafesjian interests must be allowed to examine the evidence of what supposedly took place after Waters was denied the opportunity to participate.

The necessary inquiry does not stop with the shenanigans on May 7: the Cafesjian interests have been shut out of AGM&M affairs ever since. As a result the scope and severity of defendants' machinations cannot be assessed. (*See id.* ¶¶ 6-7.) AGM&M continues to function and make decisions; CFF, however, is denied input and information. Discovery regarding AGM&M expenditures and ongoing governance goes directly to the merits. (*Id.*) Without full disclosure, plaintiffs are unable to present their case. (*Id.*) For example, an accounting of AGM&M expenses and income would reveal whether the board coup perpetrators have misused assets. (*Id.*) Likewise, records about the trustee and committee decisions, plans and actions would reveal the extent to which AGM&M's corporate purpose has been perverted. (*Id.*)

Because the dispositive facts can only be gleaned from the testimony of the corporations and principals who have yet to be deposed, as well as from the documentary and tangible evidence that has yet to be produced, defendants' motion must be denied. Plaintiffs are not required to litigate their claims in a vacuum.

III.    **DERIVATIVE STANDING**

Defendants posit that plaintiffs lack standing to pursue their claims under "general derivative standing doctrines" and Fed. R. Civ. P. 23.1. (Defs.' Br. at 15.)  Plaintiffs are said to be unable to show that this suit is "valuable" to the corporation or that a derivative claim demand has been made on the board.  Defendants also contend that CFF and Waters are neither proper derivative plaintiffs nor adequately represent other AGM&M shareholders and members.

A.    **Demand Futility Has Been Adequately Alleged**

Plaintiffs admittedly failed to make the requisite demand on the supposedly disinterested trustees – *i.e.* the gang of three – prior to filing suit.  But "when demand would be futile, the requirement has been excused."  *Gaubert v. Federal Home Loan Bank Bd.*, 863 F.2d 59, 65 (D.C. Cir. 1988).

> The predominant federal view is that the board of directors must have been actively involved in the alleged wrongdoing for demand to be excused:  only when directors' actions demonstrate self-interest or some other form of bias will most courts find that it is presumptively unlikely that they would respond fairly to a shareholder demand for corporate action.

*Id.*  Demand futility is a case by case determination.  *See id.*; *see also* 13 Fletcher Cyc. Corp. § 5965; *Morgan v. Robertson*, 609 S.W.2d 662, 665 (Ark. Ct. App. 1980).  When it came to asking Hovnanian, Krikorian and Mathevosian to vindicate AGM&M's corporate purpose and governing procedures, futility was a foregone conclusion.

The *Morgan* court explained demand futility as follows:

> The law does not require a futile ceremony.  Therefore, where a majority of the directors are under the control of a majority of the stockholders, and an action is brought against them by an innocent shareholder in his own name, charging wrongdoing on their part in the manner above indicated, it is not necessary for him to allege and prove, as a condition precedent to the maintenance of the action, that, before instituting the same, he protested to the board of directors against their own mismanagement and appealed to

> them for redress. Such protest would fall upon deaf ears, because a
> majority of the directors could not be expected to authorize, or to
> institute, an action against themselves charging themselves with
> fraud. If they should do such an anomalous thing . . . the bad faith
> of their action would be so apparent that no court would entertain
> suit.

609 S.W.2d at 665 (quoting *Red Bud Realty Co. v. South*, 241 S.W. 21, 27 (Ark. 1922)). If the

directors "would deny a request for actions by the plaintiff as emphatically as they denied the

allegations of the complaint," it is "evident that demand upon the directors in the premises of this

case would be of no real purpose." *Id.* at 665-66.

The Hovnanian cabal cannot seriously contend that a demand by the CFF designated

trustee to hold the defendant trustees accountable would have been anything other than an

exercise in futility. For that reason, the Amended Verified Complaint fully articulates the

elements of demand futility:

> The wrongs complained of were unlawful, ultra vires and not the
> product of a valid exercise of business judgment; any demand by
> CFF or Waters to the Board of Directors would have been futile
> because either the Trustees would be deadlocked or Hovnanian,
> Mathevosian, Krikorian and the Assembly would continue to
> exclude CFF and the CFF designated Trustee from participation in
> the formulation of the Trustees' response.

