**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., and John J. Waters, Jr., individually and on behalf of the Armenian Genocide Museum and Memorial, Inc.<br><br>       *Plaintiffs*,<br><br>v.<br><br>Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, Anoush Mathevosian, Van Krikorian, and Armenian Assembly of America, Inc.<br><br>       *Defendants*. | NO. 1:07-CV-01746 (RWR)<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT**

   Plaintiffs The Cafesjian Family Foundation, Inc. and John J. Waters, Jr. come before this Court and state as follows:

   1.  On September 28, 2007, Plaintiff The Cafesjian Family Foundation ("CFF") filed this action on its own behalf and on behalf of the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") challenging the AGM&M Board of Trustee's improper exclusion of CFF from participation in the planning and design of an Armenian Genocide museum and memorial. This right to participate was a primary condition on a grant of funds and property from Gerard L. Cafesjian and CFF to the Armenian Assembly of America, Inc. ("the Assembly"), the obligations of which AGM&M assumed.

   2.  As described in Plaintiffs' July 2, 2008 Motion for a Status Conference (Dkt. No. 35), at the time undersigned counsel was retained in this matter, there were six separate lawsuits related to the dispute among CFF, the Assembly, and AGM&M.  Since then, Plaintiffs have

undertaken significant efforts to dismiss and/or consolidate several of those actions—three arising out of the District of Minnesota and three arising in this district—in an effort to streamline the litigation for the convenience of the courts and the parties.  As of the present date, two of the three Minnesota cases have been dismissed, while the third, *Waters et al. v. Armenian Genocide Museum & Memorial, Inc., et al.*, No. 08-cv-00373 (D. Minn.), has been transferred to this Court.[1]  Plaintiffs have also effectively resolved the dispute in *Armenian Genocide Museum & Memorial, Inc. v. Cafesjian Family Foundation*, No. 1:07-cv-01259-CKK, and have today filed a suggestion of mootness in that action.

3.    On December 19, 2007, the Court granted an oral motion for leave to amend the complaint in this matter.  In that amendment, John J. Waters, Jr. was added as a Plaintiff, but Plaintiffs added no new claims.  Defendants moved to dismiss this complaint on March 4, 2008. The motion is still pending.

4.    Plaintiffs now seek leave to file a second amended complaint, a copy of which is attached.  This Second Amended Complaint drops all derivative claims being brought "on behalf of" AGM&M, drops Anoush Mathevosian and Van Krikorian as defendants, adds Gerard L. Cafesjian and The TomKat Limited Partnership as plaintiffs, and adds several additional claims related to the Grant Agreement and the Defendants' improper exclusion of Mr. Cafesjian and CFF from participating in the planning and design of the museum and memorial, contrary to the Grant Agreement.  This Second Amended Complaint also alleges several derivative torts committed by Defendants in the aftermath of their improper exclusion of Mr. Cafesjian and CFF.

5.    Plaintiffs recognize that their prior counsel had agreed, in a December 12, 2007 Joint Report, that the deadline for amending pleadings and adding additional parties would be

---

[1] The District of Minnesota's docket notes that the transfer occurred yesterday, July 16, 2008.  The case does not yet appear on this Court's docket, however.

February 1, 2008.  There is good cause, however, for this Court to permit amendment, as it will

not prejudice Defendants, but rather will conserve the resources of all parties and the Court itself.

Specifically, the proposed amendment in this case is identical to counterclaims being filed, as of

right, in *Armenian Assembly of America, Inc. et al. v. Cafesjian et al.*, No. 1:08-cv-00255-CKK

(D.D.C.), a later-filed case in which the Assembly seeks to effectively cancel its obligations

under the Grant Agreement and otherwise tries to justify its exclusion of Mr. Cafesjian and CFF

from AGM&M governance.  As the Defendants will face these claims regardless of amendment

here, their inclusion in this case will not prejudice the Defendants.  Allowing amendment in this

case, however, will facilitate the streamlining and consolidation of all outstanding cases related

to the AGM&M dispute into a single forum, and thus will help all parties avoid the perpetuation

of multiple suits involving the same players and the same background issues of fact and law.

6.      When considering a motion for leave to amend under Rule 15(a)(2), "[t]he Court

should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In this Circuit,

"[l]eave to amend a complaint should be freely given in the absence of undue delay, bad faith,

undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility."

*Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999).

7.      Pursuant to LCvR 7.1(m), counsel for Plaintiffs have conferred with counsel for

Defendants, who have indicated that they object to this motion, on unspecified grounds.

8.      Despite Defendants' apparent objection, leave to amend should be granted here.

The motion for leave to amend is made in good faith.  Moreover, Defendants would suffer no

prejudice or undue delay from the amendment.  Discovery has not yet commenced in this matter,

and Defendants have yet to answer the First Amended Complaint.  Further, the new counts

proposed in the Second Amended Complaint are also being set forth as counterclaims in No.

1:08-cv-00255-CKK (D.D.C.), a later-filed case which is fit for Rule 42 consolidation, even were

no leave to amend granted here.  Indeed, Plaintiffs intend to file such a motion to consolidate in

the immediate future.

### CONCLUSION AND REQUEST FOR ORAL ARGUMENT

In light of the foregoing, this Court should GRANT Plaintiffs' motion for leave to amend

the First Amended Complaint.  Plaintiffs hereby requests oral argument on this motion.

Dated:  July 17, 2008

Respectfully submitted,

/s/ Thomas F. Cullen, Jr._____
Thomas F. Cullen, Jr. (D.C. Bar No. 224733)
Nancy Berardinelli-Krantz (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
tfcullen@jonesday.com
nbkrantz@jonesday.com

*Counsel for Gerard L. Cafesjian, The Cafesjian*
*Family Foundation, Inc., John J. Waters, Jr., and*
*The TomKat Limited Partnership*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., Gerard L. Cafesjian, John J. Waters, Jr., and The TomKat Limited Partnership,<br><br>     *Plaintiffs*,<br><br>           v.<br><br>The Armenian Genocide Museum and Memorial, Inc., Hirair Hovnanian, and the Armenian Assembly of America, Inc.,<br><br>     *Defendants*. | Civil File No. 1:07-01746 (RWR) |

### [PROPOSED] SECOND AMENDED COMPLAINT

Plaintiffs The Cafesjian Family Foundation, Inc. ("CFF"), Gerard L. Cafesjian, John J. Waters, Jr., and The TomKat Limited Partnership (collectively, "Plaintiffs"), file its Second Amended Complaint against The Armenian Genocide Museum and Memorial, Inc. ("AGM&M"), Hirair Hovnanian, and the Armenian Assembly of America, Inc. ("the Assembly").  Plaintiffs claim as follows:

### **PARTIES**

1.      Gerard L. Cafesjian is a resident of Florida.

2.      CFF is a Florida nonprofit corporation, with its principal place of business in Minnesota.

3.      John J. Waters, Jr. is a resident of Minnesota.

4.      The TomKat Limited Partnership is a South Dakota limited partnership, with its principal place of business in Minnesota.

5.      AGM&M is a District of Columbia nonprofit corporation, with its principal place of business in the District of Columbia.

6.      Hirair Hovnanian is a resident of New Jersey.

7.      The Assembly is a District of Columbia nonprofit corporation, with its principal place of business in the District of Columbia.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, citizenship is diverse, and the amount in controversy exceeds $75,000.

9.      This Court has personal jurisdiction over all defendants and venue is proper.

## FACTUAL BACKGROUND

10.      From 2000 to 2003, the Assembly and CFF cooperated to promote and develop a museum and memorial to commemorate the Armenian Genocide.  In 2003, an independent entity, AGM&M, was incorporated pursuant to the District of Columbia Nonprofit Corporation Act to achieve that purpose.

11.      AGM&M was created to:

> [F]urther educational purposes through its activities, which will include, but are not limited to, the following:  to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

- 2 -

Articles of Incorporation Art. IV (Ex. 1).

12.    AGM&M is governed by a Board of Trustees ("Trustees"), who serve as the Board of Directors of AGM&M for purposes of the District of Columbia Nonprofit Corporation Act.

13.    AGM&M has no members.

14.    The Trustees are appointed by individuals and organizations that contribute or pledge $5,000,000 or more to AGM&M, with the exception that the Assembly and Anoush Mathevosian have the right to appoint a single Trustee without having met the $5,000,000 threshold.  Currently the Trustees exercise a total of six votes.

15.    Pursuant to the charter documents, the Grant Agreement (Ex. 2), and by virtue of significant donations and pledges for the benefit of AGM&M, CFF is entitled to appoint up to three Trustees and controls three of the six Trustee votes.

16.    Mr. Waters is the current CFF-appointed Trustee and is entitled to exercise CFF's three votes.

17.    Pursuant to the charter documents and his pledge of $5,000,000, Mr. Hovnanian is a Trustee of AGM&M and controls one vote.

18.    Pursuant to the charter documents and in recognition of her early contribution to AGM&M, Ms. Mathevosian is a Trustee of AGM&M and controls one vote.

19.    Pursuant to the charter documents and the Transfer Agreement (Ex. 3), the Assembly is a Trustee of AGM&M and controls one vote.

20.    Robert  Kaloosdian was the initial Assembly-appointed Trustee.  Van Krikorian is the current Assembly-appointed Trustee.

21.    AGM&M's By-Laws provide that "[p]ersons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called."  By-Laws § 2.6 (Ex. 4).  To convene the Trustees, notice of the time and place of meetings must be provided.

22.    The By-Laws further require that "all [AGM&M] questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  *Id.* § 2.7.

23.    On August 31, 2007, AGM&M announced that phase I contracts had been awarded to two design firms.  The contracts were allegedly intended to initiate the development of a museum at the site of the former National Bank of Washington Building.  Upon information and belief, AGM&M has taken additional steps towards the planning, design, and development of the museum.  Mr. Cafesjian and CFF have been excluded from participating in these activities.

24.    Mr. Cafesjian and CFF donated $3,500,000 and loaned $500,000 to the Assembly for the purchase of a parcel of land located at 14th and G Streets, N.W., Washington, D.C., known as the National Bank of Washington Building (the "First Grant Property").

25.    Mr. Cafesjian and CFF contributed $12,850,000 to the Assembly for the purpose of purchasing four parcels of real estate located at 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (collectively, the "Second Grant Property").

26.    Per the Grant Agreement, the First Grant Property and the Second Grant Property are collectively referred to as the "Grant Property."  Ex. 2 at 3.

27.    A promissory note was executed by the Assembly in favor of CFF on March 17, 2000.  The note required the Assembly to pay $500,000 to CFF on or before May 16, 2000.

28.    The Assembly did not pay $500,000 to CFF on or before May 16, 2000.

29.    On November 1, 2003, Mr. Cafesjian, CFF, and the Assembly entered into a written contract, the Grant Agreement (*Id.* at 11).