(Verified Am. Compl. ¶¶ 49, 55, 60, 69.)

The trustees are irretrievably deadlocked – three votes for the Cafesjian interests, three

votes against.[7] (*Id.* ¶¶ 14-17.) In May 2007, this tension snapped as two AGM&M trustees

declared the CFF designee to be conflicted. On that trumped-up charge Waters was unilaterally

ousted from AGM&M governance. (*Id.* ¶ 25.) Waters was not physically removed, but the other

---

[7]    If defendants' assessment of CFF's board voting rights were correct, then a demand
would be even more futile because Waters would only hold one or two of four or five total
trustee votes.

trustees refused to proceed with business while Waters was in attendance. He had no choice but to excuse himself. This virtual expulsion enabled the non-Cafesjian trustees to break the stalemate that had all but permanently frustrated corporate action.

Hovnanian and Krikorian – motivated by their desire to bar Cafesjian from AGM&M decision-making but nevertheless retain his significant contributions – were finally able to arrogate control on to themselves. Since May 7, 2007, the Cafesjian interests have neither been consulted nor informed about any matter affecting AGM&M. (*See id.* ¶¶ 28, 46, 57, 65.)

The disenfranchisement of the CFF designee was effected without regard to CFF input and in violation of charter document procedures. (*Id.* ¶ 26.) Certainly, any demand from Waters would have been emphatically rejected by Hovnanian and Krikorian. (*See id.* ¶¶ 49, 55, 60, 69.) Those trustees had already denied Waters the opportunity to participate in board affairs. Because "courts should allow a shareholder derivative action to go forward . . . when the directors stand in a dual relation which prevents an unprejudiced exercise of judgment," defendants' grumblings about the lack of a demand are spurious. *Gaubert*, 863 F.2d at 69. Nothing more is required at this stage of the proceedings.[8]

### B.   Proper plaintiffs

Defendants also charge that plaintiffs are not proper representatives of the other AGM&M shareholders or members. (Defs.' Br. at 17.) According to defendants, plaintiffs have

---

[8]     In the event the Court concludes that plaintiffs have failed to allege demand futility with sufficient particularity, plaintiffs must be allowed to amend. "Leave to amend should ordinarily be freely granted to afford a plaintiff 'an opportunity to test his claim on the merits.'" *Gaubert*, 863 F.2d at 69 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (courts generally allow demand futility to be repled). Any technical deficiency can be readily cured by a fulsome averment about why a demand to these defendants would be futile. *Hartline v. Sheet Metal Workers' Nat'l Pension Fund*, 134 F. Supp. 1, 22 (D.D.C. 2000) (allowing plaintiff leave to replead futility).

failed to demonstrate that they "adequately represent[] the over 100 other donors to the AGM&M, none of whom have joined in this lawsuit." (*Id.*) Rule 23.1, however, only applies to "shareholders or members." AGM&M has neither. (Am. Verified Compl. Ex. A at Art. V; *id.* Ex. B § 2.1.) Thus Rule 23.1 is not implicated.[9]

And, for the purposes of this Rule 12 motion, plaintiffs do not need to demonstrate anything. The issue of who and what plaintiffs must represent awaits record development.

The rationale in *Morgan* confirms plaintiffs' standing to pursue this derivative action:

> We believe an officer, director and a member of a non-profit corporation is not without standing to question the management and conduct of other officers and directors which are alleged to be in violation of the By-Laws and Articles and against the purposes of the corporation. If such an individual lacks standing, who would have it? We regard the public as having a clear interest in non-profit corporations from the standpoint of the faithful administration of the affairs of the corporation. The standing of one or more directors of non-profit corporations to act derivatively on behalf of the corporation does not seem open to question.

609 S.W.2d at 665; *see Wickes v. Belgian Am. Educ. Found., Inc.,* 266 F. Supp. 38 (S.D.N.Y. 1967); *Holt v. College of Osteopathic Physicians and Surgeons,* 394 P.2d 932 (Cal. 1964); *see*

---

[9] Even if the interests of "the over 100 other donors to the AGM&M," needed to be represented, plaintiffs' are certainly aligned with those contributors. Both plaintiffs and the other benefactors made donations that were intended to further AGM&M's corporate purpose – namely "to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide . . . and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes." (Am. Verified Compl. Ex. A at Art. IV.) Requiring the board to fulfill that purpose and to comply with AGM&M's charter documents ensures that donors will not have been misled and that their gifts are put to their intended use. Defendants' stratagem puts AGM&M's viability at risk, and this lawsuit was brought to prevent the irreparable harm that is threatened. Finally the contributions of the over 100 other donors do not come close to equaling the philanthropy of Cafesjian. Without Cafesjian's support there would be no real estate over which to fight. By seeking to protect those assets from reversion, this lawsuit clearly serves the interests of all donors.