30.    The Grant Agreement requires, in part, that:

(a)    the Assembly must issue a new promissory note in favor of CFF in the amount of $500,000 to replace the promissory note that was originally issued on March 17, 2000, and that note was to mature on December 31, 2005 (*Id.* § 5.4(A-B));

(b)    Mr. Cafesjian and CFF were required to transmit funds to the Assembly for the purpose of establishing AGM&M, including the purchase of the Grant Property, which may only be used as part of the AGM&M, subject to plans approved by the Board of Trustees of AGM&M (the "Plans") (*Id.* § 3.1(A));

(c)    the Assembly shall make available in the Grant Property space acceptable to CFF for a memorial commemorating the Armenian Genocide (*Id.* § 3.2(A));

(d)    the Assembly must permit CFF to participate in all material decisions regarding the memorial (*Id.* § 3.2(C));

(e)    the Assembly must cooperate with the design firms, artists and others selected by CFF to design and ensure the successful completion of the memorial (*Id.* § 3.2(B));

(f)    the Assembly must name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by CFF in writing (*Id.* § 3.2(F)); and

(g)    Mr. Cafesjian and CFF have a conditional reversionary interest in the Grant Property (*Id.* § 3.1(B)).

31.    The reversionary interest contained in the Grant Agreement mandates that in the event that the Grant Property is not developed prior to December 31, 2010, or if the Grant Property is not developed in substantial compliance with the Plans, then Mr. Cafesjian and CFF are entitled to remedies including, but not limited to, termination of the Grant Agreement and return of the Grant Property or the grant funds.  *Id.* § 3.1(B).

32.    Mr. Cafesjian and CFF substantially performed all obligations under the Grant Agreement in reliance upon and in exchange for the Assembly's written agreement that Mr. Cafesjian and CFF had an ongoing right for participation in and approval of the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial.

33.    Pursuant to its obligations under the Grant Agreement, the Assembly failed to issue a replacement promissory note in the amount of $500,000 in favor of CFF and did not pay CFF the $500,000 it agreed was due on December 31, 2005.

34.    On November 1, 2003, the Assembly and AGM&M entered into a written contract, the "Transfer Agreement."  Ex. 3.

35.    The Transfer Agreement requires, in part, that AGM&M honor the Assembly's donor requirements, including specifically to assume and to agree to comply

with the Assembly's obligations relating to the museum and memorial commemorating the Armenian Genocide under the agreement between the Assembly, Mr. Cafesjian, and CFF (the Grant Agreement).  *Id.* § 1.2(A-B).

36.     AGM&M and the Assembly utilized the funds donated by Mr. Cafesjian and CFF to acquire the four parcels of real estate referred to in the Grant Agreement as the "Second Grant Property."  AGM&M acquired these parcels from TomKat Limited Partnership, an entity affiliated with Mr. Cafesjian that had previously acquired the properties.

37.     Pursuant to the Transfer Agreement, the Assembly contributed its rights, title, and interest in and to all cash pledges, real property, tangible property, intangible property, and other assets to AGM&M.  *Id.* § 1.1(A).

38.     Pursuant to the Transfer Agreement, the Assembly assigned to AGM&M its contractual obligations that are due to Mr. Cafesjian and CFF and that are set forth in the Grant Agreement, including the obligation to issue a promissory note that was due December 31, 2005, and the obligation to transfer the Grant Property to CFF if the Grant Property is not developed prior to December 31, 2010, or if the Grant Property is not developed in substantial compliance with the Plans.  *Id.* § 1.2(A), (D).

39.     Despite obligations pursuant to the Transfer Agreement, AGM&M failed to issue a replacement promissory note in the amount of $500,000 in favor of CFF as required by the Grant Agreement, and AGM&M failed to pay CFF the $500,000 that was due on December 31, 2005.

40.    Mr. Cafesjian and CFF's grant obligations were conditioned upon AGM&M's agreement to use the Grant Property "in furtherance of AGM&M['s] stated charitable purpose."  Ex. 3 § 4.6.  AGM&M also agreed to "honor all of the existing donor requirements existing at the time of transfer," including the requirement that the CFF designated Trustee participate in all material decisions relating to the museum and memorial. Ex. 2 § 5.3(B); *see also* Ex. 3 § 1.2(A).

41.    The Transfer Agreement was executed for the direct benefit of Mr. Cafesjian and CFF, as the Transfer Agreement requires AGM&M to comply with the Assembly's obligations to Mr. Cafesjian and CFF.  For example, the Transfer Agreement requires, in part, that:

(a)    "AGM&M, Inc. must honor all of [the Assembly's] donor requirements existing at time of transfer";

(b)    "AGM&M, Inc. assumes and agrees to comply with the [Assembly's] obligations relating [*sic*] the memorial commemorating the Armenian Genocide under the agreement between [the Assembly] and Gerard L. Cafesjian and The Cafesjian Family Foundation";

(c)    "If at the time [the Transfer Agreement] is executed the promissory note executed by [the Assembly] in favor of the [*sic*] The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the 'Promissory Note') or any promissory note issued to replace the Promissory Note (the 'Replacement Promissory Note') is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant."

*Id.* § 1.2(A-B), (D).

42.    On May 7, 2007, a portion of AGM&M's Board of Trustees prevented CFF, by its designated Trustee Mr. Waters, from participating in the entirety of the Board of Trustees meeting.

43.     On May 7, 2007, AGM&M's Board of Trustees created a planning committee to oversee the development of the museum and memorial in violation of the Assembly and AGM&M's obligations under the Grant Agreement and Transfer Agreement.

44.     The Assembly and AGM&M have prevented Mr. Cafesjian and CFF from utilizing their ongoing right for participation in and approval of the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial.

45.     AGM&M has failed to honor the Assembly's donor requirements as required by the Transfer Agreement, including its failure to comply with the Assembly's obligations relating to Mr. Cafesjian and CFF's rights pertaining to the museum and memorial as provided by the Grant Agreement between the Assembly, Mr. Cafesjian, and CFF.

46.     On July 18, 2007, in a letter signed by Mr. Hovnanian, on behalf of the Assembly, Mr. Hovnanian made the false allegation that:

> At no point did the Assembly reject Mr. Cafesjian's vision for the museum, which is his stated reason for abandoning the project and filing suit against the Assembly. Rather, the AGMM Board asked Mr. Cafesjian to proceed with his vision for the museum, only to be informed that he no longer was interested in the project. In addition, the Armenian Assembly has sought an accounting.

Ex. 5 at 1-2.

47.     In a press release issued by AGM&M that was published on October 4, 2007, AGM&M made the false allegation that:

(a)     Mr. Cafesjian has filed a "frivolous" lawsuit that was "intended to scuttle the building of a genocide museum in Washington, DC";

(b)     the lawsuit "has no basis in fact or law";

      (c)     the lawsuit is "a desperate attempt by Mr. Cafesjian to block the recent progress made by the trustees to restart the process of building [the] museum"; and

      (d)     AGM&M's actions with regard to Mr. Waters were proper.

Ex. 6.

48.     In a press release issued by AGM&M that was published on October 31, 2007, AGM&M made the false allegation that:

      (a)     Mr. Cafesjian "left the other trustees with serious problems, including unpaid taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left in tatters a project that the Armenian-American community strongly endorsed and wants completed";

      (b)     "In early 2007, after flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy and after legal review, Cafesjian and John Waters were suspended from the Assembly board";

      (c)     "Cafesjian's formation of his personal lobbying organization, USAPAC, has caused additional damage"; and

      (d)     "Taking control of AGMM, [Mr. Cafesjian] failed to fund the project, mismanaged development, resigned, and abandoned the properties and project in 2006."

Ex. 7 at 1-2.

49.     In a press release issued by AGM&M that was published on April 11, 2008, AGM&M made the false allegation that:

The lawsuit filed by Cafesjian in April 2007 sought to rescind the grant agreement his Foundation had made with the Armenian Assembly with respect to the Armenian Genocide Museum project, so that Cafesjian could recover substantially appreciated real estate. Subsequent filings and press attacks by Cafesjian were similarly intended to scuttle the building of a genocide museum.

Cafesjian formally abandoned the project demanding return of appreciated real estate, leaving behind unpaid taxes, an unpaid mortgage, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left the project in tatters."

## COUNT I

## BREACH OF CONTRACT

### (The Assembly)

50.    Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

51.    The Grant Agreement is a valid and binding contract and requires the Assembly to fulfill the obligations set forth in the Grant Agreement.

52.    Mr. Cafesjian and CFF have substantially satisfied all of their contractual obligations to the Assembly under the Grant Agreement.

53.    As a consequence of the Assembly's failure to reissue the promissory note and failure to repay the $500,000 as agreed in the Grant Agreement, the Assembly breached the Grant Agreement and CFF has sustained substantial damages.

54.    As a consequence of the Assembly's failure to allow Mr. Cafesjian and CFF to exercise their ongoing right to participate in and approve the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial, the Assembly breached the Grant Agreement and Mr. Cafesjian and CFF have sustained substantial damages.

## COUNT II

## BREACH OF CONTRACT

### (AGM&M)

55.    Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

56.     The Transfer Agreement, to which the Assembly and AGM&M are parties, assigned the Assembly's contractual obligations set forth in the Grant Agreement to AGM&M.

57.     The Grant Agreement is a valid and binding contract and requires AGM&M to fulfill the contractual obligations set forth in the Grant Agreement.

58.     Mr. Cafesjian and CFF have substantially satisfied all of their contractual obligations to AGM&M under the Grant Agreement.

59.     As a consequence of AGM&M's failure to reissue the promissory note and failure to repay the $500,000 as agreed in the Grant Agreement, AGM&M breached the requirements Grant Agreement, for which it was obligated to comply by virtue of the Transfer Agreement, and CFF has sustained substantial damages.

60.     As a consequence of AGM&M's failure to allow Mr. Cafesjian and CFF to exercise their ongoing right to participate in and approve the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial, AGM&M breached the requirements of the Grant Agreement, for which it was obligated to comply by virtue of the Transfer Agreement, and Mr. Cafesjian and CFF have sustained substantial damages.

## COUNT III

## BREACH OF IMPLIED COVENANT OF GOOD FAIR AND FAIR DEALING

### (The Assembly)

61.     Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

62.     Mr. Cafesjian, CFF, and the Assembly executed a contract, the Grant Agreement, which includes an implied obligation of good faith.

63.     The Assembly's failure to issue a replacement promissory note in favor of CFF while retaining the $500,000 loan, and the proceeds thereof, is unreasonable and unfair and constitutes a breach of the Assembly's implied obligation of good faith.

64.     The Assembly's failure to allow Mr. Cafesjian and CFF to exercise their ongoing right to participate in and approve the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial constitutes a breach of the Assembly's implied obligation of good faith.

65.     As a consequence of the Assembly's breach of its implied obligation of good faith, Mr. Cafesjian and CFF have sustained substantial damages.

## COUNT IV

## BREACH OF IMPLIED COVENANT OF GOOD FAIR AND FAIR DEALING

### (AGM&M)

66.     Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

67.     Mr. Cafesjian, CFF, and the Assembly executed a contract, the Grant Agreement, which includes an implied obligation of good faith.

68.     The Transfer Agreement, for which the Assembly and AGM&M are parties, assigned the Assembly's contractual obligations set forth in the Grant Agreement to AGM&M.

69.     The Grant Agreement is a valid and binding contract and includes an implied obligation of good faith and fair dealing.

70.     The Transfer Agreement requires AGM&M to fulfill the contractual obligations set forth in the Grant Agreement.

71.     AGM&M's failure to issue a replacement promissory note in favor of CFF while retaining the $500,000 loan, and the proceeds thereof, is unreasonable and unfair and constitutes a breach of AGM&M's implied obligation of good faith.