*also Morris v. Thomas*, 589 S.E.2d 419, 422-23 (N.C. Ct. App. 2003) (director has standing to bring derivative claims).

The Amended Verified Complaint derivatively alleges that defendants have abused corporate control, mismanaged corporate affairs and pursued a project that contravenes corporate purpose. If that were not enough, defendants are accused of wasting corporate assets by spending to construct a museum that departs from AGM&M's mission and governance procedures.

AGM&M's charter documents charge CFF and its board designee with oversight and management of AGM&M affairs; that obligation perforce encompasses the responsibility to advance and protect AGM&M's founding goal. (Am. Verified Compl. Ex. A at Art. VII.) The direction in which defendants are headed puts AGM&M's survival in peril because the improper use of granted assets, the construction of a middling museum and continued delay can only result in grant property reversion. Defendants' ruthless tactics and donor alienation cannot help but wreak havoc on fundraising. If a $17 million benefactor is treated so dismissively what can lesser supporters expect? And if CFF and its designee do not challenge this abuse of power, who would? Plaintiffs would be remiss by failing to challenge the defendant trustees' hubris.

Plaintiffs, as the holder and the exerciser of one half of the trustee franchise, are duty bound to hold AGM&M to its stated purpose and applicable laws, contracts and donor requirements. Defendants' disregard of these commitments threatens the very existence of the cultural and memorial center that AGM&M aspires to become. Plaintiffs' standing could not be more clear.

## IV.    THE COMPLAINT PASSES RULE 12 MUSTER

In a shot-gun assault, defendants denounce the complaint as failing to state claims upon which relief can be granted.  Defendants do not, however, challenge how the claims have been pled.  And dispositively, defendants refuse to concede the truth of the allegations in the complaint – as required of a Rule 12 movant.  Instead dismissal arguments are premised upon defendants' take on the facts and plaintiffs' purported failure to "offer evidence".  Rule 12, however, is not about whether a case will be proved, but only whether the complaint states a legally sufficient claim.  Fed. R. Civ. P. 12(b)(6).  To plead such a claim, plaintiffs need only allege the essential elements of each cause of action.  The Amended Verified Complaint more than satisfies that requirement.

### A.    Ultra Vires Act

Defendants disavow ultra vires action and for that reason insist that the claim cannot be sustained.  (Defs.' Br. at 18.)  According to defendants, plaintiffs have neither asserted "any facts or law" to support an ultra vires cause of action nor identified "any corporate action that was taken after a vote with less than 80 percent approval."  (*Id.* at 20.)  This argument draws upon matters outside the pleadings.  The unilaterally prepared minutes of the May 7, 2007 trustees' meeting have not been subjected to discovery scrutiny.  And where is the record of board ratification for AGM&M's conduct of litigation against and with CFF, Cafesjian and Waters?  As far as plaintiffs know, no proper board action authorizes AGM&M to take the positions that are being asserted in the various Cafesjian interests' lawsuits.  How could there be? – no board meeting has been noticed; even if Waters were conflicted at the very least he would have been notified about any meeting that had been called.

"A corporation acts 'ultra vires,' or beyond its power, when it acts in an area outside the scope of the power allowed by its charter or statute."  *Wolgin v. Simon*, 722 F.2d 389, 393 (8th

Cir. 1983); *see also* D.C. Code § 29-301.06 (a director may enjoin actions that are beyond corporate power or capacity).  "Generally, meetings of a corporation or association should be conducted in compliance with the constitution and bylaws.  Only votes taken in compliance with these rules can effect binding actions."  *Nat'l Dev. Co. v. Trusteeship of Woodland Lakes*, 643 F. Supp. 561, 563 (E.D. Mo. 1986).