72.     AGM&M's failure to allow Mr. Cafesjian and CFF to exercise their ongoing right to participate in and approve the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial constitutes a breach of AGM&M's implied obligation of good faith.

73.     As a consequence of AGM&M's breach of its implied obligation of good faith, Mr. Cafesjian and CFF have sustained substantial damages.

## COUNT V

## THIRD PARTY BENEFICIARY

### (AGM&M)

74.     Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

75.     The Assembly and AGM&M entered into a contract, the Transfer Agreement, which was intended for the direct benefit of AGM&M's project donors, including and most

specifically, Mr. Cafesjian and CFF.  For example, the Transfer Agreement requires, in part,

that:

> (a)    "AGM&M, Inc. must honor all of [the Assembly's] donor requirements existing at time of transfer";
>
> (b)    "AGM&M, Inc. assumes and agrees to comply with the [Assembly's] obligations relating [*sic*] the memorial commemorating the Armenian Genocide under the agreement between [the Assembly] and Gerard L. Cafesjian and The Cafesjian Family Foundation";
>
> (c)    "If at the time [the Transfer Agreement] is executed the promissory note executed by [the Assembly] in favor of the [*sic*] The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the 'Promissory Note') or any promissory note issued to replace the Promissory Note (the 'Replacement Promissory Note') is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant."

Ex. 3 at § 1-2 (A)-(B), (D).

76.    AGM&M's failure to comply with the terms of the Transfer Agreement has

prevented Mr. Cafesjian and CFF from exercising their ongoing right to participate in and

approve the planning and design of the museum and memorial, including the right to

participate in all material decisions regarding the memorial.

77.    As a consequence of AGM&M's failure to fulfill its contractual obligations

and its prevention of Mr. Cafesjian and CFF from exercising their contractual rights, Mr.

Cafesjian and CFF have sustained substantial damages.

## COUNT VI

## UNJUST ENRICHMENT

### (The Assembly and AGM&M)

78.    Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

79.    Plaintiffs have donated millions of dollars and property to the Assembly and AGM&M when it was otherwise not due or payable.

80.    The Assembly and AGM&M have been unjustly enriched by retaining both Plaintiffs' donated money and property while refusing to permit Mr. Cafesjian and CFF to exercise their ongoing right to participate in and approve the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial.

81.    In equity and good conscience, it would be inequitable to allow Assembly and AGM&M to enrich themselves at Plaintiffs' expense and retain the benefit of Plaintiffs' donated money and property without honoring the obligations attached to those donations. Assembly and AGM&M should thus be ordered to disgorge the unjustly retained money and property.

## COUNT VII

## IMPOSITION OF CONSTRUCTIVE TRUST

### (AGM&M)

82.    Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

83.     By virtue of AGM&M's wrongful conduct in retaining both Mr. Cafesjian and

CFF's donated funds and the Grant Property while refusing to permit Mr. Cafesjian and CFF

to exercise their ongoing right to participate in and approve the planning and design of the

museum and memorial, including the right to participate in all material decisions regarding

the memorial, AGM&M holds all money paid and all properties acquired with Mr. Cafesjian

and CFF's donated funds as a constructive trustee for Mr. Cafesjian and CFF's benefit.


## COUNT VIII

## DEFAMATION

### (Mr. Hovnanian and the Assembly)

84.     Plaintiffs incorporate by reference each allegation in the above paragraphs as

if fully rewritten here.


85.     On July 18, 2007, in a letter signed by Mr. Hovnanian, on behalf of the Assembly,

Mr. Hovnanian made the false allegation that:

> At no point did the Assembly reject Mr. Cafesjian's vision for the
> museum, which is his stated reason for abandoning the project and
> filing suit against the Assembly.  Rather, the AGMM Board asked
> Mr. Cafesjian to proceed with his vision for the museum, only to
> be informed that he no longer was interested in the project.  In
> addition, the Armenian Assembly has sought an accounting.

Ex. 5 at 1-2.

86.     Mr. Hovnanian and the Assembly caused these statements to be published to

third parties.


87.     These statements were false and defamatory.

88.    Mr. Hovnanian either knew that there was no truth to these statements or made the statements with reckless disregard for the truthfulness of the statements.

89.    The statements are actionable as a matter of law irrespective of special harm.

90.    This defamatory statement is particularly harmful to Mr. Cafesjian, as Mr. Cafesjian is active within the close-knit Armenian-American community; his reputation is of the utmost importance to his business dealings, both within the United States as well as in Armenia; and he has devoted himself to supporting Armenian causes within the United States and abroad for over a decade.

91.    A declaration that these statements are false and defamatory would ameliorate the reputational harm caused by Mr. Hovnanian and the Assembly.

## COUNT IX

## DEFAMATION

### (AGM&M)

92.    Plaintiffs incorporate by reference each allegation in the above paragraphs as if fully rewritten here.

93.    In a press release issued by AGM&M that was published on October 4, 2007, AGM&M made the false allegation that:

(a)    Mr. Cafesjian has filed a "frivolous" lawsuit that was "intended to scuttle the building of a genocide museum in Washington, DC";

(b)    the lawsuit "has no basis in fact or law";

(c)    the lawsuit is "a desperate attempt by Mr. Cafesjian to block the recent progress made by the trustees to restart the process of building [the] museum"; and

(d)     AGM&M's actions with regard to Mr. Waters were proper.

Ex. 6.

94.     In a press release issued by AGM&M that was published on October 31,

2007, AGM&M made the false allegation that:

(a)     Mr. Cafesjian "left the other trustees with serious problems, including unpaid taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left in tatters a project that the Armenian-American community strongly endorsed and wants completed";

(b)     "In early 2007, after flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy and after legal review, Cafesjian and John Waters were suspended from the Assembly board";

(c)     "Cafesjian's formation of his personal lobbying organization, USAPAC, has caused additional damage"; and

(d)     "Taking control of AGMM, [Mr. Cafesjian] failed to fund the project, mismanaged development, resigned, and abandoned the properties and project in 2006."

Ex. 7 at 1-2.

95.     In a press released issued by AGM&M that was published on April 11, 2008,

AGM&M made the false allegation that:

The lawsuit filed by Cafesjian in April 2007 sought to rescind the grant agreement his Foundation had made with the Armenian Assembly with respect to the Armenian Genocide Museum project, so that Cafesjian could recover substantially appreciated real estate. Subsequent filings and press attacks by Cafesjian were similarly intended to scuttle the building of a genocide museum.

Cafesjian formally abandoned the project demanding return of appreciated real estate, leaving behind unpaid taxes, an unpaid mortgage, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left the project in tatters.

Ex. 8 at 1-2.

96.     AGM&M, by issuing these press releases, published these statements to third parties.

97.     These statements were false and defamatory.

98.     AGM&M either knew that there was no truth to these statements or made the statements with reckless disregard for the truthfulness of the statements.

99.     The statements are actionable as a matter of law irrespective of special harm.

100.    These defamatory statements are particularly harmful to Mr. Cafesjian, as Mr. Cafesjian is active within the close-knit Armenian-American community; his reputation is of the utmost importance to his business dealings, both within the United States as well as in Armenia; and he has devoted himself to supporting Armenian causes within the United States and abroad for over a decade.

101.    A declaration that these statements are false and defamatory would ameliorate the reputational harm caused by AGM&M.

WHEREFORE, Plaintiffs request relief including, but not limited to, the following:

1.  Declare that:

    (a)     allegations made by the Assembly, AGM&M, and Mr. Hovnanian that Mr. Cafesjian has taken efforts to delay, stall, or prevent the development of the museum and memorial are false and defamatory;

    (b)     allegations made by the Assembly, AGM&M, and Mr. Hovnanian that Mr. Cafesjian abandoned or lost interest in the museum and memorial are false and defamatory; and

    (c)     allegations made by the Assembly, AGM&M, and Mr. Hovnanian that Mr. Cafesjian mismanaged the museum and memorial are false and defamatory.

2. Enjoin the Assembly, AGM&M, and Mr. Hovnanian from any further planning or design of the museum and memorial without the participation and approval of Mr. Cafesjian and CFF;

3. Order specific performance mandating that the Assembly, AGM&M, and Mr. Hovnanian must permit Mr. Cafesjian and CFF to participate in and approve the planning and design of the museum and memorial, including the right to participate in all material decisions regarding the memorial;

4. Order the Assembly, AGM&M, and Mr. Hovnanian disgorge all money and property that is being unjustly retained;

5. Award Mr. Cafesjian and CFF money damages against defendants the Assembly, AGM&M, and Mr. Hovnanian, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein;

6. Award Mr. Cafesjian and CFF punitive damages against defendants the Assembly, AGM&M, and Mr. Hovnanian, jointly and severally;

7. Award Mr. Cafesjian and CFF all costs and expenses incurred to pursue this action;

8. All other relief the Court deems just and equitable.


### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated:  July 17, 2008                    Respectfully submitted,

                                         /s/  Thomas F. Cullen, Jr.
                                         Thomas F. Cullen, Jr. (D.C. Bar No. 224733)
                                         Nancy Berardinelli-Krantz (admitted *pro hac vice*)
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, D.C.  20001-2113
                                         Telephone:  (202) 879-3939
                                         Facsimile:   (202) 626-1700
                                         tfcullen@jonesday.com
                                         nbkrantz@jonesday.com

                                         *Counsel for Gerard L. Cafesjian, The Cafesjian*
                                         *Family Foundation, Inc., John J. Waters, Jr., and*
                                         *The TomKat Limited Partnership*


- 21 -

# EXHIBIT 1

# ARTICLES OF INCORPORATION

## OF

## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

To:    Department of Consumer and Regulatory Affairs
        Business Regulation Administration
        Corporations Division
        Washington, D.C.

THE UNDERSIGNED, all of whom are natural persons of the age of eighteen years or

more, acting as incorporators of a corporation pursuant to the District of Columbia Nonprofit

Corporation Act hereby adopt the following Articles of Incorporation:

### ARTICLE I. NAME

The name of the Corporation is the Armenian Genocide Museum and Memorial, Inc.

(the "Corporation").

### ARTICLE II. DURATION

The period of duration of the Corporation is perpetual.

### ARTICLE III. ADDRESS

The address of the Corporation's registered office in the District of Columbia is

Armenian National Institute, 122 C Street NW, Suite 360, Washington, DC  20001.  The name

of the Corporation's registered agent at such address is Rouben Adalian.

DOC# 190529 v4                          Page 1 of 8



### ARTICLE IV.  PURPOSE

A.    The Corporation is a nonprofit organization organized and operated exclusively for charitable, educational, and other purposes beneficial to social welfare within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").  All references to sections of the Code include the corresponding provision of any subsequent federal tax law.  Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

B.    In furtherance of these purposes, the Corporation shall have all powers granted to a corporation under the District of Columbia Nonprofit Corporation Act and the power to do all things necessary, proper, and consistent with maintaining its tax-exempt status under section 501(c)(3) of the Code.

C.    No part of the net earnings of the Corporation shall inure to the benefit of or be distributed to any trustee, employee or other individual, partnership, estate, trust or corporation having a personal or private interest in the Corporation.  Compensation for services actually rendered and reimbursement for expenses actually incurred in attending to the

affairs of the Corporation shall be limited to reasonable amounts. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

D.      Notwithstanding any other provisions of these Articles, the Corporation shall not carry on any activity not permitted to be carried on by (a) a corporation exempt from federal income tax under section 501(c)(3) of the Code, or (b) a corporation, contributions to which are deductible under section 170(a) and (c)(2) of the Code.