The Amended Verified Complaint itemizes the requisite elements of an ultra vires claim.  AGM&M's charter documents specify the process for exercising corporate prerogative: 80% trustee approval for corporate actions; "unanimous affirmative vote" of the quorum for trustee removal; and perpetual board representation and input for CFF.  (Am. Verified Compl. ¶¶ 19, 38-39; *id.* Ex. B § 2.4).  The exclusion of the CFF designee was effected without unanimous approval, and AGM&M is now being managed without board oversight.  (*Id.* ¶¶ 40-41.)  As alleged in the Amended Verified Complaint, such malfeasance is ultra vires.  (*Id.* ¶¶ 40-41, 43; *see also id.* ¶¶ 18-28; *id.* Exs. A-B.).  Nothing more needs to be pled.

On similar facts, *Owen v. Board of Directors of Washington City Orphan Asylum* set aside a nonprofit corporation's contravention of charter document mandated governance procedures.  888 A.2d 255 (D.C. Ct. App. 2005).  One governing board attempted to disenfranchise another governing board; because the charter documents contemplated a dual governance arrangement, the purported subjugation was ultra vires.  *Id.* at 261-67.  Similarly, in *Higginsville Memorial Post 6270 v. Benton*, a nonprofit corporation purported to exercise a repurchase option without following internal procedures and by-laws.  108 S.W.3d 28, 31-34 (Mo. Ct. App. 2003).  Such an action was ultra vires and therefore invalid.  *Id.*

The Amended Verified Complaint sufficiently charges that the exclusion of the CFF designee was not unanimously approved as required by the charter documents and for that reason

the ongoing conduct of corporate business is void.  (Am. Verified Compl. ¶¶ 36-43.)  Defendants want the Court to believe that Waters voluntarily left the meeting.  The Amended Verified Complaint, however, asserts that in Waters' presence, the other trustees refused to do anything except badger and provoke.  (*Id.* ¶¶ 24-28, 40-41.)  Even more troubling, since May 7, 2007, AGM&M has continued to make decisions and take actions, all of which require board approval; yet Waters has never been invited to a trustee meeting or consulted in any way.

Despite Rule 12 protocol defendants do not contend that plaintiffs' claims, as pled, are legally deficient.  To the contrary, defendants question whether plaintiffs' claims have garnered sufficient evidentiary support.  Such inquiry is not the stuff of Rule 12 consideration.  The sufficiency of ultra vires evidence is for another day.[10]

### B.    Breach of Fiduciary Duty

Defendants go on to argue that breach of fiduciary duty facts have not been pled.  The law, however, only requires a plaintiff to assert the existence of a fiduciary duty and a breach.  *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 363 (D.C. 1984).  The Amended Verified Complaint pleads those elements exactly in spades:

> 45.    Hovnanian, Mathevosian, Krikorian and the Assembly, by reason of their positions as fiduciaries, owe duties to AGM&M, its directors and trustees of undivided loyalty, good faith, fair dealing, due care, candid disclosure and diligence in the management and administration of AGM&M's affairs.

---

[10]    As this litigation progressed, it became apparent that Waters' exclusion was not the only by-law transgression.  The actions purportedly taken after his ouster were not supported by an 80% vote of the purported three-person quorum.  (*See* Thornton Rule 56(f) Aff. ¶ 7.)  The evidence shows that only two trustees – and only one in the event Hovnanian has not given enough for his vote to count – approved the actions supposedly authorized at the May 7, 2007 meeting.  (*Id.*)  Without an 80% affirmative vote from the self-ordained quorum, the approval requirements of the AGM&M charter documents were not satisfied:  two votes out of three does not equate with 80%.  At the very least, this factual dispute remains for resolution.

46.    Hovnanian, Mathevosian, Krikorian and the Assembly have breached their fiduciary duties to AGM&M, its directors and trustees by excluding the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank site without corporate authority, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act, and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

47.    As a direct and proximate cause of this breach of fiduciary duty, AGM&M has sustained, and will continue to sustain, substantial harm.

(Am. Verified Compl. ¶¶ 45-47.)