## ARTICLE V. MEMBERS

The Corporation shall have no members.

## ARTICLE VI. BOARD OF TRUSTEES

The Board of Directors of the Corporation shall be referred to as the Board of Trustees. The manner of election or appointment to the Board of Trustees shall be as provided in the By-Laws of the Corporation.

## ARTICLE VII. REGULATION OF INTERNAL AFFAIRS

A.      The affairs of the Corporation shall be managed and controlled by the Board of Trustees.

B.    The initial By-Laws shall be adopted by the Board of Trustees, which may alter, amend or repeal the By-Laws or adopt new By-Laws.

C.    In the event of the dissolution or final liquidation of the Corporation:

1.    None of the property of the Corporation nor any proceeds thereof shall be distributed to or divided among any of the trustees or officers of the Corporation or inure to the benefit of any individual.

2.    After all liabilities and obligations of the Corporation have been paid, satisfied and discharged, or adequate provision made therefor, all remaining property and assets of the Corporation shall be distributed to one or more organizations organized and operated exclusively for religious, charitable, scientific, literary, educational or social welfare purposes, provided that such organizations shall be exempt from federal income taxes by reason of section 501(c)(3) of the Code, and subject to any additional restrictions imposed by the By-Laws of the Corporation.

3.    The private property of the trustees or officers of the Corporation shall not be subject to payment of corporate debts to any extent whatever.

## ARTICLE VIII.  PRIVATE FOUNDATION RULES

The Corporation shall at all times be organized and operated so as to qualify as an organization that is not a private foundation, as defined in section 509(a) of the Code. If, however, at any time, the Corporation shall be classified as a private foundation under federal tax laws, then at such time or times the Corporation shall be subject to the following restrictions:

Page 4 of 8

1.    The Corporation shall not engage in any act of self-dealing as defined in section 4941(d) of the Code.

2.    The Corporation shall make distributions for each taxable year at such time and in such manner so as not to become subject to the tax on undistributed income imposed by section 4942 of the Code.

3.    The Corporation shall not retain any excess business holdings as defined in section 4943(c) of the Code.

4.    The Corporation shall not make any investments in such manner as to subject it to tax under section 4944 of the Code.

5.    The Corporation shall not make any taxable expenditures as defined in section 4945(d) of the Code.

### ARTICLE IX.  TRUSTEES

The number of Trustees may be increased or decreased from time to time by the Board of Trustees, but shall in no event be less than three (3).  The names and addresses of the persons who shall serve as initial Trustees until their successors are elected and qualify, are:

| NAME | ADDRESS |
|------|---------|
| Gerald L. Cafesjian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Hirair S. Hovnanian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |

Anoush Mathevosian

c/o The Armenian Genocide Museum
and Memorial, Inc.
122 C Street, N.W., Suite 360
Washington, DC 20001

Robert A. Kaloosdian

c/o The Armenian Genocide Museum
and Memorial, Inc.
122 C Street, N.W., Suite 360
Washington, DC 20001

## ARTICLE X.  INCORPORATORS

The name and addresses of the incorporators are as follows:

| NAME | ADDRESS |
| --- | --- |
| Diara M. Holmes | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Sharon P. Light | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Lloyd H. Mayer | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |

IN WITNESS WHEREOF, we, the undersigned, being the Incorporators hereinabove

named, do hereby affirm under penalties of perjury that these Articles are our act and deed,

and the facts herein stated are true and, accordingly, we have executed these Articles this

2<u>4th</u> day of <u>October</u>, 2003.

Diara M. Holmes
Diara M. Holmes

Sharon P. Light
Sharon P. Light

Lloyd H. Mayer
Lloyd H. Mayer

)
)
DISTRICT OF COLUMBIA        )  SS:
)
)

I, _Jeanne G Katz_ , a Notary Public in and for the District of Columbia, do

hereby certify that Diara M. Holmes, Sharon P. Light and Lloyd H. Mayer whose names are

signed to the foregoing Articles of Incorporation of Armenian Genocide Museum and

Memorial, Inc., bearing the date of _October 29_, 2003, personally appeared before me in said

District, the said persons being personally well known to me as the persons who executed the

said Articles of Incorporation, and each acknowledged the same to be his or her act and deed.


_____
Notary Public

JEANNE G. KATZ
Notary Public of District of Columbia
My Commission Expires December 14, 2007

Page 8 of 8

# EXHIBIT 2



# ARMENIAN ASSEMBLY OF AMERICA

50 NORTH LA CIENEGA BLVD. • SUITE 202 • BEVERLY HILLS, CA 90211 • (310) 360-0091 • FAX (310) 360-0094

November 1, 2003

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

      Re:   Grant Agreement

Dear Mr. Cafesjian:

      Thank you for your very generous grants to support the Armenian Assembly of America, Inc. (the "Assembly"). The purpose of this letter (the "Agreement") is to set forth the terms and conditions of the grants, as described below (the "Grants"), from you, Gerard L. Cafesjian ("GLC"), and The Cafesjian Family Foundation (the "Foundation"; and together with GLC, the "Grantor"), to the Assembly for the purposes of establishing the Armenian Genocide Museum and Memorial (the "AGM&M"). If this Agreement correctly sets forth your understanding with respect to the subject matter hereof, please indicate your agreement by countersigning below and returning the executed original Agreement to the Assembly. The enclosed duplicate original of the Agreement is for your records.

## SECTION 1  First Grant.

    1.1    <u>Amount of First Grant</u>. The Grantor shall grant the Assembly $4,000,000 in accordance with the terms of this Agreement (the "First Grant"). This amount is in addition to the $1,000,000 delivered to the Assembly on or about February 16, 2000 by the Vanguard Charitable Endowment Program – Cafesjian Family Foundation Charitable Trust, as directed by GLC as donor advisor to said Trust.

    1.2    <u>Use of First Grant</u>. The Assembly shall use First Grant funds solely: (i) to purchase the property at 14th and G Streets, N.W., Washington, D.C., known as the National Bank of Washington Building (the "First Grant Property"); (ii) to pay for any transaction costs related to the purchase of the First Grant Property; and (iii) for the installation of a Memorial as described in Section 3.2 of this Agreement.

1.3    <u>Payment of First Grant</u>.  The Foundation shall have made First Grant funds available in the following manner:

    (A)    the Foundation transmitted $1,000,000 to the Assembly on February 4, 2000;

    (B)    the Foundation transmitted $1,500,000 to the Assembly on or before the closing date for the purchase of the First Grant Property, which was on or about February 16, 2000; and

    (C)    the Grantor shall transmit $1,500,000 to the Assembly at such time as mutually agreed to by the parties to fund the purchase and installation of the Memorial described in Section 3.2 of the Agreement.

## SECTION 2  Second Grant.

2.1    <u>Amount of Second Grant</u>.  The Grantor shall grant the Assembly $12,850,000 in accordance with the terms of this Agreement (the "Second Grant").

2.2    <u>Use of Second Grant</u>.  The Assembly shall use Second Grant funds solely to purchase the four parcels of real estate located at 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (collectively, the "Second Grant Property") and for any related transaction costs.

2.3    <u>Payment of Second Grant</u>.  The Grantor shall make Second Grant funds available in the following manner:

    (A)    the Grantor shall transmit $6,700,000 to the Assembly on or before the closing date for the purchase of 1334-36 G Street, which is November 4, 2003, of which the Assembly shall use approximately $6,500,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

    (B)    the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1338 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

    (C)    the Grantor shall transmit $800,000, to the Assembly on or before the closing date for the purchase of 1340 G Street, of which the Assembly shall use approximately $750,000 to pay the current owner of 1340 G Street an amount equal to the current owner's current cost basis in 1340 G Street and shall use the remaining amount to pay any related transaction costs;

    (D)    the Grantor shall transmit seven annual payments of $150,000 each to the Assembly on or before the March due date of each of the seven

annual payments (the "Annual Payments") of $150,000 owed or to be owed by the Assembly under the 1340 G Street contract of deed currently held by the current owner of 1340 G Street and to be assumed by the Assembly (the "Contract of Deed"), which the Assembly shall use to pay the Annual Payments;

(E)    the Grantor shall transmit $1,500,000 to the Assembly on or before the due date of the final balloon payment (the "Balloon Payment") of $1,500,000 owed or to be owed by the Assembly under the Contract of Deed, which the Assembly shall use to pay the Balloon Payment; and

(F)    the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1342 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs.

**SECTION 3    General Conditions and Covenants.**

3.1    <u>Use of the Grant Property.</u>

(A)    The First Grant Property and the Second Grant Property (together, the "Grant Property") may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the "Plans"), and subject to any leases in place at the time of the acquisition of the Grant Property by the Assembly with respect to all or a portion of the Grant Property (and with respect to which the Assembly shall take any necessary steps to terminate such leases as soon as possible, subject to the terms of such leases and applicable law, and shall not consent to any renewals or extensions).

(B)    If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

(i)    in the event any portion of the Grants has not been funded, this Agreement terminates; and

(ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

3.2    <u>Memorial.</u>  The Assembly shall:

3

(A)   make available in the Grant Property space acceptable to the Foundation for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by the Foundation;

(B)   cooperate with the design firms, artists and others selected by the Foundation to design and ensure the successful completion of the Memorial;

(C)   permit the Foundation to participate in all material decisions regarding the Memorial;

(D)   operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by the Foundation in writing;

(E)   be solely responsible for the costs of maintaining the Memorial; and

(F)   name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by the Foundation in writing.

3.3   Use of Grant Funds. The Assembly shall use Grant funds only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.4   Private Foundation Grants. The Assembly may not use any portion of the Grants that have been received from the Foundation to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

3.5   Financial Records. The Assembly shall maintain financial records regarding the use of the Grants consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

3.6   Reports and Records.

(A)   Until completion of the AGM&M and operation of the completed facility for 12 months, the Assembly shall provide written reports to the Grantor at least quarterly.

(B)   Such reports shall include details on:

(i)   the amount and nature of the expenditures made from the Grant; and

> > (ii) the progress made in acquiring, designing, renovating, and utilizing the Grant Property and completing the AGM&M.

> (C) In such reports, an officer of the Assembly shall certify its compliance with the terms and conditions of this Agreement.

> (D) The Assembly shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the Grant Property and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

3.7   No Other Rights or Obligations.  Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence the Assembly's use of any funds provided in accordance with this Agreement.

3.8   No Further Grants Required.  It is expressly understood that by making these Grants the Grantor has no obligation to provide additional funding to the Assembly for the AGM&M or for any other purpose.

3.9   Breach by the Assembly.

> (A) If the Assembly fails to use the Grants solely for the purposes set out in this Agreement or if the Assembly fails to satisfy any of the conditions of this Agreement, Grantor is released from any remaining obligation under this Agreement to provide funds or property to the Assembly.

> (B) If the Assembly uses any portion of the Grants either for a purpose other than those set out in this Agreement or for a purpose other than those described in Section 501(c)(3) of the Code, as amended, the Assembly shall repay the portion of the Grants so spent to Grantor, plus interest.

> (C) The remedies set out in this Section 3.9 are in addition to any other remedies that may be available to the Grantor at law or equity.