For Rule 12 purposes, these allegations establish that Waters was excluded from board participation in violation of the articles and by-laws and that the museum and memorial project called for by AGM&M's corporate purpose was abandoned in favor of an inferior structure. (*Id.* ¶¶ 25-26, 28, 46.) The exclusion of CFF was improper, so defendants' subsequent delegation of authority was illegitimate, defying the spirit and letter of AGM&M charter documents. (*See id.* ¶¶ 28, 46.) AGM&M governance was purposefully designed to afford all major contributors a say. (*See id.* Exs. B, C, and E.) In return for giving in excess of $5 million, donors were guaranteed input into what AGM&M would become. (*Id.*) Despite that founding principle, a committee is moving forward in deliberate disregard of AGM&M's largest donor's wishes.

In addition to recognizing CFF board participation rights, the trustees are obligated to comply with AGM&M's commitments to donors. Most of the assets transferred to AGM&M came with restrictions:  the grant property can only be used for "AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of the Armenian Genocide Museum & Memorial, Inc." (*Id.* Ex. C § 3.1.)  AGM&M accepted transfer of the grant property promising to honor all donor conditions. (*See id.* ¶ 34; *id.* Ex. E §§ 1.2, 1.3, 4.6.) AGM&M's failure to

comply with donor intent or misuse of the property results in the reversion.  (*Id.* Ex. E §§ 1.2, 1.3; *id.* Ex. C § 3.1.)

Defendants' pursuit of a mediocre and memorial-less museum – as indicated by the award of Phase I development contracts and the selection of architects and project managers – and continued exclusion of the CFF-designee from AGM&M decision-making can only result in reversion.  (*See id.* Ex. C § 3.1; *id.* Ex. E.)  These facts, if proven, would unquestionably constitute a breach of fiduciary duty.  The pleadings need do no more.

C.    **Waste of Corporate Assets**

Defendants exhort that a cognizable waste of corporate assets claim has not been alleged because plaintiffs "fail to state with particularly what specific assets, if any, have allegedly been wasted . . . [or] diverted for an improper or unnecessary purpose." (Defs.' Br. at 25.)  The crux of this demurrer is plaintiffs' supposed failure to proffer underline evidence of corporate waste.  (*Id.*)  On this Rule 12 motion and in the absence of discovery into AGM&M's financial affairs, plaintiffs cannot enumerate the amount or source of improper corporate disbursements.  (*See* Thornton Rule 56(f) Aff. ¶¶ 6-7.)  But the submission of detailed evidence is not necessary to defeat this motion.

"The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes."  *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979).  "So long as claimant alleges facts in his description of a series of events from which a gift or waste may be reasonably inferred and makes a specific claim for the relief he hopes to obtain," a claim for waste of corporate assets has been stated.  *Id*.

The Amended Verified Complaint makes the following allegations:

51.    Hovnanian, Mathevosian, Krikorian and the Assembly owe to AGM&M the obligation to protect AGM&M's assets from

undue loss or waste and to utilize these assets as required by AGM&M's by-laws and to fulfill AGM&M's stated purpose.

52.    Hovnanian, Mathevosian, Krikorian and the Assembly have breached their obligation to AGM&M and wasted corporate assets, by, among other things, knowingly or recklessly proposing, implementing, agreeing to, approving, and ratifying the decisions to authorize the creation and delegation of authority to a planning, development and building committee and to develop the museum and memorial at the National Bank of Washington site, without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act.

53.    As a direct and proximate result of this waste of corporate assets, AGM&M has sustained, and will continue to sustain, substantial harm.

(Am. Verified Compl. ¶¶ 51-53.)

Defendants are thus accused of going forward with a project without requisite trustee approval.  (*Id.*)  Accordingly the complaint seeks the cessation of unauthorized action and the return of the improper expenditures.  (*Id.*)  The trustees, pursuant to their duty to control and manage corporate affairs, must spend donated funds in accordance with AGM&M's charter documents and donor obligations.  (*Id.* Ex. E §§ 1.2, 1.3, 4.6; *id.* Ex. C § 3.1.)  Spending on a project that lacks 80% trustee approval is not consistent with either AGM&M's corporate purpose or commitments to donors.  (*See id.* ¶ 19; *id.* Ex. E § 4.6.)  Such use, really misuse, of resources also exposes AGM&M's most important assets to reversion.  (*See id.* Ex. C § 3.1.) There could not be a more classic example of waste.