## SECTION 4  Conditions Related to the Assembly.

The Grantor's obligation to make the Grants is subject to the following conditions:

4.1   Total Grants and Pledges.  On or before October 30, 2003, the Assembly must have received actual grants or firm pledges to support the AGM&M, including the Grants, totaling at least $20,000,000.  Any grant or pledge that can only be used for the post opening operation or for an endowment for the future

operation of the AGM&M may not be considered for purposes of satisfying this condition.

4.2    Tax-Exempt Status.  The Assembly must be a tax-exempt organization described in Section 501(c)(3) of the Code, and may not be a private foundation within the meaning of Section 509(a) of the Code.

4.3    Tax Status Documentation.  The Assembly shall deliver to the Grantor a copy of its IRS determination letter and such other documentation reasonably requested by the Grantor, including without limitation evidence that the Grants and the other contributions expected in connection with the AGM&M, including those described in Section 4.1 of this Agreement, have not caused the Assembly to be treated as a private foundation.

4.4    Evidence of Satisfaction.  The Assembly has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

## SECTION 5  Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grants is subject to the following conditions:

5.1    New Nonprofit Corporation.  On or before October 30, 2003, a new, independent entity described in Section 501(c)(3) of the Code, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), must be created by the Assembly and the Foundation, with the costs borne by AGM&M, Inc.

5.2    Governance of AGM&M, Inc.

(A)    AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

(B)    Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of the Transfer Agreement described in Section 5.3 of this Agreement), except that the Assembly shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by the Assembly to AGM&M, Inc.

(C)    In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

(D)    In recognition of its efforts in establishing the AGM&M, the

6

Assembly is included as a Major Donor and has the right to appoint a voting member of the AGM&M, Inc. Board of Trustees.

(E)     Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless otherwise specified in the Articles or Bylaws of the corporation.

(F)     Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G)     The initial Board of Trustees of AGM&M, Inc. consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

5.3     Transfer Agreement.

(A)     On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

(B)     The Transfer Agreement will oblige AGM&M, Inc. to honor all of the existing donor requirements at time of transfer, or in the alternative, to obtain donor consent to the transfer and any modification of donor terms.

(C)     Under the Transfer Agreement, AGM&M, Inc. must assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial.

5.4     Promissory Note.

(A)     The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)     The new note must be interest free and mature on December 31, 2005.

(C)     If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

5.5     Armenian National Institute. On or before November 1, 2003, the Assembly

7

shall assign its right to appoint Trustees of the Armenian National Institute to AGM&M, Inc.

**SECTION 6   Representations by the Assembly.**

The Assembly hereby represents and warrants to the Grantor as follows:

6.1     <u>Tax Status</u>. The status of the Assembly as an organization described in Section 501(c)(3) of the Code, and as an organization that is not a private foundation within the meaning of Section 509(a) of the Code is in full force and effect and there is, to the Assembly's knowledge, no IRS reexamination of such status pending or threatened.

6.2     <u>Organization</u>. The Assembly is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

6.3     <u>Power</u>. The Assembly has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grants.

6.4     <u>Actions</u>. All actions required to be taken by the Assembly to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

6.5     <u>Authorization</u>. This Agreement has been duly and validly authorized by all necessary action of the Assembly and constitutes, when executed, a valid and binding obligation of the Assembly.

6.6     <u>Furtherance of Charitable Purposes</u>. The acquisition, renovation, and utilization of the Grant Property is solely in furtherance of the Assembly's stated charitable purposes.

**SECTION 7   General Provisions.**

7.1     <u>Notice</u>.

(A)     Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)     upon personal delivery, if delivered by hand; or

(ii)    three days after the date of deposit in the U.S. mail, postage prepaid; or

8

      (iii)   on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

    (B)   Notice sent in accordance with Section 7.1(A) of this Agreement must be addressed as follows:

      (i)   If to Grantor:

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

      (ii)   If to the Assembly:

Armenian Assembly of America, Inc.
122 C Street, NW
Suite 350
Washington, DC 20001
Fax: 202-383-9012

    (C)   Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 7.1.

7.2    Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

7.3    Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and the Assembly and are not assignable or transferable to any other person, firm or corporation without the consent of the other party, except that the Assembly may assign its rights and obligations under this Agreement to any entity that succeeds to all or substantially all of the Assembly's business and assets or as set out in Section 5.3 of this Agreement.

7.4    Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

7.5    <u>Entire Agreement</u>.

    (A)    This Agreement represents the entire agreement between the Grantor and the Assembly concerning the Grants and all previous agreements, whether written or oral, are superseded by it.

    (B)    This Agreement may be modified or waived only by a written agreement between the Grantor and the Assembly.

    (C)    The Assembly acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

Thank you again for your generous grant to support the Armenian Assembly of America.

Sincerely,

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____
        Hirair S. Hovnanian
        Chairman of the Board of Trustees

By: _____
        Peter Voskibian
        Chairman of the Board of Directors

Accepted and agreed to as of the date of this Agreement by:

THE CAFESJIAN FAMILY FOUNDATION

By: _____        Date: _NOV. 1, 2003_
        Gerard L. Cafesjian
        President and CEO

GERARD L. CAFESJIAN

_____        Date: _NOV. 1, 2003_

11

# EXHIBIT 3

## TRANSFER AGREEMENT

This Transfer Agreement (this "Agreement") is made as of November 1, 2003, by and between:

**Armenian Assembly of America, Inc.** (the "Grantor"), a District of Columbia nonprofit corporation; and

**Armenian Genocide Museum and Memorial, Inc.** ("AGM&M, Inc."), a District of Columbia nonprofit corporation.

## BACKGROUND

In order to complete the building of the Armenian Genocide Museum and Memorial (the "AGM&M"), the Grantor desires to transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc. under the terms and conditions set out in this Agreement.

The parties, therefore, agree as follows:

## TERMS

### SECTION 1  Grant.

1.1   <u>Nature of Grant</u>.

    (A)   The Grantor shall contribute to AGM&M, Inc., all of its rights, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Grantor and/or held by the Grantor for the development, renovation, and construction of the AGM&M, as detailed on <u>Schedule A</u> (the "Grant").

    (B)   Copies of all outstanding grant agreements between the Grantor and its donors relating to the AGM&M are attached to this Agreement as <u>Exhibits A-X</u>.

    (C)   The approximate aggregate value of the Grant is $27,784,901. Within this aggregate estimate the value of the real property is $7,250,000.00; the value of the pledges as of October 30, 2003, is $19,422,044; and the value of cash and other assets on hand is approximately $669,528.

1.2   <u>Other Rights and Obligations Transferred</u>.

    (A)   AGM&M, Inc. must honor all of the Grantor's donor requirements existing at time of transfer, or in the alternative, obtain donor consent

to the transfer and any modification of donor terms.

(B)  Without limiting Section 1.2(A) of this Agreement, AGM&M, Inc. assumes and agrees to comply with the Grantor's obligations relating the memorial commemorating the Armenian Genocide under the agreement between Grantor and Gerard L. Cafesjian and The Cafesjian Family Foundation attached to this Agreement as Exhibit A.

(C)  The Grantor hereby assigns to AGM&M, Inc. the Grantor's right to appoint Trustees of the Armenian National Institute, Inc.

(D)  If at the time this Agreement is executed the promissory note executed by Grantor in favor of the The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

1.3  Use of Grant. AGM&M, Inc. shall use the Grant solely to develop, construct and operate the AGM&M.

1.4  Transfer of Grant.

(A)  The Grantor shall begin to transfer the assets that compose the Grant upon the execution of this Agreement.

(B)  The Grantor shall diligently undertake to complete the transfer of all titles, obtain all consents or other permissions, and otherwise act to effect the completion of the Grant.

## SECTION 2  General Conditions and Covenants.

2.1  Use of Grant Funds. AGM&M, Inc. shall use the Grant only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

2.2  Private Foundation Grants. AGM&M, Inc. may not use any portion of the Grant that has been received from a private foundation, as defined by Section 509(a) of the Code, to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

2.3  Financial Records. AGM&M, Inc. shall maintain financial records regarding the use of the Grant consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

2.4  Reports and Records.

(A)    Until completion of the AGM&M and operation of the completed facility for 12 months, AGM&M, Inc. shall provide written reports to the Grantor at least quarterly.

(B)    Such reports shall include details on:

    (i)    the amount and nature of the expenditures made from the Grant; and

    (ii)    the progress made in acquiring, designing, renovating, and utilizing the Property and completing the AGM&M.

(C)    In such reports, an officer of AGM&M, Inc. shall certify its compliance with the terms and conditions of this Agreement.

(D)    AGM&M, Inc. shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the real property portion of the Grant and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

2.5    Access to Public Spaces. Upon written and reasonable notice, AGM&M, Inc. shall provide Grantor with access to the public spaces within the AGMM free of charge at least six times annually for tours, dinners or other events consistent with the nature of the AGMM in the sole judgment of the AGM&M, Inc., each not lasting longer than six hours, all costs of such events to be borne by Grantor. Grantor shall not have the right to assign, lease or otherwise transfer this right to any other entity or person. This right of access shall expire if Grantor ever ceases to be an organization described in Section 501(c)(3) of the Code.

2.6    Narrative. Grantor and AGM&M, Inc. shall use their best efforts to jointly prepare a narrative on the creation of the AGMM (the "Narrative") for approval by both Grantor and AGM&M, Inc. Upon approval by both Grantor and AGM&M, Inc. and completion of the AGMM, AGM&M, Inc. shall permanently and prominently memorialize the Narrative within the AGMM. AGM&M, Inc. shall include the Narrative or a condensed version thereof in all major publications and public presentations of AGM&M, Inc. that reference the creation of the AGMM.

2.7    No Other Rights or Obligations. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence AGM&M, Inc.'s use of the Grant provided in accordance with this Agreement.

**SECTION 3  Conditions Related to AGM&M, Inc.**

The Grantor's obligation to make the Grant is subject to the following conditions:

3.1    <u>Tax-Exempt Status</u>.  AGM&M, Inc. must be a tax-exempt organization described in Section 501(c)(3) of the Code, as amended, and may not be a private foundation within the meaning of Section 509(a) of the Code.

3.2    <u>Tax Status Documentation</u>.  AGM&M, Inc. shall deliver to the Grantor a copy of its IRS application for recognition of exemption (when prepared), its IRS determination letter (when received), and such other documentation reasonably requested by the Grantor.

3.3    <u>Evidence of Satisfaction</u>.  AGM&M, Inc. has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

3.4    <u>Governance of AGM&M, Inc</u>.

(A)    AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

(B)    Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of this Agreement), except that the Grantor shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by Grantor to AGM&M, Inc.

(C)    In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

(D)    In recognition of its efforts in establishing the AGM&M, the Assembly is included as a Major Donor and a voting member of the AGM&M, Inc. Board of Trustees.

(E)    Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless other wise specified in the Articles or Bylaws of the corporation.

(F)    Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees.  Each subsequent successor Trustee has the rights of a Trustee.

(G)   The initial Board of Trustees of AGM&M, Inc., consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

## SECTION 4   Representations by AGM&M, Inc.

AGM&M, Inc. hereby represents and warrants to the Grantor as follows:

4.1   <u>Tax Status</u>. AGM&M, Inc. is an organization described in Section 501(c)(3) of the Code and an organization that is not a private foundation within the meaning of Section 509(a) of the Code, and AGM&M, Inc. shall apply by November 30, 2003 to the Internal Revenue Service for recognition of this status.