The donors, especially Cafesjian, intended the AGM&M to encompass all five parcels that were assembled and transferred for museum and memorial purposes.  (*Id.* ¶ 31; *id.* Exs. A-C, E.)  Rather than pursue that significant project, defendants, without regard to CFF input, are developing a bank only museum building.  (*Id.* ¶¶ 20-21, 28, 31-32.)  AGM&M's receipt of the grant property was conditioned upon CFF's participation in museum planning and development,

so expenses incurred without that input are improper.  (*Id.* Ex. E §§ 1.2, 1.3, 4.6.)  If such claims are proven, corporate waste would be established.[11]   The Amended Verified Complaint sufficiently alleges waste of corporate assets.  (*Id.* ¶¶ 31-32, 34, 50-55; *id.* Exs. C, E.)

### D.    Abuse of Control and Frustration of Purpose

Defendants contend that the abuse of control and frustration of purpose claims fail because the complaint does not accuse defendants of having "acted inconsistently with or frustrated the corporate purpose of AGM&M, let alone that AGM&M has suffered any harm as a result."  (Defs.' Br. at 26.)  Defendants further decry that "Plaintiffs offer no evidence" in support of these claims.  (*Id.*)  Defendants' argument once again departs from the limitations of Rule 12 and ignores the allegations of the Amended Verified Complaint.

Defendants have unilaterally and improperly excluded CFF from AGM&M governance, and the complaint says just that:

> 57.    Hovnanian, Mathevosian, Krikorian and the Assembly have abused their control and influence over AGM&M by excluding CFF and the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank of Washington site without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

(Am. Verified Compl. ¶ 57; *see also id.* ¶¶ 20-28.)

---

[11]    CFF donations were expressly designated for museum and memorial purposes.  Any allocation of donated property for use by the Assembly would violate the articles of incorporation prohibition against AGM&M earnings "inur[ing] to the benefit of or being distributed to any trustee."  (*Id.* Ex. A at Art. IV.)  Defendants' intention to use some of the donated property for Assembly offices would be a further waste of AGM&M assets.

At the May 7, 2007 meeting, the CFF trustee was subjected to continuous browbeating. (*Id.* ¶ 24.) This verbal abuse, contrived conflict of interest accusations and refusal to proceed with business resulted in Waters' involuntary exclusion from AGM&M affairs. (*Id.* ¶¶ 24-26.) This ejection did not comport with the AGM&M's charter documents, which mandate a unanimous approval for trustee removal. (*Id.* ¶ 39; *id.* Ex. B § 2.17.) After banning Waters, the non-CFF trustees disregarded CFF's perpetual entitlement to designate a new representative and without CFF participation continued to conduct corporate business. (*Id.* Ex. B § 2.17; *id.* ¶ 28.) Defendants went so far as to delegate all museum planning and development authority to a committee that is answerable to no one – and is certainly beyond the reach of CFF. (*Id.* ¶ 28.) This delegation precludes the board from ever again having a say about the project – an arrangement that could not be more contrary to AGM&M's governance protocol and major donor obligations.

As a result of this self-anointed exercise of control, defendants have abused the authority afforded by AGM&M's charter documents. And, the continued pursuit of a memorial-less museum on the single parcel is not supported by any enabling grants. (*Id.* ¶ 28.) If defendants are not restrained, AGM&M will proceed with a development that can only result in reversion. (*Id.* Ex. C § 3.1.) AGM&M is to be managed and controlled by an 80% trustee vote, not some ad hoc committee. (*Id.* Ex. C § 5.2(E); *id.* Ex. E § 3.4(E).) Until the propriety of the non-Cafesjian trustee conduct can be assessed and restrained, AGM&M's existence is threatened. (*See id.* ¶¶ 56-60.) The allegations sufficiently state a claim for abuse of control. Nothing more is required.

Finally, defendants argue that the frustration of purpose claim fails because it "seeks to assert that, by allegedly failing to comply with the terms of the Grant Agreement, the Trustees of

AGM&M have frustrated the corporate purpose of AGM&M." (Defs.' Br. at 27.) Contrary to defendants' pronouncements, the Amended Verified Complaint does plead that defendants' plans for AGM&M and exclusion of CFF disregard AGM&M's stated purpose and obligations to donors:

> 62.    The AGM&M was organized and operates exclusively for charitable, educational, and other beneficial purposes to, among other things, "own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide," secure universal affirmation of the Armenian Genocide, and establish a memorial and public programs to further these purposes. Articles of Incorporation Art. IV.