4.2   <u>Organization</u>.   AGM&M, Inc. is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

4.3   <u>Power</u>.  AGM&M, Inc. has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grant.

4.4   <u>Actions</u>.  All actions required to be taken by AGM&M, Inc. to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

4.5   <u>Authorization</u>.  This Agreement has been duly and validly authorized by all necessary action of AGM&M, Inc. and constitutes, when executed, a valid and binding obligation of AGM&M, Inc..

4.6   <u>Furtherance of Charitable Purposes</u>.  The receipt and use of the Grant pursuant to this Agreement is solely in furtherance of AGM&M, Inc.'s stated charitable purposes.

## SECTION 5   General Provisions.

5.1   <u>Notice</u>.

(A)   Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)   upon personal delivery, if delivered by hand; or

(ii)   three days after the date of deposit in the U.S. mail, postage prepaid; or

       (iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

   (B)   Notice sent in accordance with Section 5.1(A) of this Agreement must be addressed as follows:

       (i)    If to AGM&M, Inc.:

           c/o The Cafesjian Family Foundation, Inc.
           15 South Fifth Street
           Suite 900
           Minneapolis, MN 55402
           Fax: 612-359-8994

       (ii)    If to the Grantor:

           Armenian Assembly of America, Inc.
           122 C Street, NW
           Suite 350
           Washington, DC 20001
           Fax: 202-383-9012

   (C)   Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 5.1.

5.2    Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

5.3    Dispute Resolution. Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

5.4    Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party.

5.5    Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

5.6    Entire Agreement.

   (A)   This Agreement represents the entire agreement between the Grantor

and AGM&M, Inc. concerning the Grant and all previous agreements, whether written or oral, are superseded by it.

(B)    This Agreement may be modified or waived only by a written agreement between the Grantor and AGM&M, Inc.

(C)    AGM&M, Inc. acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

IN WITNESS WHEREOF, the parties hereto have caused this Transfer Agreement to be duly executed as of the day and year first above written.


ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____          Date: _Nov / 2003_
     Hirair S. Hovnanian
     Chairman of the Board of Trustees

By: _____          Date: _NOV. 1, 2003_
     Peter Voskibian
     Chairman of the Board of Directors


ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

By: _____          Date: _Nov 1, 2003_
     John J. Waters, Jr.
     Secretary and Treasurer


8

## TRANSFER AGREEMENT

### Schedule A

**Transferred Assets**

**(See attached.)**

## TRANSFER AGREEMENT

## Exhibit A

## Grant Agreement with [_____]

## (See attached.)

# EXHIBIT 4

# BY-LAWS

## OF

## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

### ARTICLE I

### EFFECT, NAME, PURPOSES, POLICY AND RELATED MATTERS

Section 1.1. **General.** These By-Laws shall become effective as of October 30, 2003.

Section 1.2. **Name and Purpose.** The Corporation shall conduct its programs and activities under the name of the Armenian Genocide Museum and Memorial. The Corporation is organized exclusively for educational purposes. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

Section 1.3. **Policy.** The Corporation, its Trustees, officers, and employees shall ever be mindful of the pluralistic character of the Armenian community world-wide, and the worth of its institutions and organizations.

Section 1.4. **Location.** The principal office of the Corporation shall be located in the District of Columbia Metropolitan area. The Trustees, by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, may change the location of the principal office from time to time to any other place within the United States of America. The Trustees, by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, may open and operate other offices of the Corporation in the United States and abroad. The Corporation shall have and continuously maintain in the District of Columbia a registered office and a registered agent whose business office is identical with such registered office, as required by the District of Columbia Nonprofit Corporation Act. The address of the registered office and the identity of the registered agent may be changed from time to time by the Board of Trustees.

Section 1.5. **Fiscal Year.** The fiscal year of the Corporation shall, unless otherwise decided by the Trustees, end on December 31 of each year.

## ARTICLE II

## BOARD OF TRUSTEES

Section 2.1. **Members.** The Corporation shall have no members.

Section 2.2. **Board of Trustees.** The Board of Trustees of the Corporation shall serve as the Board of Directors of the Corporation for purposes of the District of Columbia Nonprofit Corporation Act.

Section 2.3. **Number and Election.** The Board of Trustees shall consist of not less than three (3) nor more than fifteen (15) members. At no time, however, shall the total number of votes exercised by the Board of Trustees exceed fifteen (15), even if the Board of Trustees has not reached its maximum size authorized under these By-Laws.

Section 2.4. **Initial Trustees.** The initial Trustees shall be the Trustees of the Corporation serving as such as of the date of the adoption of these By-Laws. The term of office of an initial Trustee shall be perpetual. Each donor that elected an initial Trustee (as identified by the initial Trustees in the unanimous written consent in lieu of the organization meeting of the Board of Trustees of the Corporation) (an "Initial Donor") shall appoint a successor within thirty (30) days of the adoption of these By-Laws to serve as Trustee should the initial Trustee be unable to serve for any reason. If an Initial Donor fails to appoint such a successor, the initial Trustee elected by that Initial Donor shall be automatically removed from the Board of Trustees effective thirty-one (31) days after the adoption of these By-Laws, but shall be automatically reinstated to the Board of Trustees if and when the Initial Donor appoints a successor to that Trustee. Each Initial Donor shall have the same rights as donors described in Section 2.5 of these By-Laws with respect to the initial Trustee elected by the Initial Donor and the successors to that initial Trustee, including the right, if an Initial Donor makes contributions to the Corporation in excess of $5 million, to elect an additional Trustee for each $5 million increment above the initial $5 million in contributions by that Initial Donor or to grant to the Trustee previously elected by that Initial Donor the right to exercise as many additional votes as the donor has contributed whole increments of $5 million above the initial $5 million in contributions by that Initial Donor.

Section 2.5. **Additional Trustees.** Additional Trustees shall be elected to the Board of Trustees according to the following procedure:

Each contribution of $5 million to the Corporation entitles the donor to elect one Trustee to the Board of Trustees, provided:

(1) the Board of Trustees has accepted the contribution on behalf of the Corporation by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present; and

(2) the donor has appointed a successor to the Trustee elected by the donor to serve on the Board of Trustees should that Trustee be unable to serve for any reason,

until such time as the total number of votes exercised by the Board of Trustees reaches fifteen (15).

When the Corporation has accepted multiple $5 million contributions from a single donor, the donor may either elect one Trustee for each $5 million increment or elect one Trustee who shall exercise as many votes as the donor has contributed whole increments of $5 million. The donor must appoint a successor or successors to the Trustee or Trustees at the time of election.

An individual donor may elect himself or herself as a Trustee or appoint himself or herself as a successor.

An institutional donor shall retain the right to elect Trustees and to appoint successors in perpetuity, which rights, and the right to pass these rights to successor institutions, shall pass to any institution that the governing body of the institutional donor designates as its successor. If an institutional donor dissolves or otherwise ceases to exist without having designated a successor, the institutional donor's rights shall expire. A Trustee elected by such an institutional donor before the expiration of the donor's right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor or successors appointed by such an institutional donor prior to the expiration of the donor's right to appoint one or more successors shall succeed to the Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

An individual donor may appoint an individual or an institution to succeed to the donor's right to elect one or more Trustees, to appoint one or more successors, and, if the person appointed to succeed to these rights is an individual, to appoint an individual or institution to succeed to all of these rights. If the person so appointed is an institution, the immediately preceding paragraph of this section 2.5 shall apply with respect to the donor's rights as if the appointed institution was an institutional donor. If an individual donor or an individual appointed to succeed to the donor's rights fails to appoint such an individual or institution, the donor's rights shall expire on the death of the individual holding those rights or the declaration by a court of legal incompetence of the individual holding those rights. A Trustee elected by such an individual before the expiration of the right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor to that Trustee position appointed by such an individual prior to the expiration of the right to appoint that successor shall succeed to that Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

Page 3 of 10

The term of office of a Trustee shall be perpetual. However, the donor or the individual or institution that has succeeded to the donor's rights may remove the elected Trustee and elect a new Trustee or appoint a different successor at any time, with or without cause.

All elections of Trustees, appointments of successors to Trustees and appointments of successors to a donor's rights must be in writing and delivered to the Chairman, the President, the Secretary or the Executive Director of the Corporation to be effective. Any such election or appointment shall take effect on the date of receipt of such election or appointment or at any later time therein specified, and the acceptance of such election or appointment shall not be necessary to make it effective.

If the position of a successor to a Trustee becomes vacant for any reason, and the donor who has the right to appoint that successor fails to do so within thirty (30) days of that position becoming vacant, the Trustee for whom the successor position is vacant shall be automatically removed from the Board of Trustees effective thirty-one (31) days after that successor position becomes vacant but shall be automatically reinstated to the Board of Trustees if and when that donor appoints a successor to that Trustee.

If a Trustee position becomes vacant for any reason and remains vacant for a continuous period of three (3) years, then the donor who has the right to elect that Trustee and to appoint the successor to that Trustee, and, in the case of an individual donor, to appoint an individual or institution to succeed to these rights, shall lose all of his, her or its rights with respect to that Trustee position and the vote(s) associated with that Trustee position shall expire.

Section 2.6. **Quorum.** Persons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called. If less than a quorum of Trustees is present at a meeting, a majority of Trustees present may adjourn the meeting without further notice.

Section 2.7. **Action by Vote.** Unless otherwise provided herein or in the Articles of Incorporation, all questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present.

Section 2.8. **Action by Writing.** Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting if all Trustees then in office consent to the action in writing and the written consents are filed with the records of meetings of Trustees. Such consents shall be treated for all purposes as votes at a meeting.

Section 2.9. **Powers and Duties.** The Board of Trustees shall meet from time to time and not less than twice yearly, shall manage and direct the Corporation's funds and investments, shall review the programs and affairs of the Corporation, and shall generally have and exercise all powers of the Trustees except such powers as are expressly prohibited to it by law, at all times in furtherance of the policy and purposes of the Corporation. Without limiting the generality of the foregoing, they shall elect their officers, expand their numbers, examine the

budget, and to the extent approved, provide and allocate funds necessary to carry out the programs reflected therein.

Section 2.10. **Committees.** The Board of Trustees may organize, appoint and supervise one or more committees, including an Executive Committee, and may delegate to any such committee any or all of their powers which may be delegated by law. The members of any committees shall remain in office at the pleasure of the Board of Trustees.

Section 2.11. **Other Appointments.** The Board of Trustees may from time to time designate certain persons or groups of persons as benefactors, patrons, contributors, advisors, friends, or otherwise of the Corporation or with such other titles, upon such terms, for such periods and with such qualifications as they may deem appropriate. Such persons shall serve in an honorary capacity and shall in such capacity have no right to notice of or to vote at any meeting of the Trustees, shall not be considered for the purposes of establishing a quorum, and shall have only such rights or responsibilities as the Board of Trustees may designate from time to time.