> 63.    CFF made significant grants and pledges for the purpose of creating a museum and memorial dedicated to the memory of the Armenian Genocide: a museum and memorial developed with the broadest possible participation and support of the Armenian Community and a museum and memorial that properly and significantly presents the tragedy of the Armenian Genocide, that would serve as a permanent reminder in our Nation's capitol of the horrific atrocities committed against the Armenian people. CFF's obligation to make these grants was conditioned on AGM&M's commitment that CFF would participate in all material decisions relating to the museum and memorial.

> 64.    The Grant Agreement further mandates that the grant properties be used only as part of the AGM&M and that all plans for the AGM&M be approved by the Trustees.

> 65.    Hovnanian, Mathevosian, Krikorian and the Assembly have refused to allow CFF and its designated trustee to participate in material decisions relating to the museum and memorial by excluding CFF and the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank of Washington site without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Non-Profit Corporation Act and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

> 66.    This interference has frustrated the corporate purpose of AGM&M.

> 67.    As a direct and proximate cause of this abuse of control, AGM&M has sustained, and will continue to sustain, substantial harm.

(Am. Verified Compl. ¶¶ 62-67.)

AGM&M's charter documents guarantee CFF a perpetual right to participate in corporate governance.  (*See id.* Ex. B §§ 2.4, 2.5.)  This provision ensures that all AGM&M actions are considered and approved by major donors.  (*Id.* § 2.17.)  Allowing a few trustees to commandeer corporate control and dictate the entity's future without regard to the charter document restrictions can not be squared with the corporate mandate that "[t]he affairs of the Corporation shall be managed and controlled by the Board of Trustees."  (*Id.* Ex. A at Art. VII.)  This abrogation is particularly egregious because AGM&M's reason for being has been delegated to a committee that exists for the singular purpose of frustrating, rather than honoring, donor input.  (*Id.* ¶ 28.)

Defendants' disregard of AGM&M's obligations to the major donor in order to achieve some alternative agenda indisputably interferes with AGM&M's stated purpose and threatens AGM&M's retention of CFF's donations.  (*Id.* Ex. C § 3.1; *see* Ex. E § 4.6.)  Cafesjian and CFF gave the money and property so that a proper museum and memorial would be realized.[12]  AGM&M accepted these donations and assumed the obligation to use the gifts as intended.  (*Id.* Ex. E §§ 1.2, 1.3, 4.6.)

If AGM&M fails to abide by conditions placed upon the transferred property, the donations revert, and AGM&M's ability to achieve its corporate purpose would be frustrated.  (*See id.* Ex. C § 3.1; *id.* Ex. E §§ 1.2, 1.3, 4.6; *id.* Exs. A-B.)  These facts, if proven, demonstrate

---

[12]    Despite defendants' accusations to the contrary, any return of grant property would be exclusively to CFF, for dedication to another eleemosynary purpose.  Cafesjian is not seeking a windfall profit.  Rather he only wants to ensure that the donated real estate is used as intended.

that the rogue trustees' continued defiance of AGM&M's obligations put entity existence in jeopardy. Pursuant to Rule 12, plaintiffs have stated a viable claim for relief.

## CONCLUSION

Defendants' premature arguments exceed the scope of Rule 12 procedures by reaching outside the pleadings and attempting to concoct a factual record based upon made up and misinterpreted evidence. Defendants' version of events is markedly different than plaintiffs'. The resolution of these contradictions requires an evaluation of witness credibility and other scrutiny. An evidentiary hearing, much less discovery, can not be preempted.

Rule 12 only requires the complaint to allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp.*, 127 S. Ct. at 1964-65. Plaintiffs have made such allegations. The Amended Verified Complaint easily satisfies Rule 12 standards. Defendants' motion to dismiss must be denied.