Section 2.12. **Meetings.** An annual meeting of the Board of Trustees shall be held at a time to be determined by the Board of Trustees, and at such place as the Board shall determine to conduct such business as may properly come before the meeting. Regular meetings of the Board of Trustees may be held at such places and at such times as the Board shall determine. Special meetings of the Board of Trustees may be called by or at the request of the Chairman and the President and shall be called by the Secretary or his or her designee at the request of Trustees who are authorized to exercise one-half of the votes exercisable by the Trustees then in office. The person or persons authorized to call such special meetings may fix any place as the place for holding such meeting.

Section 2.13. **Telephonic Meetings.** A Trustee may participate in any meeting of the Board of Trustees or any meeting of any committee of the Board by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another, and such participation shall constitute presence in person at the meeting.

Section 2.14. **Notice.** Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated by mail, telegram, facsimile or email to each Trustee, charges prepaid, addressed to him or her at his or her address as shown by the records of the Corporation. Meeting notices, delivered by any method, shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting. Whenever any notice is required to be given to any Trustee under the provisions of these By-Laws or the Articles of Incorporation, or by the District of Columbia Nonprofit Corporation Act, a written waiver thereof signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Presence at a meeting without objection also constitutes a waiver of notice. Neither the business to be transacted at, nor the purpose of, any annual, regular or special meeting of the Board need be specified in the

notice of such meeting or any waiver of notice, unless specifically required by law, the Articles of Incorporation, or these By-Laws.

Section 2.15. **Officers, Agents and Employees.** The Board of Trustees shall elect from time to time by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, from among its members, a Chairman, a President, one or more Vice Chairmen, a Treasurer and a Secretary. The Trustees may elect such other officers, if any, as they may from time to time determine, and such other officers need not be Trustees. The Trustees may also have such agents, if any, as they may appoint. Any two (2) or more offices, except those of President and Secretary, may be held by the same person at the same time. Any officer may resign at any time by giving written notice to the Board of Trustees or the President. Any such resignation shall take effect on the date of receipt of such notice unless another date is specified therein, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. Any officer elected by the Board of Trustees may be removed, with or without cause, by the Board of Trustees whenever, in its judgment, the best interests of the Corporation would be served thereby. Any such removal shall be without prejudice to the contract rights, if any, of the person so removed. The Executive Director shall be appointed by the Board of Trustees and shall be the chief executive officer of the Corporation. With the consent of the Board of Trustees, the Executive Committee, or the designee of either the Board or the Executive Committee, the Executive Director shall sign all deeds, contracts and other documents in the name of the Corporation, and shall have the general power to carry on negotiations of any and every character in the name of the Corporation. The Executive Director shall perform such other duties as assigned by the Board of Trustees or the Executive Committee. The Executive Director shall, among other things, supervise the employees and the hiring of employees. The Executive Director shall be a non-voting ex-officio member of all committees, except the Nominating Committee, if one exists.

Section 2.16. **Duties of Officers.** Each officer shall have the duties usual to his office unless otherwise prescribed by the Board of Trustees and shall serve for one year and until his or her successor is elected and qualified, unless another term is prescribed by the Board of Trustees. The Chairman or, in his or her absence, the President shall preside at all meetings of the Trustees.

Section 2.17. **Resignation and Removal.** Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal. Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.

Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote.

Any Trustee may resign his or her office at any time at any time by giving written notice to the Board of Trustees, the Chairman or the Secretary. Any such resignation shall take effect on the date of receipt of such notice or at any later time therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee. The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Upon removal by the donor, or by the individual or institution that has succeeded to an donor's rights to elect one or more Trustees and appoint one or more successors, the appointed successor to that Trustee shall become a Trustee, unless the donor, or the individual or institution that has succeeded to the donor's rights, has elected a Trustee to replace that Trustee immediately upon removal. If the appointed successor becomes the Trustee, the donor, or the individual or institution that has succeeded to the donor's rights, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Section 2.18. **Endowment Fund.** The Trustees may from time to time establish, hold, invest and administer such endowment fund or funds to be collectively designated the "Armenian Genocide Museum and Memorial Endowment Fund", upon such terms and conditions as the Board of Trustees may from time to time deem advisable. Except as otherwise required by law, only the "net income" therefrom as hereafter defined shall be applied to the programs and activities of the Corporation and the principal of such funds shall be preserved. As used herein, "net income" shall mean the fair value of the assets of the Fund over the sum of the contributions to the fund, whether such contributions are made by donors to the Corporation or by the Board of Trustees from other funds of the Corporation, with each contribution increased by any increase in the Consumer Price Index-All Urban Consumers (CPI-U), published by the Bureau of Labor Statistics, U.S. Department of Labor, or any successor to CPI-U adopted by the Bureau of Labor Statistics, from the date of its contribution to the Fund, calculated as of December 31 of each calendar year. Any such endowment fund or funds may be given such designations as the Board of Trustees may from time to time determine, including, without implied limitation, a designation which will commemorate any donor or person, place, event or entity designated by any donor.

## ARTICLE III

## MISCELLANEOUS

Section 3.1. **Rules of Order.** Robert's Rules of Order Revised shall govern in matters of parliamentary procedure not otherwise prescribed by law, the Articles of Incorporation, or these By-Laws.

Section 3.2. **Amendments.** Unless otherwise provided herein or in the Articles of Incorporation and with reasonable prior written notice, amendments to these By-Laws or to the Articles of Incorporation shall be approved by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present. The affirmative vote of all Trustees then in office shall be required to amend the Purpose (Section 1.2) and Dissolution (Section 3.4) clauses of these By-Laws or the Purposes (Article IV) and Dissolution (Paragraph C of Article VII) clauses of the Articles of Incorporation.

Section 3.3. **Prohibited Activities.** Notwithstanding any other provision of these By-Laws, there shall not be carried on any activities or conduct not permitted to a corporation exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law or (b) to a Corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law. No part of the net earnings shall inure to the benefit of, or be distributable to, the Trustees, officers or others except that the Trustees shall be authorized and empowered, if they so elect, to pay to Trustees, officers or others reasonable compensation for service rendered and to make payments and distribution in furtherance of the purposes set forth in these By-Laws. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

Section 3.4. **Dissolution.** In the event this Corporation is terminated, all endowment funds and net assets of the Corporation shall be transferred to one or more corporations or entities designated by the Board of Trustees as successors to the Corporation, or such one or more Eligible Institutions (as hereinafter defined) as one or more permanent endowment funds to support such Permissible Purposes (as hereinafter defined) and upon such terms and conditions as the Trustees shall determine by a unanimous affirmative vote of all Trustees then in office. As used herein, Eligible Institutions shall mean those charitable/educational institutions located in the United States which then have and maintain active programs that promote greater awareness of the Armenian Genocide and/or promote educational and charitable programs that benefit the citizens of the Republic of Armenia. Presently such designated Eligible Institutions are the Armenian Assembly of America, the Armenian General Benevolent Union, the Cafesjian Family Foundation, the H. Hovnanian Foundation, the Robert Aram and Marianne Kaloosdian and Stephen P. & Marian Mugar Endowed Chair of Armenian Genocide Studies at Clark University, provided that each recipient must be an organization that is described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any subsequent federal tax law. As used herein, Permissible Purposes shall be the specific purposes listed in the third sentence of Section 1.2 of these By-Laws.

Section 3.5. **Interpretation.** Any ambiguity in these By-Laws or any question requiring interpretation of these By-Laws shall be resolved by the Board of Trustees, whose determination shall be binding and conclusive.

**ARTICLE IV**

**INDEMNIFICATION AND INSURANCE**

Section 4.1. **Indemnification and Insurance.** Unless otherwise prohibited by law or sections 4.3 and 4.4 of these By-Laws, the Corporation shall indemnify any Trustee or officer of the Corporation, any former Trustee or officer of the Corporation, or any person who may have served at its request as a trustee, director or officer of another corporation or entity, whether for profit or not for profit, and may, by resolution of the Board of Trustees, indemnify any employee or agent of the Corporation against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, civil, criminal, administrative or investigative, including appeals) in which he or she is or may be made a party by reason of having been such Trustee, officer, person, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters as to which he or she shall be adjudged in such claim, action, suit or proceeding to be guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation. Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; and judgments, fines, and penalties against, and amounts paid in settlement by such Trustee, officer, person, employee or agent. The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any such Trustee, officer, person, employee or agent; provided, however, that such Trustee, officer, person, employee or agent shall undertake to repay or to reimburse such expense if it should be ultimately determined that he or she is not entitled to indemnification under this Section. The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such Trustee, officer, person, employee or agent may be entitled under any statute, By-Law, agreement, vote of the Board of Trustees or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

Section 4.2. **Insurance.** The Board of Trustees may authorize the purchase of insurance on behalf of any person against any liability asserted against or incurred by him which arises out of such person's status as a Trustee, officer, employee or agent of the Corporation or out of a person's having served at the request of the Corporation as a trustee, director or officer of another corporation or entity or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

Section 4.3. **Limitation.** In no case, however, shall the Corporation indemnify, reimburse or insure any person for any taxes imposed on such individual under chapter 42 of the Internal Revenue Code of 1986, as now in effect or as may hereafter be amended ("the Code"). Further, if at any time the Corporation is deemed to be a private foundation within the meaning of Section 509 of the Code then, during such time, no payment shall be made under this Article if

such payment would constitute an act of self-dealing or a taxable expenditure, as defined in Section 4941(d) or Section 4945(d), respectively, of the Code.

Section 4.4. **Severability.** If any part of this Article shall be found in any action, suit or proceeding to be invalid of ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

I certify that the foregoing Bylaws of ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. were approved and adopted for the Corporation by its Board of Trustees by unanimous consent effective on October 30, 2003, and that they are currently in effect.

Secretary of the Corporation

10/30/03
Date

Page 10 of 10

# EXHIBIT 5



# ARMENIAN ASSEMBLY OF AMERICA

1140 19TH STREET, NW • SUITE 600 • WASHINGTON, DC 20036
(202) 393-3434 • FAX: (202) 638-4904 • www.aaainc.org

July 18, 2007

Dear Armenian Assembly Member:

The Armenian Assembly of America would like to inform its membership about the current status of the Armenian Genocide Museum and Memorial (AGMM) project in Washington, DC.

After years of contemplating and planning for the project, the Armenian Assembly, together with the many donors who most generously have contributed to the vision of a museum and memorial in our nation's capital, is first and foremost committed to seeing the AGMM completed.

However, we regret to report that Gerard Cafesjian has filed a suit in federal court against the Armenian Assembly seeking to terminate the museum project and gain distribution to himself of the appreciated real estate. His attorney, Timothy Thornton of Minneapolis, said that means he wants the "four lots back, together with his interest in the bank building." The Assembly has moved to dismiss the lawsuit, a hearing is scheduled August 23rd, and we hope to prevail.

As you are aware, the Armenian Assembly is only one of the several parties involved in the establishment and governance of the AGMM. The museum project was born from a vision by philanthropist Anoush Mathevosian, which the Armenian Assembly and the Armenian National Institute readily embraced. The museum project, of course, would not have been possible without the many donors who have contributed time, energy and financial resources.

The Assembly led the initial three-year effort to locate an appropriate site for an Armenian Genocide museum in Washington, DC. Mr. Cafesjian joined the Assembly and other major donors in making the purchase of the National Bank of Washington a reality. Mr. Cafesjian subsequently purchased additional lots adjacent to the bank building and considered opening a private museum for his art collection. He later proposed forming a new entity incorporated as the Armenian Genocide Museum and Memorial with the additional adjacent lots added to the museum project. As a demonstration of its willingness to cooperate with Mr. Cafesjian on an expanded project, the Armenian Assembly went so far as to support the concept by transferring its title of the historic National Bank of Washington building to the AGMM, as well as control over its subsidiary organization, the Armenian National Institute, to the AGMM as the programming arm of the museum.