Dated: March 25, 2008

**BRIGGS AND MORGAN, P.A.**

By:  /s/ Molly M. Borg_____
     Timothy R. Thornton (Minn. #109630)
     Molly M. Borg (Minn. #0331922)
     2200 IDS Center
     80 South Eighth Street
     Minneapolis, MN 55402-2157
     (612) 977-8400

**AND**

**HOGAN AND HARSTON LLP**

By:  /s/ Peter C. Lallas_____
     Ty Cobb (DC Bar No. 270736)
     Peter C. Lallas (D.C. Bar No. 384062)
     555 Thirteenth Street, N.W.
     Washington, D.C. 20004-1109
     Tel: (202) 637-5600

**COUNSEL FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., and John Waters, Jr., individually and on behalf of the Armenian Genocide Museum and Memorial, Inc., | Civil File No. 07-1746 (RWR) |
| Plaintiffs, | **RULE 56(F) AFFIDAVIT OF TIMOTHY R. THORNTON** |
| v. | |
| Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian and the Armenian Assembly of America, Inc., | |
| Defendants. | |

COUNTY OF HENNEPIN )
                   ) ss
STATE OF MINNESOTA )

Timothy R. Thornton, under oath state as follows:

1.     I make this affidavit pursuant to Fed. R. Civ. P. 56(f), in support of Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6).

2.     Defendants flouted Rule 12 procedures by relying on voluminous materials that go well beyond the allegations in the complaint. If the Court relies on these materials, Rule 12(d) requires that the motion be treated as one for summary judgment. Plaintiffs therefore submit this affidavit to request that discovery be permitted pursuant to Rule 56(f).

3.     This case was commenced on September 28, 2007.

2155950v1

4.     On November 27, 2007, plaintiffs filed an application for preliminary injunction to enjoin defendants from conducting any further AGM&M action without proper board of trustees approval.  Defendants opposed the preliminary injunction application.  This motion remains pending before the Court.

5.     In lieu of answering, defendants filed their motion to dismiss on March 4, 2008.

6.     Defendants maintain that plaintiffs' complaint must be dismissed for failure to state a claim.  These arguments and any defenses to these arguments are predicated on further discovery, including documents, witness testimony, and other information pertaining to: (a) defendants' corporate governance, fundraising activities, organization and administration; (b) AGM&M expenditures including an accounting of AGM&M expenses and income; (c) the involvement of the individual defendants in AGM&M governance, including records regarding AGM&M decision-making and museum planning; (d) the events of and following the May 7, 2007 Board of Trustees meeting, including any audio recordings, transcripts, minutes or other notes;   and (e) the performance of the contracts and the obligations specified in the contracts.

7.     More specifically, the unapproved minutes of the May 7, 2007 Board of Trustees meeting, which are attached to the December 10, 2007 Affidavit of Naoka Carey at Exhibit 12, indicate that any action of AGM&M did not have the requisite 80% approval of the trustees at a properly-quorumed meeting.  Plaintiffs must have an

opportunity to depose meeting attendees and review documents and all records pertaining to this meeting.

8.    Defendants rely on extra-pleading materials in support of their motion to dismiss. These materials contain factual assertions and conclusions that plaintiffs have not had the opportunity to contest or oppose. Plaintiffs must be afforded the opportunity to examine all witnesses and all evidence that defendants relied upon to make their motion.

9.    Since defendants have gone beyond the pleading, the motion to dismiss is, in effect, a request for summary judgment. In the event the Court treats defendants' motion as one for summary judgment, defendants' motion must be deferred to afford plaintiffs an opportunity to conduct discovery.

*s/ Timothy R. Thornton*
Timothy R. Thornton

Subscribed and sworn to before me
this 25th day of March, 2008.

*Molly M. Borg*
Notary Public
My Commission Expires: January 31, 2012

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

The Cafesjian Family Foundation, Inc., and
John Waters, Jr., individually and on behalf of
the Armenian Genocide Museum and
Memorial, Inc.,

        Plaintiffs,

    v.

Armenian Genocide Museum and Memorial,
Inc., Hirair Hovnanian, Anoush Mathevosian,
Van Krikorian and the Armenian Assembly of
America, Inc.,

        Defendants.

---

Civil File No. 07-1746 (RWR)

**ORDER**

     This matter is before the Court on Defendants' Motion to Dismiss Pursuant to Fed. R.

Civ. P. 12(b)(6).  Based on all the files, records and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

    1.    Defendants' Motion is **DENIED;** and

    2.    Defendants shall answer the Amended Complaint within ten days of this Order.

Dated: _____, 2008

_____
Richard W. Roberts
United States District Court Judge

2156892v1