Messrs. Cafesjian and John Waters (Vice President of the Cafesjian Family Foundation) controlled the museum project over the past several years. At no point did the Assembly

reject Mr. Cafesjian's vision for the museum, which is his stated reason for abandoning the project and filing suit against the Assembly. Rather, the AGMM Board asked Mr. Cafesjian to proceed with his vision for the museum, only to be informed that he no longer was interested in the project. In addition, the Armenian Assembly has sought an accounting.

We regret that Mr. Cafesjian has chosen to pursue this matter in the courts, when any number of other alternatives, including mediation and arbitration, were and are available in order to resolve any disputes at hand. Despite this situation, the Armenian Assembly has every intention of fulfilling community expectations by ensuring the development and opening of the AGMM on the selected site in the heart of our nation's capital.

The dream of a museum that would memorialize the Armenian Genocide is shared by the entire Armenian diaspora. The other donors to this project are especially keen to see it realized within a reasonable time frame moving forward. We appreciate their strong support and commitment over the past seven years. As the largest Washington-based advocacy organization serving the Armenian-American community, the Armenian Assembly also recognizes and appreciates the trust that donors and supporters have placed in its leadership for the past 35 years. We can assure you that Mr. Cafesjian's lawsuit will do nothing to interfere with achieving the goal of establishing the museum. We will continue to provide you with further updates as news develops.

Sincerely,

Hirair Hovnanian
Chairman

Carolyn Mugar
President

# EXHIBIT 6

# Armenian Genocide Museum and Memorial, Inc.
### 1140 19th Street, NW, Suite 600, Washington, DC 20036
### Phone: 202-383-9009, Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
October 4, 2007
CONTACT: Rouben Adalian
Phone: (202) 383-9009
E-mail: ani@agmm.org
Web: www.armenian-genocide.org

## NEW CAFESJIAN LAWSUIT AGAINST GENOCIDE MUSEUM FRIVOLOUS

Lawyers for the Trustees of the Armenian Genocide Museum and Memorial and the Armenian Assembly of America have characterized as "frivolous" Gerard Cafesjian's latest lawsuit intended to scuttle the building of a genocide museum in Washington, DC to honor the Armenian Genocide victims, survivors, and family members.  "This lawsuit comes as a total surprise to us since it has no basis in fact or law" stated Arnold R. Rosenfeld of Kirkpatrick & Lockhart Preston Gates Ellis LLP.  "It is a desperate attempt by Mr. Cafesjian to block the recent progress made by the trustees to restart the process of building a museum of which all Armenian-Americans can be proud." Rosenfeld added: "All acts to proceed to build the museum were duly authorized at a meeting which was properly noticed and with a quorum of those eligible to vote, and were taken in accordance with the bylaws of the AGM&M.  All the votes were perfectly legal and authorized under the law.  In fact, Cafesjian's designated representative, John J. Waters, Jr., participated in the meeting and then voluntarily withdrew from the meeting.  All of Cafesjian's new claims are frivolous and will be dealt with through the proper motions in federal court where this case was brought."

The Armenian Genocide Museum and Memorial will be located at 14th and G Streets. in Washington, DC.

NR#2007-002

# EXHIBIT 7

# Armenian Genocide Museum and Memorial, Inc.
### 1140 19th Street, NW, Suite 600, Washington, DC 20036
### Phone: 202-383-9009, Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
October 31, 2007
CONTACT: Rouben Adalian
Phone: (202) 383-9009
E-mail: ani@agmm.org
Web: www.armenian-genocide.org

**MINNESOTA COURT RULES AGAINST CAFESJIAN AND IN FAVOR OF THE
ARMENIAN ASSEMBLY AND THE ARMENIAN GENOCIDE MUSEUM**
**Armenian Genocide Museum Proceeds to Phase Two Contracts**
**New Plans to Be Unveiled at Armenian Assembly Gala in Los Angeles**

Washington-October 31, 2007.  The U.S. District Court in Minnesota has granted a motion to
dismiss the lawsuit filed by Gerard Cafesjian and the Cafesjian Family Foundation against
the Armenian Assembly of America and the Armenian Genocide Museum and Memorial
(AGMM).  The lawsuit sought to rescind the grant agreement the Foundation had made with
the Assembly with respect to the Armenian Genocide Museum project, so that Cafesjian
could recover the substantially appreciated real estate.

At the same time, AGMM announced the signing of Phase Two contracts with the
architectural firm of Martinez & Johnson (www.mjarchitecture.com) and the museum
planning firm of Gallagher & Associates (www.gallagherdesign.com).  Architectural and
exhibit planning are proceeding on schedule and the museum is slated to open before 2011.

In a statement issued today, the Armenian Assembly and the AGMM said: "We regret that
Gerard Cafesjian has filed these lawsuits and is now attempting to try the case in the
press.  We appreciate the Minnesota court's ruling in our favor to dismiss the lawsuit, and do
not expect any court to accept the misrepresentations promoted to stop or cloud the
completion of the museum.

Cafesjian formally abandoned the project in 2006 demanding return of appreciated real
estate.  This left the other trustees with serious problems, including unpaid taxes, leaking
roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and
compliance problems with other donors' gifts, all of which left in tatters a project that the
Armenian-American community strongly endorsed and wants completed.  Unbeknownst to
the other trustees, the District of Columbia had reclassified the properties.  In early 2007,

after flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy and after legal review, Cafesjian and John Waters were suspended from the Assembly board. Cafesjian's formation of his personal lobbying organization, USAPAC, has caused additional damage.

In May 2007, at a properly noticed meeting with a quorum, the trustees voted to proceed with the project expeditiously. Cafesjian's appointed trustee and long-time employee, John Waters, attended the meeting despite his conflict of interest, but refused to account or report on basic corporate and financial matters, in a clear breach of fiduciary duties, interested only in Cafesjian's attempts to extract the appreciated real estate. Waters voluntarily left when he could not get his way, leaving the meeting with a quorum and the authority to proceed. According to the recording (made without objection) of the meeting and the transcript, Waters stated the following as he departed:

> 'Anything that you do from this point forward, you can consider it to be a quorum if you like, because it says that it is. Anything you vote on, you can do whatever you want, but. . .anyway. . .My participation in this meeting is over.'

In a series of front page stories in *The Armenian Reporter*, a newspaper which he controls, Cafesjian and his staff have spared no effort in disparaging the project, the Assembly, and other community members, with no regard to journalistic ethics. Cafesjian has filed legal proceedings characterized as frivolous, including one against the museum, and the other trustees, Anoush Mathevosian, Hirair Hovnanian, and Van Krikorian, personally. Yet the facts, confirmed by records made available after Cafesjian abandoned the project, are that Cafesjian acquired the properties adjacent to the intended museum building to construct a monument to himself in the form of a "Cafesjian Museum," which would dwarf the Armenian Genocide Museum. (See the attached drawing commissioned in secret). Only when his attention turned elsewhere, he transferred the properties to AGMM. Taking control of AGMM, he failed to fund the project, mismanaged development, resigned, and abandoned the properties and project in 2006.

*The Armenian Reporter* also failed to inform the public that the Assembly and AGMM have filed papers with the American Arbitration Association in a good faith effort to reach an amicable conclusion without making a public spectacle. Cafesjian has rejected this offer of mediation and filed in court to stop the American Arbitration Association from proceeding. Upon the Minnesota District Court's decision to dismiss, the AGMM and Assembly renewed the offer for mediation to Cafesjian attorneys and again was rebuffed.

Once more we want to thank the people who have supported our efforts to date and who continue to express confidence in the museum project, despite the litigation unnecessarily started by Cafesjian. No court will sanction the windfall profit return of appreciated property to the Cafesjian Foundation or derail the process of completing the Armenian Genocide Museum. The other museum trustees and stakeholders sincerely wish that Cafesjian had not

embarked on his misleading and destructive course of action in public and hope that he will reconsider and resolve the matter responsibly.

The Armenian Genocide Museum trustees and the Armenian Assembly are looking forward to unveiling the magnificent designs developed by our two outstanding planning firms this weekend at the Assembly's 35th Anniversary Gala event in Los Angeles.  Remarkable progress has been made in the last three months.

**Editor's Note: Photograph attached.**



AGMM and Gerard L. Cafesjian Museum of Contemporary Art:
Washington, DC

OPTION 4A: PERSPECTIVE VIEW
31 AUGUST 2000

**Caption:** AGMM Building and proposed Cafesjian Museum.

NR#2007-002

# EXHIBIT 8

**From:** ani <ani@agmm.org>
**Date:** April 12, 2008 2:24:24 AM CDT
**To:** Armenian News Network <groong@usc.edu>
**Subject: AGMA: Minnesota Fed Court Confirms Dismissal of Cafesjian Lawsuit**
**Reply-To:** Armenian News Network <groong@usc.edu>

Armenian Genocide Museum of America
1140 19th Street, NW, Suite 600, Washington, D.C. 20036
Phone: 202-383-9009; E-mail: ani@agmm.org;
Web: www.armeniangenocidemuseum.org


PRESS RELEASE
Rouben Adalian
April 11, 2008
Phone: (202) 383-9009
Web: www.armeniangenocidemuseum.org
E-mail: ani@agmm.org


MINNESOTA FEDERAL COURT CONFIRMS DISMISSAL OF CAFESJIAN LAWSUIT IN FAVOR
OF THE ASSEMBLY AND THE ARMENIAN GENOCIDE MUSEUM

Washington-On March 31, 2008, the U.S. District Court in Minnesota confirmed the October 2007 ruling to dismiss the first lawsuit filed by Gerard Cafesjian and the Cafesjian Family Foundation against the Armenian Assembly of America and the Armenian Genocide Museum and Memorial, Inc.

The dismissal of Cafesjian's lawsuit came within a week of the milestone approval obtained by the museum project from the District of Columbia Historic Preservation Review Board and the endorsements by DC community-based organizations.  Rapid progress continues toward the opening of the museum, which is slated for 2010.

The lawsuit filed by Cafesjian in April 2007 sought to rescind the grant agreement his Foundation had made with the Armenian Assembly with respect to the Armenian Genocide Museum project, so that Cafesjian could recover substantially appreciated real estate.  Subsequent filings and press attacks by Cafesjian were similarly intended to scuttle the building of a genocide museum.
Cafesjian formally abandoned the project demanding return of appreciated real estate, leaving behind unpaid taxes, an unpaid mortgage, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts,

all of which left the project in tatters.

Despite additional lawsuits filed by Cafesjian in Minnesota and the District of Columbia in an effort to obstruct the museum project, no court to date has ruled in Cafesjian's favor or hindered the rapid progress registered.  The dismissal in Minnesota allows Cafesjian to try again in the District of Columbia if he chooses, but in a filing dated April 1, 2008, Cafesjian has apparently appealed the Federal Court decision to the Eighth Circuit Court of Appeals.  At the same time, the Armenian Assembly has repeatedly called upon Cafesjian to resolve differences in private through mediation.

NR#2008-02